## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SAMUEL G. BREITLING AND** | § | |
| **JO ANN BREITLING,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:14-cv-3322-M** |
| | § | |
| **LNV CORPORATION, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTIONS TO
### RECOMMENDATION AND BRIEF IN SUPPORT

---

Now come Plaintiffs, self represented, and state as follows:

We find that the arguments presented by Defendant's LNV, MGC, DMI and C&S for removal to this court have not substantially changed and we think the recommendations of Magistrate Judge David L. Horan are well substantiated.

We concur fully with Defendant Tillery's Response to Removing Defendants' Objections to the Magistrate's Findings and Recommendation. As pro-se litigants we could not have hoped to do as good a job of dispelling the removing Defendants' three specific objections to the Magistrate's findings based on their erroneous assumptions that the Court may not consider matters beyond Plaintiffs' Petition, that they have failed to demonstrate that Judge Tillery is a nominal defendant in this matter, and Defendant Tillery is not a fraudulently misjoined party. We accept and concur with the Attorney General's arguments and memorandum of law in support of those arguments

and we agree with his conclusion that the removing Defendants' objections to the Magistrate's Findings and Recommendations should not be sustained.

We do however have one grave Constitutional concern we want to be sure is addressed whether by this Court or by the State court, and as pro-se litigants we do not know how to proceed because we believe these Constitutional questions have a significant public interest and are ripe for a Supreme Court decision to set a universal precedence as to the specific Constitutional matters in our case that are shared by millions of other homeowners across our country; and specifically with five other victims of D. Andrew Beal's MGC and LNV, Defendants named herein.

Defendants MGC and LNV use LPS "foreclosure mills" and its sub-servicer,  Defendants DMI and C&S both operate under the Lender Processing Services "LPS" umbrella.  Depositions in the cases of other Beal victims in other federal District Courts specifically depositions of MGC employee Brett Maloney provide ample evidence that MGC (Beal) employees, as well as the LPS agents used by Beal's corporations such as Northwest Trustee Services in Oregon, and Defendant C&S here, use the "LPS Desktop" to manufacture their foreclosure related documents.  Other Beal victims, even those represented by counsel, have routinely experienced tactics that can only be described as abuse of judicial process by the LPS law firms Beal hires to perfect his foreclosures. Many Beal victims who are currently representing themselves pro-se once had attorneys who started out winning for them. But the continual onslaught of motions to dismiss or motions for summary judgment from the Beal Entities' LPS counsel and their continual delays in producing evidence requested during discovery often stretching into years such as with our case either financially drained homeowners so they could no longer afford to

pay attorney fees or their attorneys quit out of sheer frustration. (One of my attorneys actually broke down in tears in mediation and said she just couldn't take it anymore.)

Then you have Law Firms, like the Lane Law Firm in our case, that take homeowners' money and mislead us as to what they will do for us.  In our case, the person I thought was our attorney, Greg Tidmore, turned out to not even be an attorney but a "sales person" for the firm.  Law Firms that scam homeowners are at epidemic proportions due to the huge demand for such legal services.  When law firms advertise that they help homeowners in foreclosure and they instead treat all cases with the same cookie cutter approach they harm their clients.  (See Exhibit A: Huffington Post Article: "Lawyers Are Now The Driving Force Behind Mortgage Scams")

Two other Beal victims, Catherine Gebhardt in Tennessee (LNV v. Gebhardt, Case No. 3:12-CV-468-TAV-HBG, U.S. District Court Eastern District of Tennessee  at Knoxville) and Kelly Randle in California (Kelly Randle et al v. LNV Corporation et al; Case No. 5:14-cv-02280, California Central District Court) were left to fend for themselves after attorneys actually sabotaged their cases.  Kelly Randle hired an attorney named John Vargus (CA Bar Number: 270181) who was sanctioned by the California Bar and was not supposed to be practicing law, she did not know this.  He took her money and failed to appear at a hearing, she consequently lost a stay on a foreclosure action allowing Defendant LNV to sell her home and forcing her to fight eviction as a pro-se litigant. Vargus is currently being prosecuted and disbarred but it is too little too late to help Kelly.

Cathy Gebhardt was sued by LNV in Federal Court on a breach of contract action and ultimately had to self represent after two attorneys who apparently were working in collusion with each other set her up for a kill by LNV, so to speak.  District Judge Thomas Varlan and Magistrate

Judge Bruce Guyton granted LNV a summary judgment against the overwhelming evidence of fraud that included Cathy's signature being electronically forged on an note LNV claimed was the original yet it does not match the note in Cahty's possession – numerous other forgeries and false signatures as well as fraud in the origination of her mortgage and a party to that origination has already been criminally convicted.  The Judge's own language in his summary judgment order states "it appears" and "it is uncertain" in reference to the chain of title.

In Cammy Depew's case in Louisiana (Depew v. LNV Case No. 14-284-SDD-RLB U.S. District Court Middle District of Louisiana) the LPS attorney representing LNV, Dean Morris Law Firm, intentionally added the "with prejudice" clause on a dismissal for improper pleadings which ultimately resulted in her home being sold by LNV to LNV in a foreclosure sell.  She was eventually able to have this judgment corrected and finally figured out how to write an original petition. As soon as she filed it LNV removed the case to Federal court where they knew she would be terribly disadvantaged.  She was carrying for five small grandchildren and did not have a car at her disposal so it was a severe hardship to have to travel to the federal court for filing and she was intimidated by having to learn federal rules when she had just begun to understand the State rules.  Ultimately the federal case was dismissed with prejudice because she failed to file an amended complaint in time.  She and her daughters and grandchildren were recently evicted causing them horrific pain and suffering.

Counsel, Locke Lord, for the Removing Defendants here are also the counsel representing LNV in Kelly Randle's case and in Cammy Depew's case.  Two other cases that were dismissed with prejudice and should not have been are in Oregon (Subramaniam v. Beal et al, U.S. District

Court District of Oregon Portland Division, Case# 3:12-CV-1681) and Robynne A. Fauley v.

Washington Mutual Bank et al (including LNV) Case No. 3:13-cv-00581-AC.

The common matters to all these cases is that in all cases identified herein the homeowners

whether Plaintiffs or Defendants in their respective court cases with LNV were or are now self-

represented; and in all these case the foreclosure mill used by LNV was an LPS Service provider;

DMI was also involved as a sub-servicer for LNV in all the cases, and the deed assignments,

allonges and other mortgage and foreclose related documents contained forgeries, false

signatures and false statements contain stamps or other statements identifying them as being

produced by LPS and/or the parent of LPS or a subsidiary of LPS and they are:

1.  Consistent with the criminal means and methods indentified by the United States in their
    criminal conspiracy conviction of Lorraine Brown (See: Plaintiffs' Motion for Judicial
    Notice of Information and Criminal Indictment and Plea Agreement of Lorraine Brown
    [Doc. 34: pages 12 – 14 and page 16])

2.  Consistent with a pattern of such acts of conspiracy to defraud specific to the enterprise
    vehicle, LPS, used by Brown in the commission of her crimes as indentified by the
    United States in their criminal conspiracy conviction of her: "DocX was re-branded as
    'LPS Document Solutions, a Division of LPS.' Following the spin-off, Brown was the
    President and Senior Managing Director of LPS Document Solutions. At all times
    relevant to this Information, Brown was the chief executive of the DocX / LPS
    operations."  (See [Doc. 34 pages 2, 8 and 9])

3. Consistent with a pattern of such fraudulent acts judicially determined as fact specific to Beal forging the signature of 81-year-old Kay Sarich to make it appear she had signed a note when she had not. (See: Exhibit B attached hereto: page 12 highlighted sections.)

4. Consistent with judicially determined facts specific to the propensity of LNV and MGC's owner D. Andrew Beal to:

   a. create shell corporations for sham tax shelters,
   b. to deceptively withhold evidence from government regulators, investigators and the courts,
   c. to pay witnesses well to say what he wants them to say.  (See: Exhibit C attached hereto: highlighted sections through-out document.)

THEREFORE we are all victims of the crimes of Lorraine Brown.  The LPS service providers identified herein are still committing the same crimes, using the same manner and means used by Brown in the commission of her crimes.  The United States has already proved the criminal conspiracy exists.  The United States identified unnamed co-conspirators in their indictment and conviction of Brown. The United States identified LPS as the corporate or enterprise vehicle through which Brown committed her crimes.  D. Andrew Beal's Beal Bank (a business enterprise under his direct control as the sole owner) has been judicially determined to have forged a signature on a note which is consistent with the crimes of Lorraine Brown.  Any reasonable person would conclude that the removing Defendants in this case LNV, MGC, DMI and C&S (also parties in the other cases named herein) are the unnamed co-conspirators identified by the United States in its criminal conviction of Brown.

As such we, the Plaintiffs in the present case and the other Beal victims named herein, ask why so many courts at both the State and Federal levels routinely dismiss or order summary

judgments against homeowners, like us, who are victims of the crimes of Lorraine Brown and her co-conspirators?

Some courts seem to understand that complete chain of title is the cornerstone of American democracy, and that due process means all parties have a right to be heard, but many other courts do not.  We, as a nation, need a Supreme Court precedence regarding cases like ours.

As such we request that the homeowner Beal victims named herein, Cathy Gebhardt, Kelly Randle, Cammy Depew, Robynne A. Fauley and Denise Subramaniam, be permissively enjoined as parties (Plaintiffs) under Federal Rule 20(a)(1) specific to the Constitutional Questions raised by this matter because we assert a right to injunctive relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and we and our Federal court cases share a common question of law or fact common to all plaintiffs will arise in the action.

The doctrine of unclean hands these Beal parties from judicial relief.

_____          _____
JoAnn S Breitling                                          Samuel G. Breitling

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was

served upon all counsel of record and pro-se parties via the Court's CM/ECF system, regular

mail, and/or certified mail, return receipt requested n this 17th day of October 2014.


/s/ JoAnn Breitling
_____

Self Represented

# Plaintiffs' Exhibit A

**Huffington Post Article: "Lawyers Are Now The Driving Force Behind Mortgage Scams"**

**This article outlines the same type of abuses that Lane Law Firm perpetrated on the Plaintiffs in the present case as per their open letter to the court filed on**

http://www.huffingtonpost.com/2014/06/09/mortgage-scams_n_5438743.html

# Lawyers Are Now The Driving Force Behind Mortgage Scams

Posted: 06/09/2014 7:39 am EDT Updated: 06/13/2014 1:59 pm EDT

From the very first day she was allowed to speak with clients at her new law firm job, Michele Stephens wondered if she was doing something unethical. By the time she quit, nearly a year later, she no longer had any doubt about it. "I was told to lie again and again," she said.

Stephens claims she took part in what consumer groups and federal regulators say is an especially ruinous scam, directed by lawyers, meant to defraud desperate and broke homeowners.

Reading from a six-page script, Stephens told hundreds of clients solicited by The Hoffman Law Group of Palm Beach, Florida, that the firm was suing banks on their behalf, seeking compensation for mortgage abuses. This aggressive litigation was all made possible, she would say, by the fees homeowners paid to support the cases – $6,000 up front, plus $495 a month.



*Vadim Govorov, a Staten Island homeowner, claims he paid $6,000 to Hoffman Law fund a lawsuit that had no chance of success. (Damon Dahlen/The Huffington Post)*

"We want to 'make you whole' ... to get you back to where you should've been had the lenders not engaged in those shenanigans," the script says, according to a copy Stephens shared with The Huffington Post. "We don't think it will be difficult to convince a judge or a jury of the reasonableness of our position."

But the lawsuits eventually filed by the firm lacked many of the most basic required elements, such as detailed information about each client's situation. The strategy never had a shot at accomplishing what was promised, Stephens said she eventually determined. It wasn't long before judges began tossing the cases out of court.

Stephens maintains the operation at Hoffman Law was a fraud from the outset. Though her allegations have not been proven, her account, also described in letters she wrote to many state attorneys general, offers rare insight into the inner workings of a firm that has drawn the scrutiny of judges and state investigators.

The final straw, Stephens said, came when she spoke to a client who told her she was surviving on oatmeal to afford the fees. "It was all a load of crap," Stephens said.

The foreclosure epidemic that swept the U.S. after the financial crash has ebbed, but the business of preying on struggling homeowners remains a thriving concern. Since 2010, more than 40,000 homeowners have complained they were scammed by someone promising to offer foreclosure assistance or help them with a mortgage modification, according to an analysis of calls to the HOPE hotline, a resource for struggling borrowers.

The most costly of these foreclosure rescue scams -- and now the most pervasive -- involve or are directed by attorneys, according to the analysis, which was conducted by the Lawyers' Committee for Civil Rights Under Law, a group that helps monitor the hotline.

Last year, nearly 60 percent of all complaint calls to the HOPE hotline involved a lawyer, the group found. That's up from 40 percent in 2010. The average loss claimed in schemes involving or directed by lawyers was $3,601 -- about $800 more than in other types of deceptions, according to the analysis.



The schemes exploit the needs of untold thousands of people who have tried to refinance their mortgage under a government-sponsored program like the Home Affordable Refinance Program (HARP), only to be met with endless and costly frustrations -- including issues like lost paperwork and overcharges that in some cases have led to wrongful foreclosures. A recent report by the California Reinvestment Coalition found that banks continue to make foreclosure-related mistakes, despite many pledges of reform.

In phone calls and direct mailings, lawyers claim they can help. "We have special relationships with banks that can speed up the approval process," reads one such ad, cited by the Federal Trade Commission in a bulletin warning against such offers.

Recruiting clients to sue banks as a group is a variation on this scheme. Lawyers promise these "mass joinder" lawsuits will force banks to stop foreclosures and cut loan balances. Some borrowers have even been told they could walk away with the title to their home, free and clear of any debt. All of this could happen in a matter of months, the attorneys claim.

But such claims are bogus, advocates warn. "Run away as fast as you can" if approached to participate in such a case, said Linda Mullenbach, an attorney at the Lawyers' Committee.

Valid mortgage fraud cases are filed only after extensive research into often messy and confusing mortgage documentation. They typically take years to reach a conclusion.

Federal prosecutors recently charged seven people, including one lawyer, with operating a mortgage modification scam outfit on Long Island that cost homeowners $2.3 million. But such frauds otherwise haven't attracted much scrutiny from law enforcement officials, who have signaled they have more pressing priorities. The Federal Bureau of Investigation has consistently ranked mortgage fraud as the lowest priority criminal threat, according to a recent report by the Justice Department inspector general.

Such negligence has let schemes fester, consumer advocates warn. The uptick in involvement by attorneys, who are being recruited to front what are essentially marketing operations, adds an extra wrinkle, making it even more difficult for prosecutors, and homeowners, to sniff out scams.

According to Stephens, the real power at Hoffman Law is a former mortgage broker named Michael Harper.

Harper is not an attorney, Stephens said. (He is not licensed to practice in Florida, according to the state bar, and his name does not appear in any national register of lawyers.) According to Florida public records, he has started several businesses that promise "lead-generation" services -- meaning getting lists of people who might be susceptible to a certain type of sales pitch. He recruited Hoffman Law, Stephens claims, to front an enterprise that would use such lists to identify and recruit clients to sue banks. The Florida Bar Association issued an alert last year warning against such arrangements.

Attempts to contact Harper through Hoffman Law were not successful.

Stephens claims the firm failed to offer the most rudimentary legal assistance to its clients. The firm's website touted her as a foreclosure expert, she said, when in reality she was a recent law school graduate with hardly any experience at all.

Over time, her client list swelled to 350 people in dozens of states, even though she was told she would be representing just those from her native Kentucky, where she is licensed to practice, she said. (It's not clear if Stephens violated any rules in doing so, though at least one state legal association is investigating the arrangement.)

When she asked her supervisors what to tell clients about the status of their cases, she was put off. "The answer was always that it will take 30 to 60 more days," she said she was told.

Vadim Govorov, a homeowner from Staten Island, New York, said he paid $6,000 to Hoffman Law to fund one such lawsuit, which was filed in Brooklyn federal court in October on behalf of 36 people.

Govorov, who is facing foreclosure, said he signed up after he received a call last spring from an operative at the firm. He said he was told a reduced-cost mortgage was all but certain if he agreed to join the case.

The lawsuit that bears Govorov's name accuses JPMorgan Chase and other banks of intentionally botching loan-modification applications. Five months later, in March, the firm abruptly withdrew the lawsuit. Until notified by his new attorney at a legal nonprofit, Govorov said he wasn't aware that the case was withdrawn. He hasn't gotten the refund he requested from the firm, he added.

All told, the Palm Beach firm has filed at least 32 such lawsuits, a HuffPost review found. The legal complaints contain nearly identical language and essentially no details about the individual plaintiffs -- a key requirement of a valid lawsuit. Almost all of these cases have been dismissed or withdrawn.

Joanna Seybert, a Brooklyn federal judge, wrote that one lawsuit, against Ocwen Loan Servicing, was "replete with legal conclusions and bare recitations of legal elements, rather than factual allegations."

In another instance, Isabel Solis, a homeowner in Las Cruces, New Mexico, wrote a letter to the court claiming that a Hoffman Law employee told her to stop making her modified mortgage payments to Bank of America -- and pay the firm instead. The judge forwarded the letter to the firm, calling its contents "disturbing."

Earlier this year, the Idaho Department of Finance issued a cease and desist order to Hoffman Law after an investigation concluded the firm was violating a state law that makes it illegal to use a bank's name in an advertisement -- in this case a direct mailing to homeowners promoting the law firm -- without consent. The Florida attorney general is also investigating the firm, a spokesman confirmed.

Marc Hoffman, the head of the firm, said in a brief phone conversation that he would try to arrange a conference call to answer questions about the allegations. He then sent an email asking that questions be submitted in writing, so that he could explain how his firm has been "seeking to alleviate through the courts the stresses that so many home owning consumers find themselves in with respect to their mortgages." He did not respond to subsequent emails. The phone at the firm has been disconnected.

Two Brooklyn attorneys who filed cases on behalf of Hoffman Law, Michael Herskowitz and Michael Lehrman, did not return calls left with their office.

Stephens said she's now being investigated by the New Mexico Supreme Court Disciplinary Board for allegedly practicing in the state without a license.

She quit in February to accept a lower-paying job as a paralegal. "I just couldn't do it anymore," she said of the alleged directive to tell people their cases were proceeding apace, as if nothing were amiss. "I've been a mom on food stamps. I know what it is like to struggle. I couldn't lie to those people."

# Plaintiffs' Exhibit B

**LNV v. Breitlings : Breitlings Motion for Judicial Notice of *Beal Bank, SSB v. Sarich, No. 05-2-11440-1SEA (King County Super. Ct. Sept. 8, 2006).*where it was judicially determined as fact that Beal (Beal Bank solely owned by D. Andrew Beal the owner of corporate Defendants MGC and LNV) forged the signature of 81-year-old Kay Sarich to make it appear that she signed the note when she had not.**

Cause No. DC-14-04053

| | | |
|---|---|---|
| LNV CORPORATION, | § | |
| ITS SUCCESSORS AND ASSIGNS, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| | § | DALLAS COUNTY, TEXAS |
| SAMUEL G. BREITLING, | § | |
| JO ANN BREITLING, | § | |
| GMAC MORTGAGE, INC., | § | |
| NORTHWEST MORTGAGE, INC., | § | |
| PINNACLE REALTY ADVISORS, INC., | § | |
| and PALISADES ACQUISITION V, LLC | § | |
| | § | |
| Defendants. | § | 134TH JUDICIAL DISTRICT |

# BREITLINGS' MOTION FOR JUDICIAL NOTICE OF A JUDICIAL DETERMINATION OF FACT THAT BEAL SWITCHED A NOTE TO MAKE IT APPEAR A WIFE SIGNED IT WHEN SHE HAD NOT

Now comes defendants Samuel G. and JoAnn S. Breitling representing themselves, pursuant to Texas Rules of Evidence 201 "Judicial Notice of Adjudicative Facts" and hereby requests this Court take Judicial Notice of the documents described herein and in support states as follows:

1. THE BREITLINGS move this Court to take judicial notice of:

*Beal Bank, SSB v. Sarich, No. 05-2-11440-1SEA (King County Super. Ct. Sept. 8, 2006) "The second page of the Term Note, dated September 24,2002, attached as Exhibit 2 to Beal Bank's Complaint for Judicial Foreclosure of Deeds of Trust, appears to be signed by Kay Sarich. CP 20. However, a copy of the actual September 24,2002 Term*

*Note obtained from the original lender (U.S. Bank) shows that Kay Sarich did not sign the note. CP 105. Beal Bank subsequently admitted switching the signature pages.*" (attached hereto as "Exhibit A".)

2.  The findings of fact in the ***Beal Bank, SSB v. Sarich*** case are relevant to our case because we claim and have shown with exhibits to our pleadings that counsel for LNV, Jeffrey Hardaway with Codilis & Stawiarski, has submitted to the court mortgage related documents in support of LNV's claims in its petition for foreclosure and to support their motion for summary judgment that contain forged and falsified signatures, as well as, false statements specific to the assigner/grantor and assignee/grantee on alleged assignments of deed of trust.  These assignments are what LNV claims give it legal standing to foreclose on our property.

3.  Under the Texas Rules of Evidence, judicial notice may be taken at any stage of the proceeding. Tex. R. Evid. 201(f). A "judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." See Tex. R. Evid. 201(b). The Court may take judicial notice of records of any court of record of the United States. A court shall take judicial notice if requested by a party and supplied with the necessary information.  A fact of which judicial notice can be taken is "a matter of evidence and knowledge on the part of courts which requires no formal proof." *Harper v. Killion, 162 Tex. 481, 348 S.W.2d 521, 523 (1961) (quoting Burtis v. Butler Bros., 148 Tex. 543, 226 S.W.2d 825, 830 (1950)).*

4. **THE BREITLINGS** move this Court to take Judicial Notice of the judicially discovered facts in this case as it shows that D. Andrew Beal's companies have a demonstrated propensity to misrepresent and falsify facts pertaining to mortgage related documents so they can confiscate property. This case further shows Beal's propensity to prey on the most vulnerable in our society, the elderly, without any sense of humanity or compassion for the destruction his actions cause to the lives of his victims. "*Defendants/Respondents Steve and Kay Sarich are Seattle residents. They have been married for nearly 60 years. Steve is 85 years old. Kay is 81. Their parents were Yugoslavian immigrants. With only a high school education, Steve and Kay worked together to build a successful business processing salmon eggs for fish bait. …In 2000 or 2001, Steve Sarich began showing signs of dementia. By the time of the summary judgment hearing, Kay and Steve were living in a rented apartment and Kay was struggling to care for Steve by herself. Steve's dementia had progressed rapidly and he was no longer able to be left on his own. Kay and Steve were unable to qualify financially for assisted living because Beal Bank's lawsuit threatened to wipe them out.*"

5. Furthermore the facts in the ***Beal Bank, SSB v. Sarich*** case demonstrate how victims like the Breitlings and the Sarichs are being denied due process and equal protections of the law. If any one of us had individually been found by a court to have deceptively "switched" a note to make it appear that someone signed it when they did not we would be sitting in a jail cell; but a when multi-billionaire like Beal uses his privately owned bank to forge and falsify a note, an Appellate Court reverses the District Court's decision based on briefs written to represent and further the interests of banks and financial institutions. ***Supreme Court of Washington, En Banc.; BEAL BANK, SSB, Appellant,***

*v. Steven and Kay SARICH; No. 79875-3, Decided: September 13, 2007* Amicus Curiae

on behalf of Washington Bankers Association, Amicus Curiae on behalf of Washington

Mortgage Lenders Association, Amicus Curiae on behalf of Washington Financial

League, Amicus Curiae on behalf of Washington Independent Community Bankers

Association, Amicus Curiae on behalf of Washington Credit Union League. "*We granted*

*Beal Bank's motion to transfer its appeal from the Court of Appeals.  We reverse the trial*

*judge's grant of summary judgment and hold, under Washington law, that the*

*"foreclosure" of a senior deed of trust does not extinguish the debt/obligation of any*

*junior lienholder or otherwise preclude an action to recover that debt.*" It doesn't matter

that Beal attempted to defraud the court by switching a note.  Something is terribly wrong

in America when courts allow such crimes to go unreported to authorities and

unpunished.

6.  Cases like this one are then used against other homeowners, like us, fighting fraudulent

foreclosures on our homes, with no concern for or acknowledgment of the fraud that

underpinned Beal's actions in the Sarich case and the many others across our country like

it.  The doctrine of unclean hands should have barred Beal from prevailing; yet the

Appellate Court seems to be blind to such fraud.  This blatant favoritism undermines

public faith in our judiciary and denies every American citizen of their Constitutional

right to due process and equal protection of law.  The judiciary itself has thus undermined

the most basic of our inherent rights which our forefathers sought to protect through the

enactment of our Constitution's Bill of Rights.

7.  The documents attached hereto as Exhibit "A" may be accessed online from PACER or through the King County Superior Court electronic filing system.

8.  Timely written notice of this request is hereby given by email and postal mail service upon Plaintiff's counsel as required by law.

WHEREFORE, pursuant to Texas Rule of Evidence 201 THE BREITLINGS move this Court to take Judicial Notice without hearing of judicially determined facts pertaining to the business practices of Daniel Andrew Beal, his privately owned Beal Bank and his other enterprise entities, including LNV Corporation and MGC Mortgage Inc., specific to their propensity to misrepresent and falsify facts pertaining to mortgage related documents; and of the propensity of the attorneys Beal hires to represent his enterprise entities, like Codilis & Stawiarski, that have demonstrated a pattern of producing such forged and falsified mortgage related documents with intent to deceive courts and who have a direct connection, as LPS Service Providers, to the computer systems and other means and methods created by convicted felon Lorraine Brown in the commission of her crimes, which are consistent with the activities of law firms like Codilis & Stawiarski; without hearing, and for such other and further relief as this Court deems just and proper under the circumstances.


JoAnn S Breitling                                          Samuel G. Breitling

**EXHIBIT A**

*79875-3*

No. 58927-0

COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION I

BEAL BANK, SSB, a Texas State Savings Bank,

Appellant,

v.

STEVEN and KAY SARICH, and the marital community comprised thereof; JOE CASHMAN and JANE DOE CASHMAN, and the marital community comprised thereof; and U.S. BANK NATIONAL ASSOCIATION #1000,

Respondents.

**BRIEF OF RESPONDENTS STEVE AND KAY SARICH**

HALL ZANZIG ZULAUF
CLAFLIN McEACHERN PLLC
Spencer Hall
WSB No. 6162
Janet D. McEachern
WSB No. 14450
1200 Fifth Avenue, Suite 1414
Seattle, Washington 98101
(206) 292-5900

BUSH STROUT & KORNFELD
Katriana L. Samiljan
WSB No. 28672
Gayle E. Bush
WSB No. 7318
601 Union Street, Suite 5500
Seattle, Washington 98101
(206) 292-2110
Attorneys for Respondents
Steve and Kay Sarich

# TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ASSIGNMENTS OF ERROR . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . .  3

      The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

      The Loans  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      First Loan (Washington Mutual) . . . . . . . . . . . . . .  5

      Second Loan (U.S. Bank)  . . . . . . . . . . . . . . . . . . . .  5

      Third Loan (U.S. Bank)  . . . . . . . . . . . . . . . . . . . . . .  5

      The Nonjudicial Foreclosure  . . . . . . . . . . . . . . . . .  7

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

A.    The Trial Court Correctly Ruled That Beal's
       Claims Are Barred By Washington Law  . . . . . . .  10

B.    The Trial Court Did Not Err By Denying
       Beal's Motion for Summary Judgment . . . . . . . . .  20

C.    The Trial Court Properly Awarded
       Attorneys' Fees To The Sariches  . . . . . . . . . . . . . .  25

D.    The Sariches Request An Award
       Of Attorneys' Fees On Appeal . . . . . . . . . . . . . . . .  30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

i

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

**Pages**

<u>DeYoung v. Cenex Ltd.</u>,
100 Wn. App. 885, 1 P.3d 587 (Div. 3, 2000) . . . . . . . . . . . 15-16

<u>Singleton v. Frost</u>,
108 Wn.2d 723, 742 P.2d 1224 (1987) . . . . . . . . . . . . . . . . 29, 30

<u>Washington Mutual Savings Bank v. United States</u>,
115 Wn.2d 52, 973 P.2d 969, clarified on denial of
reconsideration, 800 P.2d 1124 (1990) . . . . . . . . . . . . . . . 1, 2, 10,
11, 12, 13,
14, 15, 16,
19, 20

<u>**Statutes**</u>

**Pages**

RCW 4.84.330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

RCW 61.12.060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

RCW 61.24.040(1)(b)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

RCW 61.24.080(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

RCW 61.24.100(3)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

Washington Deed of Trust Act . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14,
17,

<u>**Other Authorities**</u>

**Pages**

59A C.J.S., Mortgages, §674, n. 26 (2006) . . . . . . . . . . . . . .   13

W. Stoebuck and J. Weaver, 18 <u>Washington Practice</u>,
Real Estate: Transactions, §20.17 (2006) . . . . . . . . . . . . . .  12-13

John D. Sullivan, "Rights of Washington Junior
Lienors in Nonjudicial Foreclosure – Washington
Mutual Savings Bank v. United States, 115 Wash. 2d
52, 793 P.2d 969, clarified, reconsideration denied,
800 P.2d 1124 (Wash. 1990)," 67 Wash. L. Rev. 235
(January 1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

## INTRODUCTION

This case involves claims by a self-professed "aggressive" Texas bank against an elderly Seattle couple based on two promissory notes that the Texas bank purchased at a discount as part of a package of troubled loans.  The promissory notes were secured by second and third deeds of trust on the borrowers' home.  When the senior lienholder commenced a nonjudicial foreclosure on the borrowers' home, the Texas bank failed to protect its position and squandered more than $400,000 in excess value in the collateral.

The Texas bank sought judicial foreclosure and a deficiency judgment against the borrowers.  After the nonjudicial foreclosure by the senior lienholder, the Texas bank continued to pursue its deficiency claims based on the promissory notes.  The bank moved for summary judgment.  The borrowers filed a cross-motion for summary judgment based on Washington Mutual Savings Bank v. United States, 115 Wn.2d 52, 793 P.2d 969, clarified on denial of reconsideration, 800 P.2d 1124 (1990).

The Honorable Douglas McBroom ruled that the Washington Mutual decision was controlling, granted the

1

borrowers' motion for summary judgment, and denied the bank's

motion for summary judgment.  In a later proceeding, Judge

McBroom granted the borrowers' motion for attorneys' fees.

The bank has appealed the trial court's summary

judgment rulings and award of attorneys' fees to the borrowers.

### ASSIGNMENTS OF ERROR

1.      Did the trial court err by dismissing Beal Bank's

claims based on controlling Washington law as stated in

Washington Mutual Savings Bank v. United States, 115 Wn.2d 52,

793 P.2d 969, clarified on denial of reconsideration, 800 P.2d 1124

(1990)?

2.      Did the trial court err by denying Beal Bank's

summary judgment motion where controlling law required

dismissal of Beal Bank's claims and where there were disputed

issues of material fact regarding the validity of the notes and the

amounts allegedly owed?

3.      Did the trial court err in awarding attorneys' fees to

the Sariches, where the Sariches obtained dismissal of all Beal

Bank's claims against them and Beal Bank submitted no evidence to

challenge the reasonableness of the Sariches' fees?

2

## STATEMENT OF THE CASE

### The Parties

Plaintiff/Appellant, Beal Bank, SSB ("Beal"), is a privately-owned "wholesale bank" with assets in excess of $2.1 billion.[1]  Beal, which is headquartered in Texas, buys and sells pools of loans and debt securities.  Beal openly promotes itself as an "aggressive" purchaser of distressed loans.[2]  Beal demonstrated its aggressiveness in this action by suing on an altered promissory note.  Beal switched the signature page on one of the notes to make it appear that Kay Sarich signed the note when, in fact, she did not.[3]

Defendants/Respondents Steve and Kay Sarich are Seattle residents.  They have been married for nearly 60 years.  Steve is 85 years old.  Kay is 81.[4]

Steve and Kay grew up in the Seattle/Tacoma area.

---

[1] Information regarding Beal is taken from its website: www.bealbank.com.
[2] Id.
[3] The second page of the Term Note, dated September 24, 2002, attached as Exhibit 2 to Beal Bank's Complaint for Judicial Foreclosure of Deeds of Trust, appears to be signed by Kay Sarich.  CP 20.  However, a copy of the actual September 24, 2002 Term Note obtained from the original lender (U.S. Bank) shows that Kay Sarich did not sign the note.  CP 105.  *Beal Bank subsequently admitted switching the signature pages.*  *See* Letter from Nancy L. Isserlis to Katriana Samiljan and Spencer Hall, dated June 28, 2006.  CP 238-39.
[4] Declaration of Kay Sarich dated June 26, 2006 ("Sarich Declaration"), ¶¶2 and 5.  CP 90-91.

Their parents were Yugoslavian immigrants. With only a high school education, Steve and Kay worked together to build a successful business processing salmon eggs for fish bait. In the mid-1980's, Steve and Kay sold the business. Kay became a full-time homemaker. Steve continued to work in investment financing. He stopped working approximately ten years ago.[5]

In the late 1990's, the Sariches suffered financial setbacks which required them to liquidate nearly all their assets at a steep loss.[6]

In 2000 or 2001, Steve Sarich began showing signs of dementia.[7] By the time of the summary judgment hearing, Kay and Steve were living in a rented apartment and Kay was struggling to care for Steve by herself.[8] Steve's dementia had progressed rapidly and he was no longer able to be left on his own.[9] Kay and Steve were unable to qualify financially for assisted living because Beal Bank's lawsuit threatened to wipe them out.[10]

---

[5] Sarich Declaration, ¶3. CP 90-91.
[6] Sarich Declaration, ¶4. CP 91.
[7] Sarich Declaration, ¶4. CP 91.
[8] Sarich Declaration, ¶5. CP 91.
[9] *Id.*
[10] *Id.*

Following Judge McBroom's summary judgment rulings, the Sariches were able to move into an assisted living facility where Steve is now receiving the full-time care that he needs.

## The Loans

**First Loan (Washington Mutual).**  On June 25, 2001, Steve and Kay Sarich borrowed approximately $1.6 million from Washington Mutual Bank.[11]  The Washington Mutual loan was secured by a first deed of trust on the Sariches' home, a Queen Anne condominium on Highland Drive.[12]

**Second Loan (U.S. Bank).**  On September 26, 2001, Steve and Kay Sarich signed a promissory note with U.S. Bank for a line of credit in the amount of $344,600.79.[13]  The line of credit was secured by a second deed of trust on the Sariches' home.[14]

**Third Loan (U.S. Bank).**  On September 24, 2002, Steve Sarich and Joe Cashman, a business acquaintance, entered

---

[11] CP 148-51.
[12] *Id.*
[13] CP 102-03.
[14] CP 26-34.

into a Term Loan Agreement with U.S. Bank.[15]  In connection with

the loan, Steve Sarich and Joe Cashman signed a $420,000 Term

Note.[16]  The loan was secured by a third deed of trust on the

Sariches' home.[17]  Kay Sarich was not a party to this loan.[18]

Steve Sarich already was showing signs of dementia

at the time of these loan transactions.[19]

On September 24, 2003, U.S. Bank assigned its second

and third deeds of trust on the Sariches' condominium to Beal,

together with the underlying obligations.[20]  Beal asserts in its brief

that "The condominium was not the personal residence of the

Sarichs."[21]  That is not true.  The bank's own records show the

Sariches' address as the Highland Drive condominium.[22]  When

Beal's attorneys made a formal demand for payment prior to filing

this lawsuit, the letter was sent by certified mail to the Sariches at

_____

[15] CP 113-18.
[16] CP 104-06.
[17] CP 35-44.
[18] CP 104-06 and 113-18.  *See also* Letter from Nancy L. Isserlis to Katriana Samiljan and Spencer Hall, dated June 28, 2006.  CP 238-39.
[19] Sarich Declaration, ¶4.  CP 91.
[20] CP 45-48.
[21] Appellant's Opening Brief, p. 3.
[22] *See, e.g.,* CP 283.

the condominium on Highland Drive.[23]

Beal has refused to disclose the amount it paid for the Sariches' notes.  However, in a Rule 30(b)(6) deposition, Beal's representative testified that it wouldn't surprise him if Beal Bank paid as little as 10 or 20 cents on the dollar for the loans.[24]  Beal's records show that it received more than $260,000 in payments before declaring the Sariches in default.[25]  Even at 20 cents on the dollar, Beal already has received substantially more than it paid for the loans.[26]

### The Nonjudicial Foreclosure

The Sariches were unable to repay the loans from Washington Mutual and U.S. Bank.

Beal declared the Sariches in default in January 2005.[27]  On April 5, 2005, Beal filed the action below, seeking a judicial foreclosure and deficiency judgment against the Sariches.[28]

The senior lienholder, Washington Mutual, elected to

---

[23] CP 124.
[24] Rule 30(b)(6) Deposition of Beal Bank (Ronald Bret Beattie), dated August 21, 2006 ("Beal Bank Deposition"), p. 98, lines 10-23.  CP 249.
[25] CP 206-07.
[26] Assuming Beal Bank paid 20 cents on the dollar for the loans, Beal paid approximately $152,920.  [.2 x ($344,600 + $420,000) = $152,920].
[27] CP 124-25.
[28] CP 4-13.

proceed with nonjudicial foreclosure.  Washington Mutual sent a

Notice of Default to the Sariches on July 25, 2005,[29] followed by a

Notice of Trustee's Sale on August 25, 2005.[30]  The trustee's sale

was scheduled to take place on December 2, 2005.[31]

Beal knew that the Sariches' condo was worth

substantially more than Washington Mutual's lien of $1.6 million.[32]

According to King County, the appraised value of the Sariches'

condo was approximately $2.5 million as of August 2004.[33]  Beal's

internal records show that Beal valued the condo at $2.25 million.[34]

Prior to the trustee's sale, Beal assured the Sariches

that it would pay off the senior lien and purchase the condo at the

foreclosure sale.[35]  Beal's attorney wrote to the Sariches' attorney,

stating:

> My client is making the necessary
> preparations to pay off the Washington
> Mutual Bank lien, and any lien associated

---

[29] CP 145-46.
[30] CP 148-51.
[31] CP 148.
[32] Beal Bank's internal Asset Review as of December 31, 2003 shows that the property was appraised at $2.5 million in July 2001.  CP 284.  Beal knew in September 2005 that King County had assessed the value of the condo at $2,487,000.  CP 292.
[33] CP 141.
[34] CP 284.
[35] Letter from Nancy Isserlis to Gayle Bush, dated November 3, 2005.  CP 153-54.

> with the Homeowners Association in
> anticipation of the sale on December 2,
> 2005.
>
>        \* \* \*
>
> I have prepared a Confirmation of Joinder
> of Parties Claims and Defenses and
> indicated to the court that there is a
> pleading still to be filed, which is your
> answer, and that we would request that
> this matter be continued for 30 days based
> on the fact that after December 2, 2005,
> two of the parties will be eliminated from
> the case because those liens will be paid.[36]

The Sariches expected the excess value in their condo to be applied

to the amount owed to Beal.[37]

Contrary to its announced plan, Beal decided not to

pay off the Washington Mutual lien and made no attempt to

protect its position by purchasing the property at the foreclosure

sale.[38] Washington Mutual completed the nonjudicial foreclosure

by purchasing the condo for $1,648,630 in January 2006.[39] Two

months later, Washington Mutual sold the condo for $2,050,000.[40]

Inexplicably, Beal chose to turn its back on *at least*

---

[36] *Id.*
[37] Sarich Declaration, ¶7.  CP 91.
[38] Supplemental Affidavit of David Wall, dated August 28, 2006 ("Supplemental Wall Affidavit"), ¶12.  CP 336.
[39] CP 156.
[40] CP 158.

$400,000 that it could have obtained by purchasing the Sariches'

condo at the foreclosure sale.  Beal then sought a deficiency

judgment against Steve and Kay Sarich in direct contravention of

Washington law.

## ARGUMENT

### A.    The Trial Court Correctly Ruled That Beal's Claims Are Barred By Washington Law

Judge McBroom dismissed Beal Bank's claims

pursuant to a Washington Supreme Court decision construing the

Washington Deed of Trust Act.  There is Washington law squarely

on point.  No other law needs to be considered.  Beal Bank's

arguments based on other statutes and other states' laws do not

change the fact that in Washington a nonjudicial foreclosure

eliminates the ability of *any* lienholder, including non-foreclosing

junior lienholders, to sue the debtor for a deficiency.

In Washington Mutual, supra, the Washington

Supreme Court, sitting en banc, held unanimously that a non-

foreclosing junior lienholder cannot sue a debtor for a deficiency

judgment after a nonjudicial foreclosure.  The Court flatly rejected

the parties' argument that the anti-deficiency provision of

10

Washington's Deed of Trust Act should apply only to a foreclosing

lienholder.  The Court explained:

> We conclude that there is no authority
> in Washington law for allowing **any**
> lienholder to sue for a deficiency
> following a nonjudicial foreclosure sale.
>
> \* \* \*
>
> Washington law provides that no
> deficiency judgment may be obtained when a
> deed of trust is foreclosed. . . .  The parties
> argue that the statutory bar to deficiency
> judgments following nonjudicial foreclosures
> applies only to foreclosing lienholders and
> not to a nonforeclosing junior lienholder who
> purchases the property to protect its lien at a
> nonjudicial foreclosure sale.
>
> \* \* \*
>
> **We do not deem it necessary to determine
> how a deficiency judgment should be
> measured in this case since we hold here
> that none may be obtained by a
> nonforeclosing junior lienor following a
> nonjudicial foreclosure sale.  There is
> simply no statutory authority for allowing
> such a judgment following a nonjudicial, or
> deed of trust, foreclosure.**

Washington Mutual, 115 Wn.2d at 55 and 58, 793 P.2d at 970 and

972 (emphasis added).  In addition to the Court's opinion, there is a

concurrence from Justice Guy and, a few months later, an Order

Clarifying Opinion and Denying Motion for Reconsideration,

Washington Mutual, 800 P.2d 1124 (1990), that have been the

11

subject of commentary.

The Court's holding in <u>Washington Mutual</u> is widely acknowledged to mean that a junior lienholder cannot sue on its note after the foreclosure of a senior lienholder.  For instance, the <u>Washington Practice</u> treatise states:

> [I]n *Washington Mutual Savings Bank v. United States* the Supreme Court of Washington held, as a necessary part of its decision, that nonjudicial foreclosure of a senior deed of trust bars a junior lienor from thereafter recovering the unpaid balance of his debt.  Since the senior's foreclosure extinguishes his security, he has lost both obligation and security. . . . The court expressly said that foreclosure precludes junior lienors from pursuing a "deficiency."  Later, in an addendum labeled a "clarification," the court said its decision did not "address the matter of a junior deed of trust holder's continued right to sue the debtor on the promissory note."  Since a suit "on the promissory note" is synonymous with a suit for "deficiency," the "clarification" only adds confusion.

> Obviously, either the Washington State Supreme Court or the state legislature needs really to "clarify" the *Washington Mutual* decision.  Taken literally, it means that the holder of every lien junior to a deed of trust in Washington, which of course includes many commercial lenders, must buy at the trustee's sale or lose everything.

W. Stoebuck and J. Weaver, 18 <u>Washington Practice</u>, Real Estate:
Transactions, §20.17 (2006).

The legal encyclopedia <u>Corpus Juris Secundum</u> cites
<u>Washington Mutual</u> for the rule in Washington that "No deficiency
judgment may be obtained by a nonforeclosing junior lienor
following a nonjudicial foreclosure sale." 59A C.J.S., Mortgages,
§674, n. 26 (2006).

At the trial court and on appeal, Beal Bank has relied
on a law review article written about the <u>Washington Mutual</u>
decision and the subsequent clarifying opinion.[41] The law review
article expresses concerns about the potential impact of the Court's
decision on lenders, but agrees that the rule of law is as applied by
Judge McBroom. The abstract at the beginning of the article states
unequivocally:

> In *Washington Mutual Savings Bank v. United
> States*, the Washington Supreme Court
> extended the anti-deficiency provisions of the
> Deed of Trust Act to all non-foreclosing
> junior lienors. Because this decision makes
> all junior obligations uncollectible following a

---

[41] John D. Sullivan, "Rights of Washington Junior Lienors in Nonjudicial
Foreclosure — Washington Mutual Savings Bank v. United States, 115 Wash.2d
52, 793 P.2d 969, clarified, reconsideration denied, 800 P.2d 1124 (Wash. 1990),"
67 Wash. L. Rev. 235 (January 1992).

> nonjudicial foreclosure, it may have a chilling
> effect on lenders . . . . [42]

The author acknowledged that judicial or legislative action would

be necessary to change Washington law after the Court's decision in

Washington Mutual.  At the conclusion of his article, Mr. Sullivan

makes a plea for legislative action:

> The Washington Legislature should amend
> the anti-deficiency provisions specifically to
> exempt the non-foreclosing junior lienor.
> Section 61.24.100 of the Revised Code of
> Washington should be changed to read:
> "Foreclosure . . . shall satisfy the obligation
> secured by the deed of trust foreclosed, but
> not a lien or mortgage or trust deed junior to
> the one foreclosed . . .."

Sullivan, 67 Wash. L. Rev. at 254-55.

It has been 15 years since Mr. Sullivan wrote his law

review article.  Neither the Washington Supreme Court nor the

Washington legislature has deemed it appropriate or necessary to

change the ruling in Washington Mutual.

In 1998, the Washington legislature revised the

Washington Deed of Trust Act, without making any changes to

exempt a non-foreclosing junior lienholder from the anti-deficiency

---

[42] *Id.*

14

provisions of the act.  In fact, the 1998 amendments confirmed that

a deficiency judgment is permitted only under extremely limited

circumstances.  The statute permits such a judgment only when

specific misconduct by the debtor (causing waste to the property or

wrongfully retaining rents, insurance proceeds or condemnation

awards) has caused a decrease in the fair value of the property.

RCW 61.24.100(3)(a).  No such allegations are present here.

The Washington Mutual decision is controlling.  The

Washington legislature and the Washington Supreme Court have

left the decision unaltered for more than 16 years.  It has not been

criticized in any published decision of the Washington courts.  The

Court of Appeals has ruled only that the decision does not extend

to *judicial* foreclosures.  DeYoung v. Cenex Ltd., 100 Wn. App. 885,

1 P.3d 587 (Div. 3, 2000) (affirming denial of CR 60(b) motion).  In

DeYoung, the court explained:

> The DeYoungs incorrectly rely on
> *Washington Mut. Sav. Bank v. United States,*
> 115 Wash.2d 52, 60, 793 P.2d 969 (1990) to
> argue that Cenex, as a junior mortgagee,
> could not sue on the underlying promissory
> note because it exercised its statutory right
> of redemption on the property.  *Washington
> Mutual* concerned a non-judicial foreclosure

15

> of a deed of trust, rather than a judicial
> foreclosure of a mortgage.

DeYoung, 100 Wn. App. at 894-95, 1 P.3d at 593.  The DeYoung

court noted that in a judicial foreclosure, the borrower has the

opportunity to ask the court to set an upset price to protect any

excess value in the property.  DeYoung, 100 Wn. App. at 896, 1 P.3d

at 593.

In Washington Mutual, the Court addressed the

potential inequity illustrated so vividly in the present case.  In a

nonjudicial foreclosure, the collateral may be sold at any price.

There is no judicial determination of an upset price or fair value.  A

sale without these protections is fair to the debtor only if the

foreclosure extinguishes *all* debt secured by the collateral that is

sold.

Contrary to Beal's contention, the Washington Mutual

decision imposes no undue burden on lenders.  When a junior loan

is made, the junior lender knows the amount of the senior loan,

whether it is secured by a deed of trust, and the value of the

collateral.  When there is a senior deed of trust, the junior lender

knows that it may be limited to the value of the collateral, less the

16

senior debt, to satisfy the junior loan.  The junior lender determines how much it is willing to lend against the property in order to be adequately secured.  The junior lender can be as conservative or as aggressive as it likes.  Creditors can and do protect themselves by making certain that the value of the collateral fully secures their debt, by charging higher interest rates on loans secured by junior liens, and by protecting their position in foreclosure by purchasing the property.

In the event of a default, the senior lender can elect to proceed with a judicial foreclosure or a nonjudicial foreclosure.  In a nonjudicial foreclosure, the senior lender is required to provide notice of foreclosure to all junior lienholders.  RCW 61.24.040(1)(b)(ii).  The junior lender can then decide how to proceed.  The junior lender may await the outcome of the nonjudicial foreclosure and look to the excess proceeds of the foreclosure sale to satisfy its junior loan.  The Deed of Trust Act provides that the excess proceeds shall be deposited with the clerk of the court and liens eliminated by the sale shall attach to the surplus in the order of priority that they attached to the property.

RCW 61.24.080(3). The junior lender will be fully paid provided that the property is sold for fair market value and the junior lender exercised prudence in making the loan.

If the junior lender is concerned that the nonjudicial foreclosure sale initiated by the senior lender will not produce sufficient proceeds to pay both the senior loan and the junior loan, the junior lender may take steps to acquire control of the foreclosure process. Typically, the junior lender will acquire control of the process by purchasing the senior lender's position prior to any foreclosure sale. The junior lender then can decide whether to proceed on an expedited basis with a nonjudicial foreclosure, or take more time to conduct a judicial foreclosure and seek a deficiency judgment if necessary. If a junior lender is not prepared to deal with these options, it should not make a loan that is junior to an existing deed of trust.

Beal Bank certainly should not be heard to complain about its position. It was not the original lender. Beal Bank purchased the loans at a discount *after* they were in default.[43] Beal

---

[43] Beal Bank Deposition, p. 98, lines 10-23. CP 249.

18

could have protected its position by purchasing the property at foreclosure. Beal told the Sariches that's what it planned to do.[44] Instead, Beal allowed more than $400,000 in collateral to evaporate into thin air.[45] This would not have happened in a judicial foreclosure, where the Court would determine the fair value of the property and apply the full amount of the fair value to extinguish as much debt as possible. RCW 61.12.060.

Without the protection provided by the <u>Washington Mutual</u> decision, the borrower is the one who is at the mercy of the lenders. The rule advocated by Beal Bank would expose borrowers to deficiency judgments without any of the protections provided by a judicial foreclosure. The rule adopted by the Supreme Court in <u>Washington Mutual</u> protects borrowers from this result.

The nonjudicial foreclosure by Washington Mutual eliminated Beal's right to sue the Sariches for a deficiency. Beal could have purchased the property and recovered a significant portion, if not all, of the total amount it allegedly was owed. Beal decided not to purchase the property and must now live with the

---

[44] CP 153-54.
[45] CP 156 and 158.

consequences. The trial court properly granted the Sariches'
motion for summary judgment.

> **B.    The Trial Court Did Not Err By Denying
> Beal's Motion For Summary Judgment**

Beal Bank's motion for summary judgment was
properly denied by the trial court as a matter of law based on
Washington Mutual, supra. Even if the law had not required
dismissal of Beal Bank's claims, summary judgment was properly
denied because there were disputed issues of fact material to Beal's
claims.

1.    There are factual issues regarding Steve
Sarich's mental capacity to agree to the terms of the $420,000 note
he signed in 2002.[46] This may explain why Beal Bank switched
signature pages to make it appear that Kay Sarich also signed the
note.

2.    There are factual issues regarding Beal Bank's
actions in connection with the sale of the Sariches' house in
California. These questions affect the amount allegedly owed on
the notes. The Sariches had a third loan with U.S. Bank which was

_____

[46] *See* Sarich Declaration, ¶4. CP 91.

secured by a deed of trust on the Sariches' home in California.[47]
That loan is not a subject of the present lawsuit because it was fully
paid from the sale of the house in April 2004.[48]  There were funds
left over from the sale after paying off the first loan.[49]  Those funds
should have been applied to the $344,600 note (the one signed by
Steve and Kay Sarich) because it was secured by the second deed of
trust on the house.  However, Beal Bank applied the remaining
funds from the sale of the Sariches' house in California to the
$420,000 loan which was secured by the *third* deed of trust on the
house.[50]  It appears that Beal improperly applied the Sariches'
funds toward payment of the note that Kay Sarich did not sign and
that Steve Sarich signed after he developed dementia.

    3.    The bank made unauthorized expenditures of
funds from the sale of the Sariches' house in California.  The
Sariches refused to sell the California house for less than
$3 million.[51]  The counter-offer signed by the Sariches stated:
"(1) Selling price to be $3,000,000.  (2) Agency commission to be

---

[47] CP 107-12.
[48] CP 303.
[49] *Id.*
[50] CP 294, 296 and 303.
[51] CP 296-97.

reduced by $60,000 to go towards purchase price."[52]  After the sale, however, Beal Bank paid an additional $60,000 from the proceeds to the broker without disclosing the gratuitous arrangement to the Sariches or obtaining their consent.[53]  Thus, after paying off the loan on the California house, the Sariches had $60,000 *less* to pay on the loans that are the subject of the present lawsuit.

4.      In addition to the $60,000 that Beal Bank gave away to the broker after the sale of the California home, Beal Bank lost another $45,000 from the sale proceeds.  In a memo directing the application of the proceeds, Beal stated that the funds available to apply to the $420,000 loan "should be approximately $294,483.30."[54]  The amount that was actually paid on the loan was $249,245.47.[55]  This was $45,237.83 *less* than it should have been. Beal Bank has no explanation for where that money went.[56]

5.      Part of the payment from the sale of the California home was applied to interest on the $420,000 note.[57]

---

[52] CP 297.
[53] CP 294, 296 and 303.
[54] CP 294.
[55] CP 303.
[56] Beal Bank Deposition, p. 211, lines 8-11.  CP 281.
[57] CP 303.

22

Subsequent invoices from Beal Bank show that the bank did not credit the interest payment of $17,733.35. Instead, the bank continued to show that amount as "past due" in subsequent invoices to the borrower.[58]

   6. The loans that are the subject of Beal's claims were secured by the Sariches' condominium. The appraised value of the condo was $2,525,000 in July 2001.[59] Beal Bank valued the Sariches' condo at $2,250,000 in an internal Asset Review as of December 31, 2003.[60] In 2004 and 2005, Beal Bank obtained opinions from brokers regarding the value of the condo. Those opinions ranged as high as $2,750,000.[61] In September 2005, Beal Bank was informed that King County assessed the value of the condo at $2,487,000.[62] Beal Bank's internal Asset Review as of December 31, 2003 showed that Beal expected to obtain a "Net Realizable Value" of $521,602 from the sale of the condo after paying off the senior lien of $1.6 million.[63] The Net Realizable

---

[58] CP 310-13.
[59] CP 284.
[60] *Id.*
[61] CP 315.
[62] CP 292.
[63] CP 288.

Value was more than enough to pay off the $344,600 note secured by the second deed of trust on the condo.  By letter dated November 3, 2005, Beal assured the Sariches that it would purchase the condo and pay off the senior lienholder.[64]  Without any explanation, Beal Bank changed its mind and chose not to purchase the property at the foreclosure sale in December 2005.[65]  The senior lienholder, Washington Mutual, purchased the condo for $1,648,630 million,[66] and sold it two months later for $2,050,000.[67]

       7.     The loans were also secured by stock owned by the Sariches.[68]  In 2001, U.S. Bank valued the stock at approximately $450,000.[69]  Beal Bank has the stock certificates in its vault but has not tried to liquidate them.[70]  Beal did not even attempt to determine the value of the stock until some time in 2006.[71]  Beal asserts that the stock is now worthless.[72]

---

[64] CP 153-54.
[65] Supplemental Wall Affidavit, ¶12.  CP 336.
[66] CP 156.
[67] CP 158.
[68] CP 283.
[69] Beal Bank does not dispute U.S. Bank's valuation of the stock.  Beal Bank Deposition, p. 192, line 2 through p. 193, line 14.  CP 276-77.
[70] Beal Bank Deposition, p. 192, lines 2-7, and p. 194, lines 1-5.  CP 276 and 278.
[71] Beal Bank Deposition, p. 194, lines 6-19.  CP 278.
[72] Beal Bank Deposition, p. 195, lines 2-16.  CP 279.

24

<u>Summary of Collateral Wasted by Beal Bank</u>

| | |
|---|---:|
| Sale of California Home: | |
|       Gratuitous payment to broker | $  60,000 |
|       Amount missing from sale proceeds | 45,238 |
|       Uncredited interest payment | 17,733 |
| Condominium (minimum estimated loss) | 400,000 |
| Stock (2001 value) | <u>450,000</u> |
|       *Minimum* amount of wasted collateral: | $ 972,971 |

The evidence establishes that Beal Bank failed to mitigate its damages on a grand scale. Beal Bank allowed nearly $1 million to slip through its fingers. That was *more than enough to pay everything* that Beal Bank now claims it is owed.

The trial court properly denied Beal Bank's motion for summary judgment. Beal's claim is barred by Washington law, and any loss suffered by Beal was a result of its own choices.

### C. The Trial Court Properly Awarded Attorneys' Fees To The Sariches

The award of attorneys' fees to the Sariches was reasonable and proper. The loan documents contain attorneys' fee provisions, the Sariches were the prevailing party, the fees awarded were reasonable in light of the work performed and the results obtained, and Beal Bank submitted no evidence to challenge the reasonableness of the fees sought by the Sariches.

25

Beal Bank asserted claims against the Sariches totaling more than $720,000.[73] The claims were based on two promissory notes. The loan documents provide for recovery of attorneys' fees and costs.[74]

Beal Bank argues that there is no attorney fee provision relating to the $420,000 loan.[75] The bank is wrong. The note itself does not contain an attorney fee provision, but there is an attorney fee provision in paragraph 1.5 of the Term Loan Agreement executed in connection with the $420,000 loan.[76]

While the attorneys' fee provisions provide for recovery by the lender, Washington law requires such provisions to be construed to apply to whichever party prevails in the action. RCW 4.84.330.[77] All Beal Bank's claims against the Sariches were dismissed.[78] The Sariches are undoubtedly the prevailing party in the action. As such, they were properly awarded attorneys' fees

---

[73] Order Granting Sarich Defendants' Motion for Award of Attorneys' Fees and Costs, dated October 18, 2006 ("Attorneys' Fee Award"), ¶3. CP 454.
[74] CP 102 and 113.
[75] Appellant's Opening Brief, p. 30.
[76] CP 113.
[77] The loan documents provide that Washington law applies. *See* Promissory Note, dated September 26, 2001, p. 1 (CP 102), and Term Loan Agreement, dated September 24, 2002, ¶ 6.9 (CP 118).
[78] Order Granting Motion for Summary Judgment by Defendants Steve and Kay Sarich, dated September 8, 2006.  CP 415-17.

26

and costs.

The amount of attorneys' fees and costs incurred by the Sariches to defend against the bank's claims was reasonable. The Sariches were defending against claims in excess of $720,000.[79] The bank' claims were dismissed on summary judgment less than three weeks before trial.[80]  Given these circumstances, the trial court's award of approximately $81,000 in attorneys' fees[81] to the Sariches is reasonable.

Beal Bank offered no affidavits or other evidence to the trial court to challenge the reasonableness of the Sariches' fee request.[82]  The bank argues that the fee award is high because the Sariches were represented by two law firms, but the bank did not identify any examples of duplicative, overlapping or wasted time in the billing summaries submitted by counsel in support of the

---

[79] Attorneys' Fee Award, ¶3.  CP 454.
[80] Attorneys' Fee Award, ¶5.  CP 454.
[81] CP 524.
[82] Beal Bank's opposition to the Sariches' motion for attorneys' fees is contained in Plaintiff's Memorandum in Opposition to Defendants' Motions for Attorneys' Fees, dated September 29, 2006.  CP 593-97.  Beal submitted no other materials in opposition to the motion.

Sariches' request for attorneys' fees.[83]

The Sariches' fee application was supported by affidavits stating that the hourly rates charged by the Sariches' attorneys "are within the range charged by attorneys with similar experience and comparable legal practices in Seattle."[84]  Beal did not challenge that evidence.  In fact, Beal alleged in its complaint that "**the sum of $20,000 is reasonable** and shall be allowed the Plaintiff as attorneys fees **in case this action is uncontested** . . .."[85]  If a fee award of $20,000 is reasonable in an *uncontested* action, surely it is reasonable to award an additional $60,000 when the action is heavily contested and the result achieved is dismissal of all claims less than three weeks before trial.

Beal Bank argues that Kay Sarich is not entitled to attorneys' fees because she did not sign one of the two promissory notes at issue in the case.  This argument has no merit.  Beal Bank was seeking judgment in excess of $458,000 on the note signed by

---

[83] Declaration of Gayle E. Bush, dated September 19, 2006 ("Bush Declaration"), Exs. A and B (CP 532-65); Declaration of Spencer Hall, dated September 19, 2006 ("Hall Declaration"), Ex. A (CP 577-84).
[84] Bush Declaration, ¶5 (CP 530); Hall Declaration, ¶5 (CP 574).
[85] Complaint for Judicial Foreclosure of Deeds of Trust, ¶11.1 (emphasis added). CP 10.

Kay Sarich (Note #61).[86]  Beal Bank was seeking significantly less,

approximately $261,000, on the note that Kay did not sign

(Note #62).[87]  Either way, the bank expected to recover on both

notes from the community property of Steve and Kay Sarich.  In

support of its summary judgment motion, Beal Bank stated:  "**Beal

Bank seeks recovery on Note #62 from** Steve Sarich, Jr., **the

marital community of Steve Sarich, Jr. and Kay Sarich**, and Joe

Cashman."[88]

Steve and Kay Sarich obtained a dismissal of all

claims against them and against their marital community.  As

prevailing parties, they are entitled to recover their attorneys' fees,

including fees spent defending claims against their marital

community.  *See, e.g.,* Singleton v. Frost, 108 Wn.2d 723, 742 P.2d

1224 (1987) (awarding attorneys' fees to creditor who recovered

against community property even though spouse who did not sign

promissory note was determined to have no individual liability).

Washington law provides that in determining a

reasonable attorney fee, "The trial court is to take into account the

---

[86] Supplemental Wall Affidavit, ¶10.  CP 336.
[87] Supplemental Wall Affidavit, ¶11.  CP 336.
[88] Supplemental Wall Affidavit, ¶5 (emphasis added).  CP 335.

amount involved and to set the award of fees with the total sum recovered in mind." Singleton, 108 Wn.2d at 731, 742 P.2d at 1228. The Sariches were successful in obtaining dismissal of all claims against them. Those claims exceeded $720,000. The total attorneys' fees paid by the Sariches (approximately $81,000),[89] are only a fraction of the total claims dismissed.

The trial court's award of attorneys' fees to the Sariches is reasonable and should be affirmed.

### D.   The Sariches Request An Award Of Attorneys' Fees On Appeal

Pursuant to RAP 18.1, the Sariches respectfully request an award of their attorneys' fees and costs incurred in connection with this appeal.

## CONCLUSION

For the foregoing reasons, the Sariches respectfully request that the Court affirm all rulings of the trial court below, and award the Sariches their attorneys' fees and costs incurred in connection with this appeal.

---

[89] CP 524.

30

DATED this 23rd day of January, 2007.

HALL ZANZIG ZULAUF
CLAFLIN McEACHERN PLLC

By _____
Spencer Hall
  WSB No. 6162
Janet D. McEachern
  WSB No. 14450

BUSH STROUT & KORNFELD

By _____  by JDM
Katriana L. Samiljan
  WSB No. 28672
Gayle E. Bush
  WSB No. 7318
Attorneys for Respondents
Steve and Kay Sarich

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 23, 2007, a copy of the Brief of Respondents Steve and Kay Sarich was served on the following parties:

C. Matthew Andersen
Nancy L. Isserlis
Winston & Cashatt
601 W. Riverside, Suite 1900
Spokane, Washington  99201
(via fax and U.S. mail)

Thomas Cline
2502 North 50th Street
Seattle, Washington  98103
(via U.S. mail)

Katriana L. Samiljan
Bush Strout & Kornfeld
601 Union Street, Suite 5500
Seattle, Washington  98101
(via U.S. mail)

U.S. Bancorp
800 Nicollet Mall
Minneapolis, Minnesota  55402
(via U.S. mail)

Karen A. Benedict

32

# Plaintiffs' Exhibit C

**LNV v. Breitlings : Breitlings Motion for Judicial Notice of the Southgate and Bemont cases showing judicial findings of fact specific to the owner of Defendants MGC and LNV, D. Andrew Beal's propensity to create sham shell corporations for purposes of fraudulent tax shelters.**

Cause No. DC-14-04053

| | | |
|---|---|---|
| LNV CORPORATION, | § | |
| ITS SUCCESSORS AND ASSIGNS, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| | § | DALLAS COUNTY, TEXAS |
| SAMUEL G. BREITLING, | § | |
| JO ANN BREITLING, | § | |
| GMAC MORTGAGE, INC., | § | |
| NORTHWEST MORTGAGE, INC., | § | |
| PINNACLE REALTY ADVISORS, INC., | § | |
| and PALISADES ACQUISITION V, LLC | § | |
| | § | |
| Defendants. | § | 134TH JUDICIAL DISTRICT |

# BREITLINGS' MOTION FOR JUDICIAL NOTICE OF THE SOUTHGATE AND BEMONT CASES

Now comes defendants Samuel G. and JoAnn S. Breitling representing themselves pro-se, pursuant to Texas Rules of Evidence 201 "Judicial Notice of Adjudicative Facts" and hereby requests this Court take Judicial Notice of the documents described herein and in support states as follows:

1.  THE BREITLINGS move this Court to take judicial notice of:

    ***Southgate Master Fund, LLC v. US, 659 F. 3d 466 - Court of Appeals, 5th Circuit 2011***

    This case involves tax shelters created for D. Andrew Beal by Tom Montgomery, CPA, through the creation of several "on paper" companies or business entities as vehicles for "sham" tax shelters including: Southgate Master Fund, LLC; Eastgate LLC; Montgomery Capital Advisers, LLC; and Martell LLC. The appellate court in this case affirmed the

district court's findings: "Discerning none, we affirm the district court's holding that Southgate was a sham partnership that must be disregarded for federal-income-tax purposes." (Attached hereto as "Exhibit A".)

***Bemont Investments, L.L.C. v. United States, 679 F.3d 339 (5th Cir. 2012)*** This case involves tax shelters created for D. Andrew Beal by Tom Montgomery, CPA, through the creation of several "on paper" companies or business entities as vehicles for bogus tax shelters including: BM Investments LC (Bemont); BPB Investments; and BFC Capital Inc. Montgomery was a managing partner of Baggett, Drews, LLP and sold all its assets to Solution 6 Holding Ltd, an Australian software and sales firm. Montgomery began working for Beal in 2001 and became the head of BFC with an objective to explore new investment opportunities for Beal and his banks. As with the Southgate case they cooked up a hedge scheme that would give Beal significant tax benefits for paper only losses. Here the court concluded that "*the partnership item adjustments made by the IRS are correct… In summary, the Court concludes that the proposed tender offer in this case was just a smokescreen for tax avoidance... The Court finds that the swap transaction was substantially similar to those transactions noted in Notice 2000-44. The notice also covers those transactions lacking in any real economic substance. Here, the tax losses claimed do not correspond to any actual economic losses; nor do they constitute the type of "bona fide" losses that are allowable deductions under the IRS Code and regulations; and, in any event, they are not actual and real.*" (Attached hereto as "Exhibit B".)

2.  These cases are relevant to the Breitlings' case because, first they establish that D. Andrew Beal "*is the founder and sole owner of the Beal Financial Corporation and its*

*subsidiary, Beal Bank",* and that *"Beal and the Bank's core business involves identifying and purchasing assets that are undervalued because the market has mispriced their level of risk."* Second, they establish a modus operandi used by Beal and his "associates" specific to debt acquisition and debt collection that are consistent with the facts in the Breitlings case. This modus operandi substantiates Breitlings' assertions that LNV Corporation ("LNV") and MGC Mortgage Inc. ("MGC") are "sham" companies created for D. Andrew Beal in the same manner using the same means as the companies or business enterprises identified as being "shams" by the Appellate Justices in the Southgate and Bemont cases. These cases establish that Beal has a documented history of creating shell companies to give the appearance that they are something that they are not.

3.  From the court's finding of fact in Southgate: *"Montgomery anticipated that most of the portfolio's actual value would come from the discovery of a few 'nuggets' within the pool, loans whose values would prove to be many multiples of their acquisition prices."* A reasonable person would conclude that such "nuggets" might be over collateralized loans where the property is worth considerably more than the loan's out-standing balance; and since Beal acquired "distressed debt assets" at a typical cost of $0.04 on the dollar his financial incentive is not to collect payments on the loan, but the confiscate the property, (i.e Beal pays $4,000 for a "distressed debt" with an outstanding balance of $100,000 collateralized with a property worth $400,000.)  The Breitlings and several other victims of Beal's enterprise activities have or had significant equity in their homes; and many victims never defaulted on their mortgages of their own accord.  Beal may have other motivation for considering specific loans "nuggets."

4.  In Bemont the court found that: "*Although, at some point in time, Andrew Beal and Tom Montgomery focused on a possible tender offer, the structuring of the swaps to claim considerable losses was the primary objective of the parties.*" This judicial finding of fact shows that Beal has a propensity for intentionally structuring business entities to meet specific business objectives; that may not be considered legal or valid business objectives by a reasonable and impartial observer.

5.  Also from the court's finding of fact in Bemont: "*Pocsik* [the IRS auditor assigned to examine Beal's 2002 tax return] *specifically examined whether Beal had sufficient basis to absorb the losses, however, he was not furnished any information concerning the short swaps by Beth Montgomery, Beal's personal accountant*," and "*Ms. Montgomery never furnished information as to the short swaps in the audit; thus, the IRS did not have all information available to it.*" These findings of fact show that Beal has the propensity for intentionally withholding evidence from the government, regulators, investigators, and the courts.

6.  Additionally from the court's finding of fact in Bemont: "*The Court believes that Coscia was no more than a "puppet" for Plaintiffs and rendered no real independent or objective advice. Coscia said what he was paid to say.*" These judicial findings of fact show that Beal has a propensity to pay witnesses well so they will say what he wants them to say in a court. Perhaps criteria for the determining a "nugget" is whether the property's location is in a judicial district known to be "friendly" to banks and financial institutions; or where officers of the court are known to accept bribes. Judge Tillery in our case granted a summary judgment to LNV, a Beal enterprise entity, without even

reading or acknowledging our pleadings. Any reasonable person would conclude Judge Tillery's actions were so blatantly biased and unconstitutional that he must have been bribed to rule in favor of LNV.  Other Beal victims can provide evidence that would cause any reasonable person to conclude that Beal paid not just witnesses, but attorneys to sabotage their own client's cases in favor of Beal's enterprise entities, and that Beal may have bribed judges in other courts to meet his profit objectives.

7. Under Texas Rule of Evidence 201 the court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court may take judicial notice of records of any court of record of the United States.

8. **THE BREITLINGS** move this Court to take Judicial Notice of the judicially discovered facts in these cases as it shows that D. Andrew Beal has a demonstrated propensity to misrepresent and falsify facts pertaining to the genuine nature of business entities he has structured and controls to achieve his personal and enterprise profit objectives; and that these personal and enterprise objectives include tax evasion, and most probably also include money laundering, and bribery of witnesses and officers of the court.

9. The documents attached hereto as Exhibit "A" and Exhibit "B" may be accessed online from PACER.

10. Timely written notice of this request is hereby given by email and postal mail service upon Plaintiff's counsel as required by law.

WHEREFORE, pursuant to Texas Rule of Evidence 201 THE BREITLINGS move this Court to take Judicial Notice, without hearing, of judicially determined facts pertaining to the enterprise practices of D. Andrew Beal, his privately owned Beal Bank and his other enterprise entities as these judicially determined facts shed light onto the "sham" nature of Beal's LNV Corporation and MGC Mortgage Inc. and their operations and their propensity to violate laws, withhold evidence, to misrepresent and falsify facts pertaining to the true nature of Beal's enterprise entities and the "sham" nature of Beal's enterprise entities, and to show that the manner and means by which Beal hides his earnings and profits through his "sham" enterprise entities is consistent with the evidence pertaining to how the Beal enterprise entities operate specific to our  mortgage and to the Beal enterprise entities intention to illegally foreclose on our property; and for such other and further relief as this Court deems just and proper under the circumstances.


_____              _____
JoAnn S Breitling                        Samuel G. Breitling

**EXHIBIT A**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 30, 2011

No. 09-11166

Lyle W. Cayce
Clerk

SOUTHGATE MASTER FUND, L.L.C., by and through Montgomery Capital
Advisors, LLC its Tax Matters Partner,

Plaintiff–Appellant–Cross-Appellee

v.

UNITED STATES OF AMERICA,

Defendant–Appellee–Cross-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We affirm in all respects the district court's judgment disposing of this
petition for a readjustment of partnership tax items under 26 U.S.C. § 6226. The
plaintiff, Southgate Master Fund, L.L.C., was formed for the purpose of
facilitating the acquisition of a portfolio of Chinese nonperforming loans
("NPLs"). A partnership for tax purposes, Southgate's disposition of its portfolio
of NPLs generated more than $1 billion in paper losses, about $200 million of
which were claimed as a deduction by one of its partners in tax year 2002. The
Internal Revenue Service determined that Southgate was a sham partnership
that need not be respected for tax purposes and that Southgate's allocation of the
$200 million loss to the deducting partner should be disallowed. The district

court upheld these determinations.   After laying out the pertinent factual background in Part I, we explain in Part II why the district court was correct to do so.   The Service further determined that the accuracy-related penalties in 26 U.S.C. §§ 6662(b)(1)–(3) applied to the underpayments of tax resulting from Southgate's treatment of its losses.   On this point, the district court disagreed, disallowing the accuracy-related penalties on the ground that Southgate had reasonable cause for, and acted in good faith with respect to, the tax positions that resulted in the underpayments of tax.   Although this issue is a close one, we affirm the district court's decision to disallow the penalties.

## I. FACTUAL BACKGROUND

At issue on this appeal are the income-tax consequences of three interrelated transactions entered into by Southgate and its three members, D. Andrew Beal, Thomas Montgomery, and China Cinda.   As a limited liability company (LLC), Southgate is treated as a partnership for federal-income-tax purposes.[1]   The Internal Revenue Code subjects partnerships to pass-through tax treatment.   Partnerships do not pay income tax; instead, a partnership's income and losses flow through to its partners.[2]   The Southgate partner[3] whose individual income-tax liability will ultimately be affected by this action is Beal.[4]

---

[1] *See* 26 U.S.C. § 761(a).

[2] *Id.* § 701.

[3] Although the co-owners of a limited liability company technically are known as "members," this opinion tracks the language of the Code and refers to Southgate's members as "partners."

[4] A petition for review under § 6226 is a partnership-level proceeding.   *See* 26 U.S.C. § 6221.   Accordingly, our jurisdiction is limited to determining Southgate's legitimacy as a partnership, whether its claimed losses should be allowed, how those losses (if allowed) should be allocated among its partners, and whether penalties should be imposed.   *See id.* § 6226(f); *Petaluma FX Partners, LLC v. Comm'r*, 591 F.3d 694, 653–54 (D.C. Cir. 2010); *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 547–48 (5th Cir. 2009).   Although these determinations likely will affect the tax liability of one or more of the partners, determining the specific tax consequences to an individual partner is beyond the scope of this proceeding.   *See generally Jade Trading, LLC ex rel. Ervin v. United States*, 598 F.3d 1372, 1379–80 (Fed.

Beal is a billionaire Dallas banker who has made a name and a fortune for himself as an investor in stressed and distressed debt. Montgomery is a certified public accountant and an associate of Beal's who specializes in locating stressed- and distressed-debt investment opportunities in foreign markets. Cinda is a Chinese-government-owned financial institution. The three transactions in question are the formation of Southgate itself, Southgate's acquisition from Cinda of a portfolio of Chinese NPLs with a face value of about $1.1 billion, and Beal's contribution to Southgate of approximately $180 million worth of Government National Mortgage Association ("GNMA") securities. Summarized here are the relevant facts as found by the district court following a fifteen-day bench trial.

### A. The business plan

Beal is the founder and sole owner of the Beal Financial Corporation and its subsidiary, Beal Bank (collectively, "the Bank"). Beal and the Bank's core business involves identifying and purchasing assets that are undervalued because the market has mispriced their level of risk. Included within this category are NPLs, which are loans as to which the borrowers are in default, are in arrears, or have otherwise failed to perform under the terms of the loan agreement. For years the Bank focused primarily on domestic investment opportunities. But as the domestic market began to price risk more efficiently, Beal and the Bank began to focus on identifying inefficiencies and investment opportunities in foreign markets. In 2001, Beal hired Montgomery to help him identify opportunities to invest in foreign NPLs. Over the next year, Montgomery identified NPL investment opportunities in half a dozen foreign countries. Most notably, in early 2002 Montgomery advised Beal on a purchase of a package of NPLs that were originated in Jamaica. The Bank paid $23 million for the NPLs (approximately five percent of their face value) and

_____

Cir. 2010); *Nehrlich v. Comm'r*, 93 T.C.M. (CCH) 1105, at *2 (2007).

ultimately doubled its money on the investment. As the Jamaican NPL transaction was drawing to a close, Montgomery realized that if the transaction had been structured differently, it could have provided substantial income-tax benefits for Beal.

Around the same time that Beal and Montgomery were beginning to look for opportunities to invest in foreign NPLs, a robust market for NPLs was emerging in China. By the late 1990s, China's "big four" state-owned commercial banks had become saddled with huge numbers of NPLs. In an effort to reform and modernize its banks, the Chinese government created four new state-owned asset-management companies to assume and resolve the banks' NPLs. Cinda was one of these four new asset-management companies. The Chinese government required the asset-management companies to purchase the banks' NPLs at face value (that is, outstanding principal plus unpaid accrued interest), notwithstanding the fact that, because the loans were nonperforming, they were worth far less than their face values. From the Chinese government's perspective, the full-value-purchase requirement had the dual benefits of cleaning up the banks' balance sheets and providing the banks with an infusion of capital. In 2000 and 2001, China's big four banks sold approximately $169 billion worth of NPLs to the four asset-management companies. Cinda purchased loans with face values of approximately $45 billion.

The asset-management companies were charged with resolving the loans they had assumed. To that end, the statute that created these companies vested them with a series of so-called "super powers" that were designed to facilitate the companies' ability to resolve and collect on the NPLs. These super powers included the authority to restructure and compromise the loans, the right to pursue litigation against debtors, and the ability to toll the running of the statute of limitations.

As the size of the Chinese asset-management companies' NPL portfolios grew, investment banks and other sophisticated international investors began

to enter the Chinese NPL market. Foreign investors believed that the availability of these new super powers increased the likelihood that value could be realized from Chinese NPLs. In November 2001, China Huarong, another of China's four new asset-management companies, auctioned off some of its NPLs. Goldman Sachs and Morgan Stanley both acquired portfolios of NPLs. Each retained Huarong to service its loans, and the market intelligence was that collections were strong and that the investment banks had enjoyed sizeable returns on their investments.

By early 2002 Montgomery was aware of this market intelligence and had identified the Chinese NPL market as a potential investment opportunity for Beal and the Bank. Over the next several months, Montgomery—acting in his capacity as an employee of the Bank—researched the emerging market in Chinese NPLs. Like many other sophisticated investors, Montgomery quickly became convinced that the market held significant potential for profit. Montgomery had a contact at Deutsche Bank, which had signed a brokerage deal with Cinda that made it Cinda's sourcing agent on all NPL deals. In July 2002, Montgomery's contact put him in touch with a representative from Cinda. Montgomery then began to conduct due diligence on acquiring a portfolio of NPLs from Cinda. Montgomery made several trips to China, where he met with representatives from Cinda and reviewed various NPL portfolios. Montgomery eventually determined that the pricing structure would be more favorable on an investment in unsecured NPLs rather than secured NPLs.

## B. The tax plan

At the same time he was researching the profit potential of an investment in Chinese NPLs, Montgomery also began researching the potential tax benefits that could be created by such an investment. In May of 2002, Deutsche Bank introduced Montgomery to the law firm of De Castro, West, Chodorow, Glickfeld & Nass, Inc. ("De Castro"). Montgomery sought De Castro's advice on how to structure an acquisition of Chinese NPLs so that it would create tax benefits for

==Beal.== In a series of memoranda that it sent to Montgomery in June and July of 2002, De Castro laid out its plan for such a transaction structure. ==In short, De Castro proposed to Montgomery that, once he had identified the portfolio of NPLs he was going to recommend that Beal acquire, he form a partnership with Cinda and have Cinda contribute the NPLs to the partnership. By purchasing a portion of Cinda's interest in the partnership to which it had contributed the NPLs instead of purchasing the NPLs directly from Cinda, Beal would be able to generate a paper loss that he could claim as a deduction on his individual tax return.==

Understanding why De Castro proposed this structure requires a brief review of the relevant provisions of the Internal Revenue Code and its implementing regulations. The Code treats a taxpayer's sale or other disposition of a piece of property in the ordinary course of his business as a taxable transaction. If the amount realized on the sale is less than the taxpayer's adjusted basis in the property, then the taxpayer is entitled to deduct that loss from his taxable income.[5] "Basis" is the amount that the seller has invested in the property; ordinarily, the taxpayer takes a cost basis in a piece of property equal to the property's purchase price.[6] The amount of the loss is determined by subtracting the taxpayer's adjusted basis in the property from the amount realized on the sale.[7] For example, assume a taxpayer purchases a piece of property for $60 and later sells it for $20. The taxpayer's cost basis is $60, and he has suffered a loss of $40 on the sale; that loss, when incurred in the ordinary course of the taxpayer's business, is deductible against the taxpayer's income. By contrast, if a taxpayer purchases a piece of property for $60 and later sells it for $100, he has realized a gain of $40. He would be required to pay tax on

---

[5] 26 U.S.C. § 165(a), (c)(1).

[6] *See* 26 U.S.C. § 1012(a). *See generally* 26 U.S.C. §§ 1011–1016.

[7] 26 U.S.C. § 1001(a). If the amount realized on the sale exceeds the taxpayer's adjusted basis in the property, then the taxpayer realizes a taxable gain.

that gain. This latter example describes, in the most simplified terms, the structure and tax consequences of the Bank's early 2002 purchase of a portfolio of Jamaican NPLs.

These rules apply to purchases of property. De Castro's plan for the Chinese NPL transaction was designed to take advantage of the fact that different rules apply to sales of partnership interests, with the result that purchasing an interest in a partnership that owns property can offer big tax advantages compared to purchasing the property directly. When a partner acquires an interest in a partnership by contributing property to the partnership, the contribution is generally not a taxable disposition of the property.[8] Instead, the partner's basis in the property transfers, or carries over, to the partnership.[9] The partnership's basis in the transferred property is often referred to as "inside basis," and the partnership has the same inside basis in the property that the partner had before the contribution.[10] If, at the time of the transfer, the property's fair market value is lower than the partner's adjusted basis in the property, the property has a built-in loss.[11] Ordinarily, if a partner transfers property with a built-in loss to the partnership, any loss the partnership incurs when it sells that property must be allocated back to the contributing partner; the other partners cannot share in the loss.[12]

---

[8] 26 U.S.C. § 721(a)–(b).

[9] 26 U.S.C. § 723.

[10] *See* 26 C.F.R. § 1.723-1 ("The basis to the partnership of property contributed to it by a partner is the adjusted basis of such property to the contributing partner at the time of the contribution. . . . [S]uch property has the same basis in the hands of the partnership as it had in the hands of the contributing partner . . . .").

[11] *See* 26 U.S.C. § 704(c)(1)(C) ("[T]he term 'built-in loss' means the excess of the adjusted basis of the property . . . over its fair market value at the time of contribution.").

[12] *See id.* § 704(c)(1)(C)(I); *see also* 26 C.F.R. § 1.704-3(a)(1) ("The purpose of section 704(c) is to prevent the shifting of tax consequences among partners with respect to precontribution gain or loss.").

For example, suppose that A and B form a partnership, agreeing to a 50–50 split of profits. B contributes $10 in cash to the partnership, and A contributes built-in-loss property with a fair market value of $10 and in which A's basis is $100. A and B each receive a capital-account credit of $10,[13] and the partnership takes a carryover inside basis in the property of $100. If the partnership later sells the property for $10, the partnership has realized a $90 loss on the sale. Under § 704(c)(1)(C)(ii) of the Internal Revenue Code, the entirety of that $90 loss must be allocated to A.[14]

In this way, the normal operation of § 704(c) ensures that tax value follows book value. In other words, when property is sold for a loss, the sale creates a tax benefit in the form of a deduction. The purpose of § 704(c) is to allocate that benefit to the person who has actually suffered a real economic loss due to the property's diminution in value: the partner who paid $100 for property that is now only worth $10.

A wrinkle arises when the contributing partner sells his partnership interest to a new partner before the partnership sells the property with the built-in loss. In that circumstance, Treasury Regulation 1.704-3(a)(7) requires the built-in loss to be allocated to the partner who purchased the partnership interest in the same manner that it would have been allocated to the contributing partner.[15] This rule enables the benefit of claiming the loss as a tax

---

[13] Capital accounts, which generally reflect a partner's percentage ownership interest in the partnership, are calculated based on the fair market value of the property at the time of the contribution. *See generally* LAURA E. CUNNINGHAM & NOËL B. CUNNINGHAM, THE LOGIC OF SUBCHAPTER K: A CONCEPTUAL GUIDE TO THE TAXATION OF PARTNERSHIPS ch. 4 (4th ed. 2011).

[14] By contrast, if B contributed $100 in cash to the partnership, A contributed property with a fair market value of $100, the property's value declined to $10 post-contribution, and the partnership sold the property for $10, then A and B each would be allocated a distributive share of that $90 loss (here, $45 each). *See* 26 U.S.C. § 704(a)–(b).

[15] 26 C.F.R. § 1.704-3(a)(7).

deduction to be separated and transferred away from the person who suffered the real, economic loss of the property's diminution of value.[16]

To continue with the prior example, suppose that after A and B formed their partnership, A sold her partnership interest to C for $10. If the partnership later sold the property contributed by A for $10, the partnership—whose inside basis in the property is $100—would suffer a loss of $90. Regulation 1.704-3(a)(7) would require that $90 loss to be allocated to C.[17] Thus, even though the transaction was revenue-neutral for C in real economic terms (the partnership sold the property for the same amount of money that C spent to purchase his partnership interest), for tax purposes C has suffered a $90 loss, which C is then eligible to deduct against his other income.[18] By contrast, if C had simply purchased the property directly from A, C would have taken a cost basis of $10, and his later resale of the property for $10 would have been income-tax neutral. The real economic consequences to C of the two transactions are identical. But by running the acquisition through the partnership structure instead of consummating a direct purchase, C receives an income-tax windfall despite not being the party who suffered real economic loss as a result of the property's diminution in value.

This example describes—again in highly simplified terms—the transaction structure that De Castro proposed to Montgomery for Beal's acquisition of a portfolio of Chinese NPLs. Cinda was an ideal partner for such a transaction.

---

[16] At the time that Montgomery was researching an investment in Chinese NPLs, there was no cap on the amount of built-in loss that could be transferred this way. Congress has subsequently amended the Code to impose a $250,000 ceiling on the amount of built-in loss that can be transferred among partners. *See* 26 U.S.C. § 743(d)(1).

[17] *Cf.* 26 C.F.R. § 1.704-3(b)(2) ex. 1(iii) (describing the proper allocation of gain upon a partnership's sale of property with a built-in gain).

[18] The portion of this $90 loss that C would be able to claim as a deduction in any given tax year would be capped at the amount of C's outside basis in the partnership. *See infra* notes 21–22 and accompanying text.

Because the Chinese government had required Cinda to purchase its NPLs at face value, Cinda had a cost basis in its NPLs that far exceeded the loans' fair market value; the NPLs had a huge built-in loss. As a foreign corporation not subject to U.S. income taxation, Cinda was a tax-indifferent party, unable to obtain any economic benefit from claiming the built-in loss as a deduction on an American tax return. If Beal were to purchase the NPLs directly from Cinda, that built-in loss would evaporate, and Beal would take a cost basis in the NPLs equal to their purchase price. If Cinda instead contributed to the NPLs to a partnership and Beal then purchased Cinda's interest in the partnership, the built-in loss would be preserved and transferred to Beal. Any loss realized on the partnership's sale of the NPLs would be allocated to Beal for tax purposes.

## C. The deal

On July 18, 2002, Montgomery, Beal, and attorneys from De Castro participated in a conference call in which Montgomery presented the results of his due diligence and recommended that Beal invest in a portfolio of unsecured Chinese NPLs. The parties also discussed the potential tax benefits to Beal that would result from the partnership-based transaction structure proposed by De Castro. Beal explained on the call that the Bank was not in a position to invest in the NPLs. Montgomery—who up until this time had been acting in his capacity as an employee of the Bank—asked Beal to release him from his obligation to the Bank so that he could continue to pursue the deal in an individual capacity. Beal agreed. He also told Montgomery that he might be interested in pursuing the investment personally, outside of the Bank, and asked Montgomery to come back to him once Montgomery had finalized a deal. That same day, Montgomery formed Montgomery Capital Advisers, LLC ("MCA"), a single-member limited liability company through which Montgomery could continue to pursue an investment in Chinese NPLs.

By late July, Montgomery had settled on a particular portfolio of approximately 24,000 of Cinda's most severely distressed unsecured NPLs. The

loans had a face value of approximately $1.145 billion. ==Montgomery anticipated that most of the portfolio's actual value would come from the discovery of a few "nuggets" within the pool, loans whose values would prove to be many multiples of their acquisition prices.== Based on his experience investing in severely distressed unsecured NPLs in the United States, Montgomery believed that the nuggets would make the portfolio of Chinese NPLs worth, at a minimum, 1–3 percent of its face value. To confirm this belief, Montgomery commissioned Zhongyu, a Chinese valuation firm, to provide a valuation analysis of the NPLs. Zhonguyu was tasked with estimating the total value of the portfolio based on a statistically valid sample of about 35 percent of the loans in the portfolio. Zhongyu was to report its findings to Montgomery by mid-August. MCA also retained the services of Haiwen, a Chinese law firm, to perform legal due diligence—that is, to confirm that the loans were legally valid and enforceable, that Cinda owned the loans, and that Cinda had the ability to transfer the loans to an American entity. This due-diligence report was due by the end of August.

Eager to close the deal, Montgomery decided to move forward with Cinda before he received the results of the two due-diligence reports he had commissioned. ==On July 31 and August 1, 2002, Montgomery and Cinda consummated a series of five transactions. First, Cinda formed Eastgate, a single-member limited liability company organized under Delaware law. As a wholly owned subsidiary of Cinda, Eastgate was created for the purpose of acting as Cinda's United States investment vehicle for NPL transactions.==

==Second, Cinda contributed to Eastgate the portfolio of NPLs selected by Montgomery. Cinda contributed the NPLs to Eastgate== pursuant to a contribution agreement in which it made a series of warranties and representations stating that Cinda had not written off, compromised, or made a determination of worthlessness as to any of the NPLs.

==Third, MCA (Montgomery's single-member LLC) and Eastgate formed and organized Southgate as a limited liability company under Delaware law.== Upon

11

formation, Eastgate contributed the NPLs to Southgate pursuant to a virtually identical contribution agreement. In exchange, Eastgate received a 99 percent ownership interest in Southgate and an initial capital account balance of $19,420,000 (an amount roughly equal to 1.7 percent of the NPLs' face value, which reflected the parties' negotiated determination of the loans' fair market value). Montgomery contributed cash and a promissory note worth $196,162 in exchange for a 1 percent ownership interest in Southgate. Montgomery was appointed as Southgate's sole manager.

Fourth, Montgomery entered into a brokerage agreement with Deutsche Bank. Montgomery agreed to pay Deutsche Bank $50,000 for its services as the exclusive placement agent for Cinda's NPLs. In addition, Montgomery agreed that he would pay an additional fee to Deutsche Bank if and when an investor purchased Cinda's interest in Southgate. The fee, which was tied to the percentage of the face value of the loans in Southgate's portfolio, came to about $8.5 million. Montgomery anticipated that Beal (or some other investor) would satisfy this obligation.

Finally, Southgate and Cinda signed a loan-servicing agreement ("LSA") in which Southgate agreed to pay Cinda 25 percent of net collections in exchange for servicing the NPLs. The LSA was critical to the investment strategy in two respects. First, it reduced the up-front purchase cost of the NPLs. Cinda had initially proposed an acquisition price of between $34.36 million and $40.08 million (that is, between 3 and 3.5 percent of the portfolio's face value). However, Montgomery's due diligence had revealed that Cinda was required to use 99 percent of the acquisition price it received for the NPLs to service the bonds it had used to purchase the loans. But any fees it earned as a loan servicer it was free to retain for its own operations. Montgomery thus was able to negotiate the acquisition price of the NPLs from 3-to-3.5 percent down to 1.7 percent by agreeing to have Southgate enter into an LSA that paid Cinda a more generous fee than it otherwise would have been willing to pay. The second

reason the LSA was critical to Montgomery's business plan was that it increased the likelihood of realizing value on the loan portfolio. By retaining Cinda as its loan servicer, Southgate was able to take advantage of Cinda's statutory super powers, which increased the likelihood of successful collections. And by shifting some of the total value that Cinda would receive in the transaction out of the purchase price and into the LSA's fee structure, Montgomery hoped to incentivize Cinda's efforts to service and collect on the loans.

These transactions positioned Southgate as a tax-friendly investment vehicle. Southgate was holding NPLs with a built-in loss of more than $1.3 billion, all of which was allocable to Cinda.[19] An investor who purchased Cinda's interest in Southgate would step into Cinda's shoes and be positioned to claim the tax losses that Southgate generated as it disposed of the loans in its portfolio for pennies on the dollar. Southgate thus stood to generate more than $1 billion dollars in paper losses, losses that would arguably be of ordinary-income character.[20] To a high-net-worth individual paying a marginal tax rate of 35 percent, the ability to deduct these losses would be of tremendous value.

The final pieces of the deal fell into place over the next month. In mid-August, Zhongyu reported the findings of its valuation analysis to Montgomery. Zhongyu estimated that Southgate's portfolio of NPLs was worth between $44.67 million (3.90 percent of face value) and $111.8 million (9.76 percent of face value). Around the same time, Montgomery traveled to China and got a preliminary report from Haiwen that the NPLs were valid loans. On August 25,

---

[19] The district court found that when Cinda contributed the NPLs to Eastgate, Cinda's basis in the NPLs was equal to their purchase price of $1.380 billion, which included $1.145 billion of unpaid principal and $235 million of accrued but unpaid interest. On appeal, neither party challenges this basis calculation. Southgate's basis in the NPLs was the same as Eastgate's, *see* sources cited *supra* notes 9–10, and Eastgate's basis was the same as Cinda's, *see generally* 26 C.F.R. § 301.7701-3 (providing that certain single-member entities are to be disregarded for tax purposes).

[20] *See generally* 26 U.S.C. § 742(b); *id.* § 751(d); *id.* § 1221(a)(4). We stress that these losses are *arguably* ordinary; we do not judge their proper characterization in this appeal.

2002, Montgomery sent a memo to Beal summarizing the results of his due diligence and enthusiastically recommending that Beal purchase a portion of Cinda/Eastgate's interest in the Southgate partnership. Beal readily agreed to do so. He formed a single-member Delaware LLC, Martel Associates, through which he would invest in Southgate. By the end of the week, Haiwen's final legal due-diligence report came through and confirmed that all but a tiny sliver of the loans in the portfolio were legally enforceable and had not been compromised, written off, or discharged in bankruptcy. On August 30, 2002, Beal paid Cinda $19,407,000 in exchange for 90 percent of Eastgate's interest in Southgate. Beal thus wound up with an 89.1 percent ownership interest, leaving Cinda with a 9.9 percent interest and Montgomery's 1.0 percent share unchanged. Beal also assumed Montgomery's obligations under the brokerage agreement with Deutsche Bank and paid the $8.5 million placement fee.

With the deal papered, the parties turned to developing a collection strategy that would be responsive to both profit- and tax-driven concerns. On the business side, Montgomery and Cinda decided to focus on identifying a small number of loans (between 15 and 25 percent of the portfolio) that held enough profit potential to merit further review. The goal was to focus collection efforts on nuggets that would eventually be identified within this smaller pool. The balance of the portfolio would be packaged into smaller groups and sold off to small Chinese collection firms; the proceeds of the sales would provide Southgate with working capital. Consistent with the three-year term of the LSA between Southgate and Cinda, Montgomery and Cinda decided to aim for resolving about 25 percent of the NPLs in 2002, 50 percent in 2003, and 25 percent in 2004. It just so happened that this collection strategy would create losses in amounts tailored to the amounts of personal income against which Beal sought to claim deductions.

Ultimately, Southgate proved to be a failure as an investment venture. The primary cause of Southgate's poor performance was Cinda's disappointing

performance as a loan servicer.  The value of many of the loans that Southgate identified as nuggets derived from the fact that they were backed by a Chinese-government guarantee.  Cinda's initial efforts to collect on these loans and enforce the guarantees generated push-back and fallout in China.  Political pressure from the Chinese government led to Cinda's repeatedly selling off NPLs that Southgate had identified as high-value nuggets. These sales were in direct breach of both the Southgate Operating Agreement and the LSA and cut the legs from Southgate's business plan.  The total net collections on Southgate's NPL portfolio were approximately $10.69 million, far less than Zhongyu's valuation report had projected.

### D.  The basis-build

Consistent with the collection strategy developed by Cinda and Montgomery, in late 2002 Southgate sold off approximately 22 percent of the loans in its portfolio.  The net recovery on the sales was approximately $2.2 million.  Southgate suffered a loss on the sales of approximately $294.9 million, of which $292.8 million was pre-contribution, built-in loss.  Since Beal had purchased 90 percent of Cinda's interest in Southgate, 90 percent of that built-in loss was allocable to Beal and available for him to take as a deduction on his 2002 individual tax return.

One final step remained in the tax plan: Beal needed to build his outside basis in Southgate.  A partner's "outside basis" is his adjusted basis in his ownership interest in the partnership.  When a partner purchases a partnership interest, he generally takes a cost basis in his partnership interest.[21]  In other words, his outside basis is equal to the amount he paid to acquire the partnership interest.  And while partnership losses are deductible by the individual partners, the amount of allocated partnership loss that a partner can claim as a deduction on his individual tax return is capped at the amount of his

---

[21] *See* 26 C.F.R. § 1.742-1.

outside basis.[22]  If the amount of a partnership loss that is allocable to the partner exceeds his outside basis, the overage remains suspended inside the partnership and can only be claimed if the partner builds his outside basis during a future tax year.  Thus, the fact that some $263.5 million of Southgate's built-in losses were *allocable* to Beal was not enough to make the full value of those losses *deductible* by Beal on his 2002 tax return.  Up until the very end of 2002, Beal's outside basis in Southgate was only about $29.9 million (the roughly $19.4 million he paid for his partnership interest plus about $10.5 million in transaction and operating costs).  To be able to deduct most of the built-in loss that was allocable to him, Beal needed to build his outside basis in Southgate.

This was the purpose of what the parties have dubbed the GNMA basis-build.[23]  In late 2002, Beal owned some GNMAs with a fair market value of approximately $180.6 million.  GNMAs are fixed-rate, mortgage-backed securities. The GNMAs that Beal owned were platinum securities backed by the full faith and credit of the United States, which guaranteed timely payment of principal and interest.  In late December 2002, Beal nominally contributed the GNMAs to Southgate in an effort to build his outside basis in the partnership.

As relevant here, the GNMA basis-build took place in three steps.  First, Beal contributed the GNMAs to Martel (the single-member LLC through which he had purchased his interest in Southgate).[24]  Second, Martel distributed its

_____

[22] *See* 26 U.S.C. § 704(d) ("A partner's distributive share of partnership loss . . . shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred."); *see also Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 542 (5th Cir. 2009) ("Generally, a partner's basis in a partnership is determined by the amount of capital he contributes to the partnership, and when a partnership loses money the partners can only deduct the losses from their taxable income to the extent of their basis in the partnership.").

[23] At oral argument, Southgate readily conceded that Beal's contribution of the GNMAs was primarily a tax-motivated transaction.

[24] Soon thereafter, Martel entered into a repo transaction with UBS PaineWebber Inc., in which Martel, in substance, pledged the GNMAs as collateral for a $162 million secured loan.  Martel transferred the proceeds of this loan to the Bank.  Thus, when the GNMAs were

interest in Southgate to Beal. Beal thereby became an 89.1 percent owner of Southgate. Instead of owning an interest in Southgate through Martel, Beal now owned his interest in Southgate directly. Third, Beal contributed Martel to Southgate. Both Southgate's and Martel's operating agreements were amended to irrevocably appoint Beal as the sole manager of Martel and to reflect Beal's admission as a partner in Southgate, Beal's contribution of Martel to Southgate, and Southgate's admission as a partner in Martel. At the time of its contribution to Southgate, Martel still owned the $180.6 million worth of GNMAs. A partner's contribution of property to a partnership generally increases the partner's outside basis in his partnership interest.[25] As a result, Beal took the position that his contribution of the GNMAs to Southgate had increased his outside basis in Southgate by $180.6 million.

Beal's contribution of the GNMAs to Southgate came with numerous strings attached. Four terms of the amendments to the operating agreements are particularly important for our later analysis of this putative contribution. Three of these terms expressly ensured that the vast majority of the GNMAs' value would be reserved to Beal. First, all of the interest that accrued on the GNMAs after their contribution to Southgate was allocated to Beal. Second, in his capacity as Martel's sole manager, Beal had the absolute right in his sole discretion to cause Martel to distribute to him the GNMAs and/or all payments received with respect to the GNMAs. Beal's exercise of this right would not give rise to an obligation on Southgate's part to make proportionate distributions to

---

contributed to Southgate, Southgate assumed Martel's liability on the loan that the GNMAs secured. Ordinarily a partnership's assumption of a partner's liability causes the partner's outside basis to be reduced by the amount of the liability. *See* 26 U.S.C. § 752(b). However, Martel had distributed the proceeds of the loan to Beal in exchange for Beal's agreeing to personally and unconditionally guarantee the loan, and the district court found that Beal was at risk on the guarantee, *see generally* 26 C.F.R. §§ 1.752-1(a)(1), 1.752-2(b)(1). Beal thus assumed Southgate's liability on the loan, and his outside basis was increased concomitantly. *See* 26 U.S.C. § 752(a).

[25] *See* 26 U.S.C. § 722.

the other two partners.  Third, Beal had unconditional rights to direct the use and application of all proceeds from the GNMAs and to direct any and all other matters pertaining to the GNMAs.  There was a single provision that, at least theoretically, created a possibility that the other partners might profit from the contribution of the GNMAs.  If the GNMAs appreciated in value during the time they were held in Southgate, the gain was to be allocated among Southgate's partners in accordance with their percentage interest in the partnership.

The contribution of the GNMAs, at least in form, brought Beal's outside basis in Southgate up to a total of about $210.5 million.  When Southgate filed its 2002 partnership return, it allocated to Beal a loss of approximately $263.5 million.  The GNMA basis-build enabled Beal to claim $210.5 million of that loss as a deduction on his 2002 individual tax return.

## E.  Procedural history

The Service issued a final partnership administrative adjustment ("FPAA") to Southgate pertaining to its 2002 partnership return.  The FPAA concluded that Southgate was a sham partnership that had been formed solely for the purposes of tax avoidance, determined that Southgate would not be recognized as a partnership for federal-income-tax purposes, disallowed Southgate's claimed losses arising out of its 2002 dispositions of Chinese NPLs, and imposed substantial penalties.  Southgate filed a petition for review in federal district court under 26 U.S.C. § 6226(a)(2).  The district court issued findings of fact and conclusions of law after presiding over a fifteen-day bench trial.  The court upheld the FPAA's disallowance of Southgate's claimed losses on the ground that the Southgate partnership was a sham for tax purposes. However, the court disallowed the imposition of penalties on the ground that Southgate had established reasonable cause and good faith and thus had a complete defense to any accuracy-related penalties.  Southgate appeals the former determination; the Government appeals the latter.

## II. TAX CONSEQUENCES

This appeal requires us to determine the tax consequences of Southgate's formation, Southgate's acquisition of its portfolio of Chinese NPLs, and the GNMA basis-build. The starting point for our analysis is the cardinal principle of income taxation: a transaction's tax consequences depend on its substance, not its form.[26] This principle "is no schoolboy's rule; it is the cornerstone of sound taxation . . . . 'Tax law deals in economic realities, not legal abstractions.'"[27] This foundational principle finds its voice in the judicial anti-abuse doctrines, which "'prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit."[28] The judicial doctrines empower the federal courts to disregard the claimed tax benefits of a transaction—even a transaction that formally complies with the black-letter provisions of the Code and its implementing regulations—if the taxpayer cannot establish that "what was done, apart from the tax motive, was the thing which the statute intended."[29]

Our disposition of this appeal requires us to make use of three of the judicial doctrines. The first is the economic-substance doctrine. "[T]he law does not permit the taxpayer to reap tax benefits from a transaction that lacks

---

[26] *See, e.g., Freytag v. Comm'r*, 904 F.2d 1011, 1015 (5th Cir. 1990) ("The fundamental premise underlying the Internal Revenue Code is that taxation is based upon a transaction's substance rather than its form."), *aff'd*, 501 U.S. 868 (1991); *see also Arevalo v. Comm'r*, 469 F.3d 436, 439 (5th Cir. 2006) ("The Supreme Court has repeatedly stressed that, in examining transactions for the purpose of determining their tax consequences, substance governs over form." (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 572–73 (1978))).

[27] *Estate of Weinert v. Comm'r*, 294 F.2d 750, 755 (5th Cir. 1961) (quoting *Comm'r v. Sw. Exploration Co.*, 350 U.S. 308, 315 (1956) (internal ellipsis omitted)); *see also Frank Lyon Co.*, 435 U.S. at 573 ("'In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding.'" (quoting *Helvering v. Lazarus & Co.*, 308 U.S. 252, 255 (1939))).

[28] *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353–54 (Fed. Cir. 2006).

[29] *Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

economic reality."[30]   Thus, "[t]ransactions that have no economic effect other than the creation of income tax losses are shams for tax purposes and will not be recognized."[31]   The second is the sham-partnership doctrine.  A partnership "may be disregarded where it is a sham or unreal . . . [,] a bald and mischievous fiction."[32]  A taxpayer must be able to demonstrate that there was some nontax business purpose for his use of the partnership form.[33]   Finally, the doctrine of substance over form "provides that the tax consequences of a transaction are determined based on the underlying substance of the transaction rather than its legal form."[34]   The substance-over-form doctrine allows a transaction to be recharacterized so that its taxable form corresponds to its economic substance.[35]

In an appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo.[36]  "Specifically, a district court's characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error."[37]  Our de novo application

---

[30] *Coltec*, 454 F.3d at 1355.

[31] *Boynton v. Comm'r*,  649 F.2d 1168, 1172 (5th Cir. Unit B July 1981).

[32] *Moline Props., Inc. v. Comm'r*, 319 U.S. 436, 439 (1943).

[33] *See, e.g.*, *Estate of Strangi v. Comm'r*, 293 F.3d 279, 281–82 (5th Cir. 2002); *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512–13 (D.C. Cir. 2000).

[34] *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011) (citing *Griffiths v. Helvering*, 308 U.S. 355, 357 (1939)).

[35] *See Blueberry Land Co. v. Comm'r*, 361 F.2d 93, 101 (5th Cir. 1966) ("[C]ourts will, and do, look beyond the superficial formalities of a transaction to determine the proper tax treatment.").

[36] *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 543 (5th Cir. 2009).

[37] *Duffie v. United States*, 600 F.3d 362, 364 (5th Cir.), *cert. denied*, 131 S. Ct. 355 (2010); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) ("The general characterization of a transaction for tax purposes is a question of law subject to review."). The Government incorrectly contends that *Merryman v. Comm'r*, 873 F.2d 879 (5th Cir. 1989), establishes that sham-partnership determinations are reviewed only for clear error.

of the judicial doctrines to the facts as found by the district court leads us to three conclusions. First, Southgate's acquisition of its portfolio of Chinese NPLs had economic substance. Second, Southgate itself was a sham partnership. This second conclusion finds substantial support in our determination that the GNMA basis-build lacked economic substance. Third, Southgate's acquisition of the NPLs should be recharacterized under the substance-over-form doctrine as a direct sale from Cinda to Beal and Montgomery.

## A. The acquisition of the NPLs had economic substance.

With little difficulty, we affirm the district court's conclusion that Southgate's acquisition of the portfolio of NPLs had economic substance. In *Klamath*, we derived a three-part test for determining whether a transaction has sufficient economic substance to be respected for tax purposes: "whether the transaction (1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features."[38] In other words, the transaction must exhibit objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance. While "these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes,"[39] there is near-total overlap between the

---

*Merryman*'s application of the clearly-erroneous standard of review to the Tax Court's decision in a sham-partnership case was the result of the unusual fact that the petitioning taxpayers "agreed with the law applied by the Tax Court" and challenged only the underlying factual findings. *Id.* at 881. *Merryman* did not unseat the well-established rule in this Circuit that "'legal conclusion[s]' that transactions are shams in substance are reviewed de novo." *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 780-81 (5th Cir. 2001) (alteration in original) (quoting *Killingsworth v. Comm'r*, 864 F.2d 1214, 1217 (5th Cir. 1989)); *see also id.* at 781 n.1 (considering and rejecting the argument that this Court should review the legal conclusion that a transaction is a sham only for clear error).

[38] *Klamath*, 568 F.3d at 544.

[39] *Id.*; *accord Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006) ("[A] lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.").

latter two factors.[40]   The district court's findings of fact strongly support its conclusion that Southgate's acquisition of the NPLs satisfies the standard announced in *Klamath*.

As to the first *Klamath* factor, transactions lack objective economic reality if they "'do not vary[,] control[,] or change the flow of economic benefits.'"[41]   This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands[42] or created a realistic possibility that they would do so.[43] That inquiry must be "conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight."[44]

Southgate's acquisition of the NPLs readily satisfies the first *Klamath* factor.  The district court found that Southgate and its members entered into the NPL investment with a reasonable possibility of making a profit.  That the NPL investment ultimately turned out not to be profitable does not call this finding into question.  The investment failed largely because of Cinda's shortcomings as a loan servicer and interference from the Chinese government.  The district court found that these shortcomings were not foreseeable to Beal and

---

[40] To say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations.

[41] *Klamath*, 568 F.3d at 543 (quoting *Higgins v. Smith*, 308 U.S. 473, 476 (1940)); *see also Coltec*, 454 F.3d at 1355 ("[T]he objective economic substance inquiry [asks] 'whether the transaction affected the taxpayer's financial position in any way.'" (quoting *Adver & Grapevine Records & Tapes, Inc. v. IRS* (*In re CM Holdings, Inc.*), 301 F.3d 96, 103 (3d Cir. 2002))).

[42] "[A] circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes."  *Merryman*, 873 F.2d at 882.

[43] *Portland Golf Club v. Comm'r*, 497 U.S. 154, 170 n.19 (1990) ("'A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.'" (quoting *Gefen v. Comm'r*, 87 T.C. 1471, 1490 (1986))); *accord Coltec*, 454 F.3d at 1356; *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 94 (4th Cir. 1985) (explaining that the inquiry into objective economic substance "requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits").

[44] *Smith v. Comm'r*, 937 F.2d 1089, 1096 (6th Cir. 1991).

Montgomery at the time they decided to undertake the investment. In the summer of 2002, the available market intelligence and valuation data strongly indicated that the emerging market in Chinese NPLs held significant profit potential. If Zhongyu's upper-end valuation estimate had proven to be accurate, Beal and Montgomery stood to net upwards of $50 million on their investments.[45] The district court was correct to conclude that Southgate's acquisition of the NPLs had objective economic reality.

The latter two *Klamath* factors ask whether the transaction was motivated solely by tax-avoidance considerations or was imbued with some genuine business purpose. These factors undertake a subjective inquiry into "'whether the taxpayer was motivated by profit to participate in the transaction.'"[46] Tax-avoidance considerations are not wholly prohibited; taxpayers who act with mixed motives, seeking both tax benefits and profits for their businesses, can satisfy the business-purpose test.[47]

Here, too, Southgate's acquisition of the NPLs easily passes muster. The district court found that Southgate and its members acquired the NPLs for legitimate purposes and that they believed they could earn a profit from the NPLs. This is not an instance of a taxpayer's engaging in an exotic, one-off transaction that bears no resemblance to its ordinary business activities. Beal and Montgomery specialize in buying stressed debt. They had previously identified a growth opportunity in foreign NPL markets. As the district court

---

[45] Of course, it turned out that Zhongyu's valuation report had substantially overestimated the NPLs' value, but the district court found that it was reasonable for Southgate to rely on Zhongyu's analysis, and the Government does not contend that this finding was clearly erroneous.

[46] *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (quoting *Illes v. Comm'r*, 982 F.2d 163, 165 (6th Cir. 1992)); *see also In re CM Holdings*, 301 F.3d at 102 n.4 (explaining that the "subjective inquiry" plays the "basic role of evaluating whether the taxpayer had a business reason, apart from tax avoidance, for engaging in the transaction").

[47] *See Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 786 (5th Cir. 2001) (collecting cases).

found, the acquisition of the NPLs fit squarely within Beal and Montgomery's core business.  The district court also found that Beal and Montgomery would have done the deal regardless of whether it had any tax benefits.  As to Montgomery specifically, the court found that he was not in a position to receive tax benefits from the NPLs.  His motives were exclusively profit- and business-driven: to earn money on the deal and develop a marketable expertise in Chinese NPLs that he could use in similar transactions in the future.  As to Beal, the court found he acted with mixed motives, investing in Southgate both because it posed profit potential and because it offered potential tax benefits. Under our decision in *Compaq Computer Corp.*,[48] that finding is sufficient for economic-substance purposes.

The Government urges us to conclude that the acquisition of the NPLs lacked economic substance because the district court found only that the transaction had "some profit potential" and such a finding is not sufficient for economic-substance purposes if a transaction's profit potential is insubstantial relative to its expected tax benefits.  This argument misfires factually and legally.  Factually, the district court made three separate findings that the acquisition of the NPLs had not just a *de minimis* profit potential but a reasonable profit potential.  Under *Klamath*, those findings support the conclusion that the acquisition had economic substance.[49]  The cases that the Government cites in support of its contrary position present readily distinguishable facts.[50]  Legally, the Government would have us conflate our

---

[48] *Id.*

[49] *See Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 545 (5th Cir. 2009) (emphasizing that "the proper focus is on whether the loan transactions presented a reasonable possibility of profit" and concluding that the transaction in question lacked economic substance because "no reasonable possibility of profit existed").

[50] *See Rogers v. United States*, 281 F.3d 1108, 1117–18 (10th Cir. 2002) (distinguishing between the economic-substance doctrine and the substance-over-form doctrine before applying the latter); *Keeler v. Comm'r*, 243 F.3d 1212, 1220 (10th Cir. 2001) (rejecting a

analysis of the acquisition of the NPLs under the economic-substance doctrine with our analysis of the formation of Southgate under the sham-partnership doctrine. The acquisition of the NPLs did not, by itself, generate any tax benefits. It was the funneling of that acquisition through the partnership structure that generated massive deductions for Beal. The fact that an economically substantial transaction comes wrapped in a dubious form is not a reason to disregard the transaction; it is a reason to disregard the form. Once the acquisition of the NPLs is recharacterized as a direct sale,[51] it becomes apparent that the tax benefits it created were not disproportionate to its expected profitability.[52] As a result, we affirm the district court's conclusion that Southgate's acquisition of a portfolio of Chinese NPLs was an economically substantial transaction motived by a genuine business purpose.

## B. Southgate was a sham partnership.

We are also persuaded that the district court was correct to determine that Southgate was a sham partnership that must be disregarded for federal-income-tax purposes.[53] As the Supreme Court explained in *Comm'r v. Culbertson*,

---

taxpayer's argument that a complicated derivative-trading scheme, which as a whole provided nothing but an illusory opportunity for economic profit, nonetheless had economic substance because individual trades within the scheme sometimes generated profits); *ACM P'ship v. Comm'r*, 157 F.3d 231, 258 & n.52 (3d Cir. 1998) (explaining that the "prospect of a nominal, incidental pre-tax profit" is not enough to support a finding of economic substance where none of the partners "reasonably expected to gain any pretax profit from the transaction"); *Kuper v. Comm'r*, 533 F.2d 152, 159 (5th Cir. 1976) (holding that the form assigned to a set of economically substantial transactions need not be respected where "larger tax objectives . . . ultimately controlled [the] specific form of the transactions").

[51] *See infra* Section II.C.

[52] Indeed, the only reason the sale created any tax benefits at all is that Beal suffered real, out-of-pocket losses because of his participation in the transaction.

[53] Southgate engages in question-begging when it contends that 26 U.S.C. § 704(c) mandated the tax treatment at issue in this appeal. Section 704(c) governs the allocation of losses among partners in a valid partnership. It is silent on the question of when a putative partnership is in fact valid. Here the judicial doctrines step into the breach. Sham-partnership analysis makes it plain that Southgate was not a valid partnership for tax purposes. Neither the text of the statute nor Congress's intent in enacting it compels the

whether a partnership will be respected for tax purposes depends on whether "the parties in good faith and acting with a business purpose" genuinely "'intended to join together for the purpose of carrying on the business and sharing in the profits and losses.'"[54] This determination is made in light of all the relevant facts and circumstances, including "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent."[55]

Because so many abusive tax-avoidance schemes are designed to exploit the Code's partnership provisions,[56] our scrutiny of a taxpayer's choice to use the partnership form is especially stringent.[57] We are not compelled to conclude that a partnership must be respected for tax purposes "merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to [the partnership's] tax-avoidance objective.[58] Rather, a taxpayer's

---

application of partnership tax treatment to an entity that was not a true partnership. Section 704(c) does not control.

[54] *Comm'r v. Culbertson*, 337 U.S. 733, 741–42 (1949) (quoting *Comm'r v. Tower*, 327 U.S. 280, 287 (1946)); *see also ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000) (describing the "basic inquiry" as "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance"); *Scofield v. Davant*, 218 F.2d 486, 489 (5th Cir. 1955) ("[T]he reality vel non of the partnership for tax purposes . . . depends upon whether the partners really and truly intended to join together for the purpose of carrying on a business and sharing in the profits or losses or both.").

[55] *Culbertson*, 337 U.S. at 742.

[56] *See* BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 86.1.2 (2011); Bradley T. Borden, *The Federal Definition of Tax Partnership*, 43 HOUS. L. REV. 925, 928–29 (2006); Karen C. Burke, *Repairing Inside Basis Adjustments*, 58 TAX LAW. 639, 639 & n.1 (2005).

[57] *See TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 n.13 (2d Cir. 2006); *ASA Investerings*, 201 F.3d at 513.

[58] *See TIFD III-E*, 459 F.3d at 232.

formation of a partnership must, on balance, display good "common sense from an economic standpoint."[59]

The fact that a partnership's underlying business activities had economic substance does not, standing alone, immunize the partnership from judicial scrutiny.[60] The parties' selection of the partnership form must have been driven by a genuine business purpose.[61]  This is not to say that tax considerations cannot play *any* role in the decision to operate as a partnership.[62]  It is only to say that tax considerations cannot be the *only* reason for a partnership's formation.[63]  If there was not a legitimate, profit-motivated reason to operate as a partnership, then the partnership will be disregarded for tax purposes even if it engaged in transactions that had economic substance.[64]

---

[59] *Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003).

[60] *See TIFD-IIIE*, 459 F.3d at 231 ("The IRS . . . is entitled in rejecting a taxpayer's characterization of an interest to rely on a test less favorable to the taxpayer, even when the interest has economic substance.  This alternative test determines the nature of the interest based on a realistic appraisal of the totality of the circumstances.").

[61] *See Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir. 1989) ("The issue . . . is not whether the operation of the oil rig had economic substance, but whether the formation of the partnership had such substance.  Courts have rejected the form of a transaction even when the underlying activity, as in this case the operation of the oil rig, was not a sham."); *see also Saba P'ship v. Comm'r*, 273 F.3d 1135, 1141 (D.C. Cir. 2003) ("'[T]he absence of a nontax business purpose is fatal' to the argument that the Commissioner should respect an entity for federal tax purposes." (quoting *ASA Investerings*, 201 F.3d at 512)); *Adantech L.L.C. v. Comm'r*, 331 F.3d 972, 980 (D.C. Cir. 2003) (holding that a partnership was a sham even though it was "possible that [its] business could have been profitable"); sources cited *supra* note 33.

[62] As Judge Learned Hand once famously said, "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935).

[63] On this score, it is telling that the great judge uttered his well-known epigram just before disregarding the form of a transaction on the ground that it was a sham devoid of economic substance.  *See id*. at 811.

[64] Southgate contends that the proper test of a partnership's legitimacy is an either–or test announced by *Moline Properties v. Comm'r*, 319 U.S. 436 (1943), under which a partnership must be respected for tax purposes if it either was formed for the purpose of carrying on business activity or in fact conducts economically substantial business activity

In this case, an application of *Culberton*'s totality-of-the-facts-and-circumstances test demonstrates that the Southgate partnership was a sham that need not be respected for tax purposes. Montgomery, Beal, and Cinda did not intend to come together to jointly conduct the business of collecting on the NPLs. The structure of the GNMA basis-build underscores their lack of such an intent. The parties also lacked any genuine business purpose for their decision to form Southgate.

### (1) The lack of an intent to join together

*Culberton* directs our attention to the conduct of the parties in execution of the partnership agreement's provisions,[65] and Beal and Montgomery's conduct after Southgate's formation demonstrates that they did not truly intend to join together with Cinda in the present conduct of a business. Concededly, Beal and Montgomery's intent at the time they acquired the NPLs was to conduct the business of realizing value from the loans. But their subsequent conduct discloses no intent to conduct that business as a partnership with Cinda.

Most damning is their response to Cinda's shortcomings as a loan servicer—shortcomings that, as noted above, were the primary cause of Southgate's failure to turn a profit on its NPL portfolio. By late 2003, with the net collection rate on the portfolio languishing at less than 1.1 percent, these shortcomings had become apparent, and Montgomery retained an attorney to help him develop a strategy for improving collections. The attorney wrote a

---

post-formation. We disagree. Southgate's test conflicts with our holding in *Merryman*. *See supra* note 61. As a prior published decision of this Court, *Merryman* binds us, regardless of whether its interpretation of *Moline Properties* was correct. *See Grabowski v. Jackson Cnty. Pub. Defenders Office*, 47 F.3d 1386, 1398–1400 & n.4 (5th Cir. 1995) (Smith, J., concurring in part and dissenting in part). That said, *Merryman* was correctly decided, and it is Southgate who misreads *Moline Properties*. What Southgate "alleges to be a two-pronged inquiry is in fact a unitary test," under which "the existence of formal business activity is a given but the inquiry turns on the existence of a nontax business motive." *ASA Investerings*, 201 F.3d at 512 (citing *Knetsch v. United States*, 364 U.S. 361, 364–66 (1960)).

[65] *See also Merryman*, 873 F.2d at 882–83 (relying on the parties' post-formation conduct as evidence of their intentions at the time they formed the partnership).

letter to Cinda complaining about its servicing efforts.  Cinda responded by threatening to disclose the Southgate transaction to the IRS.  Montgomery's attorney immediately apologized to Cinda, and he made no further efforts to goad Cinda into improving its performance as the loan servicer.

This sequence of events decisively gives the lie to the notion that Montgomery and Beal intended to jointly conduct a business with Cinda. Without an improved collection rate, Southgate's profit potential was doomed. Cinda's repeated, willful breaches of the LSA and the Southgate Operating Agreement had put Beal and Montgomery to a decision: they could preserve the business but risk the tax benefit, or they could sacrifice the business and preserve the tax benefit.  With no hesitation, they charted the latter course. Their decision manifests an unmistakable intent to forgo the joint conduct of a profit-seeking venture.[66]

Beal and Montgomery's outside dealings with Cinda also shine an illuminating light on their intentions within Southgate.  In late 2003, around the same time that Cinda's shortcomings as a servicer became so egregious that Montgomery began contemplating legal action, Beal and Montgomery entered into another NPL transaction with Cinda.  As the district court delicately put it, "It is unclear why they would return to the same unprofitable NPL trough after their difficulty with Cinda's servicing of the Southgate portfolio, other than the anticipated tax benefits."  Armed with first-hand information that a second partnership with Cinda had no chance of being profitable, they nonetheless

---

[66] While this decision is highly relevant to our sham-partnership analysis, it does not undercut our previous conclusion that the initial acquisition of the NPLs had economic substance.  It is well settled that the parties' post-formation conduct is a reliable gauge of whether they intended to act as partners.  *See* sources cited *supra* notes 55, 65.  By contrast, a transaction's economic substance or lack thereof is "evaluated prospectively."  *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010).  "In other words, the transaction is evaluated based on the information available to a prudent investor at the time the taxpayer entered into the transaction, not what may (or may not) have happened later." *Id.*

formed such a partnership. If Beal and Montgomery's intent in forming Southgate had been to jointly conduct a legitimate business, they would not have entered into a second, identically structured partnership with Cinda just as Southgate's legitimate business was foundering.

Cinda's post-formation conduct is similarly incompatible with its status as a Southgate partner. Rather than an intent to join together with Beal and Montgomery to pursue profitable business activity, Cinda's actions exhibit an intent to sabotage and undermine Southgate's efforts to make a profitable business out of servicing and collecting on its portfolio of NPLs. Southgate's plan for turning a profit on the NPLs hinged on identifying a few high-value "nuggets" within the portfolio and collecting on those loans. If Cinda had been acting as a true partner, it would have concentrated its most aggressive collection efforts on these loans. Instead, Cinda repeatedly sold off the NPLs that Southgate had identified as nuggets, deliberately thwarting Southgate's profit potential. Cinda did not execute or abide the partnership agreement as a true partner would have.

In addition, Cinda did not even profess to view Southgate as a true partnership. In its public announcement of the Southgate transaction, Cinda declared that it had completed a "package sale of bad debts." Regulatory approval of the transaction was predicated on Cinda's representation that it would retain a 10 percent interest in Southgate only "symbolically." And from Cinda's perspective, its interest in Southgate was purely symbolic. Cinda had received a $19.42 million capital-account credit when it contributed the NPLs to Southgate. Just one month later, Beal paid Cinda $19.41 million to acquire an interest in Southgate. Although on paper Cinda only sold 90 percent of its interest in Southgate to Beal, in real dollars it received 99.93 percent of the value of its loans.

Cinda also did not participate in major partnership decisions. When Southgate was restructured and its operating agreement amended in connection

with the GNMA basis-build, Cinda did not make an additional, matching capital contribution, sign the restructuring agreement or the amended operating agreement, or receive notice that its interest in Southgate had been diluted. In short, the district court's pertinent findings of fact establish that Cinda, Beal, and Montgomery acted in a manner that was inconsistent with an intent to come together in the joint conduct of business.

### *(2) The lack of intent to share profits and losses*

In light of *Culbertson*'s identification of "the actual control of income and the purposes for which it is used" as a metric of a partnership's legitimacy, the terms of the GNMA basis-build constitute compelling evidence that Southgate was not a true partnership. Beal reserved for himself total control over all of the income produced by the GNMAs. At the time of their contribution to Southgate, the GNMAs could have provided real economic benefits to the partnership in any of four distinct ways. But the structure of the basis-build transaction ensured that Southgate would never receive any of those benefits.

First, the GNMAs had been used as collateral to obtain a $162 million secured loan from UBS. The loan proceeds were derived from the value of the GNMAs, but Beal did not distribute any of the proceeds to Southgate. Instead, he injected the $162 million back into the Bank as capital. There was no prospect of Southgate's ever receiving any of the loan proceeds.

Second, the GNMAs would attract principal payments as the owners of the mortgages backing the securities made their mortgage payments.[67] These payments, too, were diverted away from Southgate pursuant to Beal's unconditional right to direct the use and application of all proceeds from the GNMAs. The principal payments were used to repay UBS for the secured loan,

---

[67] Unlike the principal payment on a traditional bond, which is received on the bond's maturity date, principal payments on a mortgage-backed security are spread out over the life of the security.

thereby ensuring that the loan remained a self-liquidating transaction. There was no prospect of Southgate's ever receiving any of the principal payments.

Third, the GNMAs bore a fixed annual interest rate of 7 percent. This was a major source of the GNMAs' immediate present value during the time they were held by Southgate. But Southgate's amended operating agreement explicitly provided that all of the interest that accrued on the GNMAs after their contribution to Southgate was allocated to Beal. There was no prospect of Southgate's ever receiving any of the interest income.

Finally, the value of the GNMAs could increase in response to interest-rate fluctuations. In other words, the market price of the GNMAs would necessarily reflect their relative attractiveness vis-a-vis other available investment options. If interest rates were to rise, the GNMAs—with their fixed interest rate of 7 percent—would become relatively less attractive to investors, and their market value would go down. If interest rates were to drop, the GNMAs would become relatively more attractive, and their value would climb. When Beal contributed the GNMAs to Southgate, he agreed that if a drop in interest rates were to cause the GNMAs to gain in value, any post-contribution gain was to be shared among all three Southgate partners.

Thus, there was a prospect that Southgate might receive some economic benefit if GNMAs appreciated in value. But that prospect existed only on paper. In the absence of a realization event, any gain in the value of the GNMAs would not actually redound to the benefit of the partners. As the district court found, Southgate's other partners could share in the gain only "in the event of a sales transaction." But Southgate's amended operating agreement gave Beal the absolute right, in his sole discretion, to determine whether, and if so when, the GNMAs would be sold. If Beal wanted to avoid a sale, he had an absolute right to cause Martel to distribute the GNMAs back to Beal, and such a distribution would not create an obligation on Southgate's part to make corresponding distributions to Montgomery or Cinda. And the district court found that "Beal

never intended to share any potential gains or losses from the GNMAs with the other partners in Southgate."[68]

In light of the vise grip that Beal maintained on all economic benefits flowing from the GNMAs, the district court was correct to conclude that the GNMA basis-build lacked objective economic reality under *Klamath*.   Beal reserved for himself all loan proceeds, principal payments, interest income, and built-in gain.  He contributed the right to share in any post-contribution gain in the event the GNMAs were sold, but he retained an unconditional right to decide whether to sell the GNMAs in the first place, and he had no intention of selling them.  Stripped to its essentials, Beal's putative contribution of the GNMAs was no contribution at all.  When an asset is contributed to a partnership that will only benefit the partnership in the event of a sale, on terms and under circumstances that make it beyond unlikely that a sale will occur, with the result that no sale ever occurs and the partnership receives no value from the contribution, the contribution cannot be said to have economic substance.[69]

---

[68] Southgate contends that this conclusion about Beal's intent cannot be treated as a finding of fact because it appeared in the conclusions-of-law section of the district court's findings and conclusions.  This argument is without merit.  In our review of the results of a bench trial, we are not bound by the labels the district court attaches to its conclusions.  Instead, we make an independent determination of whether a particular conclusion is factual or legal in nature.  *See, e.g.*, *Turpen v. Mo.-Kan.-Tex. R.R. Co.*, 736 F.2d 1022, 1026 n.5 (5th Cir. 1984) ("We regard this conclusion as a finding of ultimate fact, and we are not bound by the label placed on it by the trial court.").  The district court's conclusion that Beal had no intention of allowing the other partners to share in the GNMAs was necessarily a finding of fact.  *See, e.g.*, *United States v. Hood*, 615 F.3d 1293, 1299 (10th Cir. 2010) (describing the question of intent as "'the quintessential factual question'" (quoting *United States v. Smith*, 534 F.3d 1211, 1224 (10th Cir. 2008))), *cert. denied*, 131 S. Ct. 1546 (2011); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 n.3 (5th Cir. 1993) ("[I]ntent is inherently a question of fact which turns on credibility."); *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 437 (3d Cir. 1993) (noting "the fact questions inherent in [the] determination of the intent of the contracting parties").

[69] *Accord TIFD III-E, Inc. v. United States*, 459 F.3d 220, 234–35 (2d Cir. 2006) (disregarding as economically insubstantial a transaction that was deliberately structured to minimize the possibility that two putative partners would earn substantial profits); *Dow Chem. Co. v. United States*, 435 F.3d 594, 603 (6th Cir. 2006) (concluding that a transaction lacked economic substance where it "contained features designed to neutralize the taxpayer's

For present purposes, the economically insubstantial nature of the GNMA basis-build is important primarily because of what it reveals about the intentions of Beal, Montgomery, and Cinda.[70] The *sine qua non* of a partnership is an intent to join together for the purpose of sharing in the profits and losses of a genuine business. Because of the basis-build transaction's structure, the district court found, "Beal personally received all of the potential benefits, and retained all of the risks," associated with the GNMAs. Beal's decision to structure the basis-build as he did, Montgomery's willingness to accede to such one-sided terms, and Cinda's total lack of participation in the transaction are inconsistent with their professed intent to share, as partners, in Southgate's profits and losses.[71]

---

ability to realize . . . gains"); *ASA Investerings*, 201 F.3d at 513–14 (determining that a putative partner's "participation was formal rather than substantive" where the evidence confirmed that it "could make no profit from the transaction"); *Grant v. Comm'r*, 150 F.2d 915, 917 (10th Cir. 1945) (holding that a transfer of property among partners should be disregarded for tax purposes where the transferor partner "continues to manage and control the partnership property and to use, enjoy, and dispose of the economic benefits derived therefrom . . . the same as he did before . . . the formation of the partnership").

[70] Here it matters not whether the GNMA basis-build was entirely without economic substance or actually contained some narrow sliver of economically substantial profit potential. *See TIFD III-E*, 459 F.3d at 232 n.13 (holding that a transaction that passes the economic-substance test "would not necessarily survive *Culbertson*").

[71] Southgate argues that the district court found as fact that the GNMA basis-build had objective economic substance. Southgate's argument is premised wholly on the following statement in ¶ 235 of the district court's findings of fact: "[The GNMA basis-build] had some economic substance, as all of Southgate's partners had a reasonable possibility of profit from the GNMAs after their contribution." This statement cannot be reconciled with the balance of the district court's findings on this issue, which—in addition to the three already quoted—includes findings that Beal's contribution of the GNMAs "was [e]ffectively [i]llusory," that "Beal relinquished nothing of economic value" in the basis-build transaction, that "[f]rom Southgate's perspective there was no economic benefit served by Beal's alleged contribution" of the GNMAs, that because Beal had the "option to distribute [the GNMAs] to himself, to the exclusion of Southgate and its other members, Southgate had only a small possibility of realizing an economic profit" from the basis-build transaction, that "Beal never exercised his option to share any gains from the GNMAs with Southgate's other members," that "Southgate allocated all income from the GNMAs to Beal" and none to Montgomery or Cinda, that "[t]he GNMA transaction did not expand Southgate's equity base," and that "[t]here was no substantive non-tax economic reason for" the basis-build, as "the proffered rationales" for the transaction "do not amount to substantive business purposes." In addition, the court's

### (3) The lack of a business purpose

Finally, *Culbertson* instructs us to ask whether the partners were "acting with a business purpose" when they made the decision to form the partnership. The district court found that the formation of Southgate was important in six separate respects. Southgate contends that these findings compel us to conclude that Southgate was formed with a genuine business purpose and that the partnership therefore was not a sham. Careful scrutiny of these six findings reveals that they do not demonstrate the existence of a "non-tax need to form [Southgate] in order to take advantage of the potential profits of the [NPL investment]."[72] Southgate was a redundancy, "a meaningless and unnecessary incident"[73] inserted into the chain of entities, transactions, and agreements through which the NPL acquisition took place. Southgate served no function whose accomplishment was not already assured by other means or could not have been equally well assured by alternative, less tax-beneficial means.

First, the district court found that "the establishment of a non-Chinese entity into which non-performing loans were transferred" both "avoided the difficulties of getting approval for a wholly-owned foreign entity in China" and also "allowed for easier conversion of RMB into United States dollars." This purpose had already been accomplished by Cinda's formation of Eastgate, the wholly owned subsidiary organized under Delaware law through which Cinda became a member of Southgate.

---

conclusions of law unequivocally state that the GNMA basis-build "lack[ed] economic substance" because the possibility that Beal would "allow Southgate to profit from the GNMA transaction[,] effectively to his own economic detriment," was simply too remote. Because it is inconsistent with nearly a dozen other factual findings as well as the district court's carefully reasoned conclusions of law, we conclude that the finding contained in ¶ 235 is clearly erroneous.

[72] *See Adantech L.L.C. v. Comm'r*, 331 F.3d 972, 980 (D.C. Cir. 2003).

[73] *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938).

Second, and relatedly, the court found that "Montgomery was able to confirm Cinda's title to the NPLs and its authority to transfer them to a United States-based partnership." But Cinda confirmed its title and transfer authority when it contributed the NPLs to Eastgate. The transfer from Eastgate to Southgate did not further effectuate this purpose; Cinda made the same set of representations and warranties in its contribution agreement with Eastgate that Eastgate eventually made in its contribution agreement with Southgate.

Third, the district court found that Montgomery's negotiation of an acquisition price of 1.7 percent "afforded an investor an opportunity to turn a profit," especially when coupled with Cinda's 25 percent collection fee, which "aligned Cinda's interests with Southgate's." But the 1.7 percent acquisition price was not contingent on the formation of Southgate. Cinda would have received a payment in the same amount if the transaction had instead been structured as a direct sale. And Cinda's 25 percent collection fee was a term of the LSA, not a term of the Southgate Operating Agreement.

Indeed, the district court's findings about the effects of the LSA forcefully undercut any claim that Southgate fulfilled a genuine business purpose. The court found that "[t]he LSA allowed Montgomery to achieve the essential benefits of partnering with Cinda," including "retaining Cinda's super powers relating to collections," notwithstanding the fact that "[t]he LSA explicitly disavow[ed] any partnership relationship between Cinda and Southgate arising from that agreement." In light of these findings, what was the purpose of creating a formal partnership? From a tax perspective, the answer is readily at hand. From a business perspective, none appears.

Fourth, the district court found that "Montgomery was able to 'lock-in' all of the loans that met his investment criteria . . . by making the acquisition of all such loans a condition of the transaction." While this was formally true, as a practical matter Southgate was inadequate for this purpose. The district court found that Beal walked out of the August 30, 2002, closing at which he was to

36

acquire an interest in Southgate and refused to go forward with the deal until he received additional assurances about the loans. Prior to Southgate's formation, Montgomery had obtained a CD-ROM from Cinda that contained a schedule of all the loans in the Southgate portfolio. Beal was concerned that Montgomery had not done enough to ensure that the portfolio of loans Cinda transferred to Southgate was the same portfolio of loans that Montgomery had identified during his due diligence. Before he would go forward with the deal, Beal demanded that the Haiwen law firm verify that the portfolio was intact and that Deutsche Bank obtain written confirmation from Cinda that the schedule of loans held by Southgate was identical to the schedule that had previously been provided Montgomery on the CD-ROM. It was only after Cinda provided this confirmation that Beal was willing to purchase an interest in Southgate. The fact that the loans had previously been transferred to Southgate was not sufficient to lock in those loans for later acquisition by an investor. And even if it had been, the confirmation from Deutsche Bank and verification from Haiwen were equally up to the task.

Fifth, the district court found that "the formation of Southgate enabled Cinda to remove from its books thousands of [NPLs], while retaining a profits and servicing fee interest" and receiving immediate liquidity from an infusion of foreign capital. Again, while the formation of Southgate was consistent with each of these purposes, it was not necessary to the accomplishment of any of them. The LSA was adequate to ensure that Cinda retained a servicing-fee interest. A direct sale of the NPLs would have been just as effective at removing the NPLs from Cinda's books and injecting capital. And Cinda knew that its profits interest was an empty shell. Unbeknownst to Beal and Montgomery, Cinda had commissioned a valuation report from Zhongyu around the same time that Zhongyu was preparing a valuation report for Montgomery. In stark contrast to what it told Montgomery, Zhongyu reported to Cinda that the NPLs were worth between 1.18 and 1.56 percent of face value. Given that Cinda had

negotiated an up-front payment equal to 1.7 percent the loans' face value, the profits interest it retained was so slight as to be nonexistent.

Finally, the district court found that the creation of Southgate enabled Montgomery to "obtain[] representations from Cinda that were critical to determining . . . the NPL investment also potentially had significant United States tax benefits." This finding is, of course, immaterial to our analysis, which trains exclusively on the question whether there was a nontax business purpose that necessitated the partnership's existence.[74] Discerning none, we affirm the district court's holding that Southgate was a sham partnership that must be disregarded for federal-income-tax purposes.[75]

### C. The transaction should be recharacterized as a sale.

Where, as here, "we confront taxpayers who have taken a circuitous route to reach an end more easily accessible by a straightforward path," we look to substance over form and tax the transactions "for what realistically they are."[76]

---

[74] *See supra* notes 61–65, 72 and accompanying text.

[75] Southgate's contention that the district court actually held that Southgate was a valid partnership is patently untenable. Southgate's argument rests on the fact that the district court used the label "Southgate Itself had Economic Substance" to introduce the subsection of its conclusions of law in which it concluded that "the Southgate transaction regarding the Chinese NPLs" had economic substance. The wording of the label is somewhat imprecise, but it is clear from context that the court was referring only to the acquisition of the NPLs, not the parties' use of the partnership form. The court addressed this latter issue in a separate subsection of its conclusions of law (denominated, fittingly enough, "Sham Partnership"), where it held that, "[d]espite [Southgate]'s attempts to imbue the partnership with legitimacy, the Court must conclude it was a sham." Indeed, Southgate elsewhere acknowledges that the district court invalidated the partnership, primarily because of the GNMA basis-build's lack of economic substance. Southgate takes umbrage with this line of reasoning, but it is well settled that if a district court arrives at a correct conclusion of law via faulty or questionable reasoning, we can affirm its holding based on an alternative theory that is supported by the findings of fact. *See Coggin v. Longview Indep. Sch. Dist.*, 337 F.3d 459, 466 n.35 (5th Cir. 2003) (en banc); *Hoyt R. Matise Co. v. Zurn*, 754 F.2d 560, 565 & n.5 (5th Cir. 1985); *Cutliff v. Greyhound Lines, Inc.*, 558 F.2d 803, 807 n.12 (5th Cir. 1977). Our de novo application of the *Culbertson* test moots Southgate's objection to the district court's reasons for concluding that the partnership was a sham.

[76] *Kuper v. Comm'r*, 533 F.2d 152, 153 (5th Cir. 1976); *see also Minn. Tea Co.*, 302 U.S. at 613 ("A given result at the end of a straight path is not made a different result because

A court is not bound to accept a taxpayer's formal characterization of a transaction, even a transaction that has economic reality and substance.[77] "'The major purpose of the substance-over-form doctrine is to recharacterize transactions in accordance with their true nature.'"[78]

Because we have concluded that the acquisition of the NPLs had economic substance but that the formal partnership structure through which that acquisition took place was a sham, we are left to determine what transactional form most neatly maps onto the substance of that acquisition. The outcome of our analysis under the substance-over-form doctrine is dictated by the outcomes of our economic-substance and sham-partnership analyses.[79] Beal paid Cinda $19.4 million in exchange for an interest in a portfolio of NPLs. That interest was not properly classified as a partnership interest. It is most naturally classified as an ownership interest. We hold that Southgate's acquisition of the portfolio of NPLs should be recharacterized as a direct sale of those NPLs by Cinda to Beal.[80]

### III. PENALTIES

We also affirm the district's decision to disallow the imposition of any accuracy-related penalties under 26 U.S.C. § 6662. Section 6662 imposes a

---

reached by following a devious path.").

[77] See Harris v. United States, 902 F.2d 439, 443 (5th Cir. 1990) ("The IRS . . . may disregard form and recharacterize a transaction by looking to its substance."); Kuper, 533 F.2d at 155 ("[T]he incident of taxation depends on the substance rather than the form of the transaction."); id. (collecting cases).

[78] Rogers v. United States, 281 F.3d 1108, 1115 (10th Cir. 2002) (quoting John P. Warner, Statutory, Regulatory, and Common Law Anti-Abuse Weapons, 485 PLI/Tax 883, 889 (2000)).

[79] See Fidelity Int'l Currency Advisor A Fund, LLC v. United States, 747 F. Supp. 2d 49, 233 (D. Mass. 2010) ("If a partnership is found to be a sham, the partnership should be disregarded, and the partnership's activities are deemed to be engaged in by one or more of the partners."); see also 26 C.F.R. § 1.701-2(b)(1) (same).

[80] Determining the tax consequences to Beal and Montgomery of this sale is beyond the scope of this proceeding. See supra note 4.

penalty equal to 20 percent of the portion of any underpayment of tax that is attributable to one or more of the following: negligence, a substantial understatement of income tax, or a substantial valuation misstatement under chapter 1.[81]  The valuation-misstatement penalty increases to 40 percent in the case of a gross valuation misstatement.[82]  However, § 6664(c)(1) provides that no penalty may be imposed under § 6662 if the taxpayer can show that there was reasonable cause for, and that it acted in good faith with respect to, its underpayment of tax.[83]  The district court held that none of the penalties in § 6662 were applicable and, in the alternative, that Southgate had satisfied the requirements of § 6664(c)(1).  We find no reversible error in the district court's conclusions that Southgate established the reasonable cause and good faith required by § 6664(c)(1) and therefore has a complete defense to any accuracy-related penalties.[84]

Southgate's § 6664(c)(1) defense is predicated on its reliance on tax opinions issued to it by the De Castro law firm and the accounting firm Coscia Greilich & Company ("CGC").  Both tax opinions concluded that it was more likely than not that the IRS would uphold the Southgate tax positions that are the subject of this appeal.  The district court found that Southgate relied on these tax opinions in good faith, and the Government does not challenge that finding on appeal.  Therefore, the dispositive question is whether Southgate's reliance on the De Castro and CGC opinions constitutes reasonable cause.  This

---

[81]  26 U.S.C. § 6662(b)(1)–(3).  The penalties are imposed in the alternative, not cumulatively.

[82]  *Id.* § 6662(h)(1).

[83]  26 U.S.C. § 6664(c)(1).

[84]  We do not reach the propriety of the district court's determinations that, even in the absence of the § 6664(c)(1) defense, none of the § 6662(b) penalties would have applied.

is a question of fact, so we review the district court's findings only for clear error.[85]

We determine whether a taxpayer acted with reasonable cause on a case-by-case basis, evaluating the totality of the facts and circumstances.[86] "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."[87]  The Treasury Regulations clarify that reliance on the advice of a tax professional can, but "does not necessarily[,] demonstrate reasonable cause."[88]  That advice "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances."[89]  If a tax advisor's opinion is shown to be "based on unreasonable factual or legal assumptions," that is, "upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true," then the taxpayer's reliance on that opinion does not constitute reasonable cause.[90]  And, of course, if the taxpayer fails to actually follow the advice he receives from a tax professional, the taxpayer cannot rely on that advice to establish reasonable cause.[91]

---

[85] *See, e.g.*, *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 341 (5th Cir. 2010); *see also United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985); *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1381 (Fed. Cir. 2010).

[86] *See* 26 C.F.R. § 1.6664-1(b)(1).  Where, as here, the reasonable-cause defense is asserted in a partnership-level proceeding, we look to the conduct of the partnership's managing partners in evaluating the reasonableness of the partnership's reporting position. *See Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009).

[87] 26 C.F.R. § 1.6664-1(b)(1).

[88] *Id.* § 1.6664-4(b)(1).

[89] *Id.* § 1.6664-4(c)(1)(i).

[90] *Id.* § 1.6664-4(c)(1)(ii).

[91] *See, e.g.*, *InterTAN, Inc. v. Comm'r*, 87 T.C.M. (CCH) 767, 2004 WL 25249, at *15–17, *aff'd*, 117 F. App'x 348 (5th Cir. 2004) (per curiam) (unpublished).

The district court's findings of fact establish that all of the elements of reasonable cause are present in this case. Southgate received comprehensive tax opinions from De Castro, a law firm, and CGC, an accounting firm, both of which the district court found to be qualified tax advisors not burdened by any conflict of interest. The district court also found that Southgate and its members "disclosed all pertinent facts" to De Castro and CGC and that the tax opinions "consider all facts and circumstances, analyze the relevance and persuasiveness of authorities, [and] are not based on unreasonable assumptions." The district court further found that Beal and Southgate "carried out the transactions at issue consistently with the transactional documents and descriptions in the De Castro and CGC opinions." Consequently, the court concluded that "the De Castro and CGC opinions met the standards for reliance on tax advice" described in § 6664 and its implementing regulations and that "[i]t was therefore reasonable for Beal and Southgate to rely on the De Castro and CGC opinions."

The Government advances two theories as to why these findings are not sufficient to establish reasonable cause. Neither holds water. First, the Government argues that Beal failed to follow the advice he received from De Castro and CGC when he structured the GNMA basis-build. The record belies this claim. Both opinions accurately describe the structure of the GNMA basis-build; they do not assume, for example, that Beal would share the interest proceeds with the other partners. It is true that in prior correspondence, De Castro had laid out several alternative structures for the basis-build and suggested that these alternatives were more likely to withstand scrutiny from the IRS. But a taxpayer is free to select among "any of the bona fide alternatives developed by a tax advisor acquainted with the relevant facts."[92] Both De Castro and CGC unequivocally concluded that, even in light of the structure that Beal had chosen, it was more likely than not that the IRS would uphold the GNMA

---

[92] *Streber v. Comm'r*, 138 F.3d. 216, 221 (5th Cir. 1998).

basis-build. In light of these facts, the district court's finding that Beal carried out the GNMA basis-build consistently with the advice he received from his tax advisors is not clearly erroneous.

Next, the Government argues that the district court did not find that the De Castro and CGC opinions were not based on any representations or assumptions that Beal and Montgomery knew, or had reason to know, were unlikely to be true. The Government is correct that the district court's findings that the tax opinions were not based on any "representations or assumptions that [De Castro and CGC] knew or had reason to know were inaccurate" are immaterial to our reasonable-cause determination. Our focus is on the taxpayer's knowledge, not the tax advisor's. But the district court separately found that the tax opinions were not based on any unreasonable assumptions. That finding satisfies the requirement of Regulation 1.6664-4(c)(1)(ii).

The Government's brief contention that this finding was clearly erroneous finds no purchase. The opinions accurately describe the factual underpinnings of Beal and Montgomery's decision to invest in Chinese NPLs, their reasons for forming Southgate, and the structure of and justifications for the GNMA basis-build. For example, the opinions attribute several business purposes to the decision to use the partnership structure to invest in the NPLs. These are the same business purposes that the district court found did, in fact, motivate the formation of Southgate.[93] Our conclusion that these business purposes were not sufficient to imbue the partnership with legitimacy for tax purposes does not call into question the accuracy with which Beal and Montgomery reported the relevant facts to De Castro and CGC. Regulation 1.6664-4(c) does not require

---

[93] *See supra* Subsection II.B(3).

the taxpayer to correctly anticipate the legal consequences that the IRS or the courts will attach to the facts underlying a transaction.[94]

## IV. CONCLUSION

The district court correctly held that, while Beal and Montgomery's acquisition of an interest in a portfolio of Chinese NPLs had economic substance, the Southgate partnership was a sham that must be disregarded for federal-income-tax purposes.    As a consequence, that acquisition must be recharacterized as a direct sale.    The court was also correct to disallow all accuracy-related penalties on the ground that Southgate had reasonable cause for, and exhibited good faith in, reporting the positions it took on its 2002 partnership return.    The judgment below is

AFFIRMED.

---

[94] The Government correctly notes that the district court erred in its conclusions of law by determining that penalties were not justified because Southgate's tax advisors "relied on a literal–if narrow–reading of the law and congressional intent" and that Southgate made "assiduous efforts to comply with black-letter law."  If the De Castro and CGC opinions had taken such a hypertechnical view of what a taxpayer must do to discharge its obligations under the Code, reliance on those opinions would have been unreasonable.  *See supra* note 89 and accompanying text.  But both opinions discussed and applied the judicial doctrines and the Treasury's anti-abuse regulations.  The court's findings of fact amply support its reasonable-cause determination.

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| BEMONT INVESTMENTS, LLC., by and through its Tax Matters Partner, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 4:07cv9 (Consolidated with 4:07cv10) |
| UNITED STATES OF AMERICA, | § § | |
| Defendant. | § | |

## FINDING OF FACTS, CONCLUSIONS OF LAW, MEMORANDUM OPINION AND ORDER

This is an action under 26 U.S.C. § 6626 for readjustment of the partnership items arising out of two U.S. Return of Partnership Income forms (Forms 1065) filed by BM Investments LC (Bemont) for the tax period ending December 19, 2001, and BPB Investments (BPB) for the tax period ending December 31, 2002. The case was tried before the Court for four days from March 22, 2010 until March 25, 2010. Numerous exhibits and extensive testimony, both live and by deposition, were received. Thereafter, the Court conducted several additional evidentiary hearings and considered post-trial briefing submitted by the parties.

For the reasons set forth below, the Court concludes that the partnership item adjustments made by the IRS are correct. The Court also makes certain factual determinations relevant to the assessment of accuracy-based penalties. The Court is without jurisdiction to address the assessment

of specific tax penalties in this proceeding. The Court further finds that the three-year statute of limitations has run as to Bemont's 2001 return.

Much of Plaintiffs' arguments concerning the propriety of the tax shelter focuses on their argument that the long and short swaps at issue were entered to facilitate a proposed tender offer for an Australian company, Solution 6. ==Although, at some point in time, Andrew Beal and Tom Montgomery focused on a possible tender offer, the structuring of the swaps to claim considerable losses was the primary objective of the parties.== The following findings support the Court's conclusion that the transaction, as structured, lacked economic substance.

1.  ==Tom Montgomery is a CPA and former managing partner of Montgomery, Baggett, Drews, LLP.==

2.  ==Andrew Beal is the sole shareholder of Beal Financial Corporation.==

3.  In 1999, Montgomery's CPA firm sold all of its assets to Solution 6 Holding Ltd, an Australian software and sales firm.

4.  Prior to the sale to Solution 6, Montgomery had an extensive relationship with Solution 6.

5.  Both prior to the sale and after the sale, Montgomery remained a key advisor to Solution 6.

6.  On the sale of the accounting firm to Solution 6, Montgomery became chief financial officer of Solution 6.

7.  In June 2000, Montgomery became a board member of Solution 6.

8.      In 2000, Montgomery moved to Australia to work at Solution 6, only to be terminated shortly thereafter.

9.      In the Spring of 2001, Montgomery believed that the Solution 6 stock would significantly increase over the next few years. During this time, the stock price was around $1.40 per share, down from the price per share when Montgomery left Solution 6.

10.     In the Spring of 2001, Montgomery believed that Solution 6 was undervalued and, with the management team in place, would appreciate in value.

11.     Montgomery started working with Andy Beal in the Spring of 2001.

12.     Montgomery became the head of BFC Capital, Inc. The business objective of BFC was to explore new investment opportunities for Beal and his banks.

13.     Montgomery recommended that BFC invest in Solution 6.

14.     Plaintiffs' Exhibit 2000 reflects that the Board of Directors of BFC approved the acquisition of $4 million worth of Solution 6 stock.

15.     The initial approval for the acquisition for Solution 6 stock was in May 2001.

16.     Initially, there were no discussions concerning a takeover of Solution 6, rather merely investing in the company's stock.

17.     BFC began acquiring stock in May 2001.

18.     Between May and September 2001, BFC acquired 7.6 million shares of Solution 6 stock.

3

19. The shares were normally acquired over this period through buying small lots.

20. By the end of August 2001, BFC owned 4.5% of Solution 6 stock.

21. If BFC owned more than 5% of the company, it would be required to disclose its intentions as to the purchases.

22. One of Beal's affiliates employed Jeff Crawford to prepare a business proposal for acquiring Solution 6. Crawford spent several hundred hours in preparing a proposal over a six-month period.

23. BFC received an inquiry from the Australian Securities Exchange as to its purchases and hired an Australian law firm, Swaab, to respond to the inquiry.

24. During the summer of 2001, a former officer for Solution 6, Chris Tyler, also discussed the possibility of a takeover of Solution 6 with BFC.

25. In early August 2001, Montgomery had his agents in Australia approach Solution 6's largest shareholder, Telstra, about their willingness to sell shares. Montgomery acknowledged that, without Telstra on board, a takeover in all likelihood would not succeed.

26. After adverse publicity concerning the potential takeover surfaced, BFC decided not to pursue the takeover with any assistance from Chris Tyler.

27. Montgomery testified that any tender for Solution 6 would have to be in Australian dollars.

28. Montgomery testified that the first time there were any discussions on hedging

4

American dollars to account for any currency risk issues associated with a potential takeover was in late August or early September.

29. Montgomery finally settled on using long and short swaps to hedge the currency risk.

30. These swaps were brokered by Deutsche Bank.

31. According to Montgomery, the intent in using the swaps was to hedge additional capital that might be needed to fund the takeover.

32. Montgomery testified that approximately $175 million would come from Beal's resources and the additional $10 million would be funded through the swaps.

33. Montgomery was also aware that using swaps could have potential tax benefits.

34. Montgomery testified that certain entities were set up to pursue the possible tender offer. BPB Investments was capitalized with $4 million of Solution 6 stock and $5 million cash. This was done around September 13, 2001.

35. To facilitate the transaction, BFC paid a dividend of 7,678,467 shares of Solution 6 stock to Beal. Beal then contributed the stock to BPB. All of this occurred one day prior to the purchase of the swaps.

36. On September 14, 2001, BPB entered into four digital foreign currency swaps with Deutsche Bank involving payments pegged to US dollars and Australian dollars.

37. Two of the swaps were "long swaps" which called for BPB to pay Deutsche a yield adjustment fee of $101,250,000 for each long swap or $ 202,500,000 in total. The second two swaps are "short swaps" which called for Deutsche to pay BPB a yield

adjustment fee of $98,750,000, or a total of $197,500,000 for both.

38.    The swaps were also structured so that the parties would make certain offsetting fixed payments to each other, resulting in net payments when all was said and done to BPB of $2,500,000 based on the original exchange rate.  The net effect of all this was an eventual $2,500,000 cash outlay by BPB to Deutsche for these swaps.

39.    The only cash exchanged was the initial $5,000,000.  This was done by wire transfer. BPB never actually paid $202,500,000 to Deutsche, and Deutsche never paid 197,500,000 to BPB.

40.    On September 25, 2001, BPB contributed its swaps position and the 7.6 million in Solution 6 stock for a 99% capital interest profit and a 90% profit interest in BM Investments.  BM had been formed on September 24, 2001.  Simultaneously, Montgomery transferred $64,862 plus 50,000 shares of Solution 6 stock to BM.  For this, he received a one percent capital interest and a 10% profit interest in BM. According to the Government's expert, the transfer of the 7.6 million shares actually went from BFC to BM Investments.

41.    On October 1, 2001, Beal reduced his ownership interest in BPB Investments to 99% from 100% and admitted Beneficial Property which contributed approximately $90,000 into BPB.

42.    On December 17, 2001, Montgomery received a refund of his initial investment and also was paid a $150,000 "buyer premium."

43. At the same time as referenced above, $3.4 million of AUD or $1,735,499 USD equivalent was sold by BM Investments to Deutsche.

44. This sale triggered a Section 988 foreign currency loss which the Government's expert testified was actually a fiction. What was taken as a loss was actually a built up basis, $150 million loss in 2001, and a sale on January 18, 2002, which triggers a $50 million loss for that year.

45. Montgomery did not participate in any meaningful tax loss in that his partnership interest was redeemed one day before the Australian currency was sold.

46. The offsetting long and short swaps terminated on November 13 and 28, 2001, respectively.

47. The short swaps provided that, if the spot rate on the rate determination date was greater than or equal to the digital level which was defined as the Digital Event, then BPB would have to pay Deutsche the predetermined exchange amount.

48. The long swaps had a corresponding Digital Event which, if reached, would have required Deutsche to pay BPB the predetermined exchange amount.

49. The Government's Exhibits 60 and 61 are the long swaps, and the Government's Exhibits 62 and 63 are the short swaps.

50. Exhibits 60 and 61 are identical except as to the termination and exchange dates and digital levels. Exhibit 60 has a digital level of AUD .5525 per USD 1.00, while Exhibit 61 has a digital level of .5555 per USD 1.00.

7

51.    The long swaps (Exhibits 60 and 61) provide that BPB Investments LC pay a yield adjustment fee of $101,250,000 on 60 and the same amount on 61. The short swaps (Exhibits 62 and 63) provide for a yield adjustment fee paid by Deutsche of $98,750,000 for each swap. The net out-of-pocket yield adjustment fee paid by BPB was $5,000,000.

52.    The long swaps obligated BPB to pay an exchange amount of a certain percentage should the spot rate on the currency be greater than or equal to the digital level as determined in the swap. Unless the digital level occurred, no payment was due. Likewise, the short swaps required Deutsche to pay an exchange amount if the spot rate on the currency was greater than or equal to a pre-determined digital level.

53.    On Exhibit 60, the digital level was AUD .5525 per 1.00 USD. The corresponding short swap, Exhibit 62, established a digital level of AUD .5527 per 1.00 USD. This .0002 difference was referred to in trial as the "sweet spot." Testimony at trial also indicated that the chances of hitting the sweet spot were next to impossible. The difference in the corresponding long and short swaps, Exhibits 61 and 63, also had the same .0002 sweet spot.

54.    According to Plaintiffs' expert, disregarding the digital levels, the swaps provided for four payments of about 1.2 million Australian dollars. This promised payment, when deducted from the $5 million originally paid by BPB, nets the total out of pocket to BPB of $2.5 million USD. If the Australian exchange rate exceeded the

digital level, then BPB stood to gain an additional $2.5 million dollars on each respective swap. If the exchange rate hit the sweet spot, then the potential recovery was $2.2 billion. Again, all parties and experts agreed that this was next to impossible.

55.    Using as an example the first called for rate determination date in Exhibit 60 and 62 (the offsetting swaps), the general idea of how the swaps worked is set forth below.

a.    The long swap (60) reflects Deutsche's obligation to pay BPB.

i.    If the Digital Event is less than AUD .5525 per 1.00 USD, then Deutsche has no obligation to pay BPB.  Likewise, under the corresponding short swap (Ex. 62), BPB is not obligated to pay Deutsche, since perforce the digital level of AUD .5527 per 1.00 USD was not reached.

ii.    By referring to Exhibits 60 and 62, for the first exchange, if the Digital Event was greater than or equal to AUD.5527 per 1.00 USD, then BPB would receive a payment of over $2.5 million dollars. There were four chances at obtaining this result which could have netted BPB $10 million in the swaps "lottery."  The likelihood of this happening, according to all the testimony, was unlikely and in fact did not happen.

iii.    By referring to Exhibits 60 and 62 for the first exchange, if the Digital

9

Event was .5525 to .5526, then under the terms of the swaps Deutsche would have to pay BPB on one exchange date the sum of $552,500,000. There were also four dates on which this could happen. According to all parties and experts, the maximum payout for all four dates was a staggering $2.2 billion dollars.

56. BPB contributed the short and long swaps to BM Investments. This represented the $5 million dollars of cash originally contributed by Beal to BPB. In other words, the price of the swaps was $5 million. Montgomery contributed approximately $90,909 of cash and Solution 6 stock.

57. On September 25, 2001, BPB also contributed all the Solution 6 stock it had acquired.

58. Montgomery was primarily responsible for negotiating the swaps.

59. On transfer of the swaps, BM Investments established a basis of $202,500,000 in the long swaps. BM Investments did not offset the basis in the long swaps with the short swaps since Montgomery believed that the shorts were to be disregarded for Section 752 analysis in that they were contingent obligations.

60. Beal's K-1 from BPB indicated a contribution basis of $206,500,000.

61. Transferring the swaps from BPB to Bemont only altered the identity of the beneficiary of the hedge. It did not alter the nature of the underlying foreign currency exposure or enhance the efficacy of the hedges.

10

62. Montgomery was aware of IRS Notice 2000-44 before the swaps were entered into with Deutsche.

63. Plaintiffs' expert, Chance, testified that the swaps were in fact hedges. If the Australian currency went up, then BPB could potentially receive $10 million, irrespective of the sweet spot.

64. Chance also testified that the swaps were in the nature of a loan as well as an option and hedge.

65. Chance testified that, by paying $2.5 million, BPB was buying the right to receive up to four additional payments of $2.5 million.

66. According to Chance, the value of the transaction using a Black Scholes model analysis was $2.2 million. Ignoring the sweet spot, Chance estimated that the value of the transaction was $550,000.

67. Using another analysis, Chance testified that the probability of profit was 6.75%. The probability of hitting the sweet spot was less than half a percent.

68. Chance admitted that Deutsche could probably manipulate the sweet spot so that it was not hit.

69. Even Montgomery testified that the chance of the hitting the sweet spot and hence a $2.2 billion payout under the four swaps was highly unlikely or remote.

70. Montgomery testified that this approximate $200 million loss was based on the accountant Coscia's opinion as to his interpretation of the Internal Revenue Code.

71.  Montgomery testified that the tax benefits from the swaps were definitely a part of the consideration for using the swaps.

72.  However, Beal could have used a number of other transactions to guard against the currency risk.

73.  Montgomery agreed that Deutsche would not have done the short swap without a corresponding long swap.

74.  The swaps were exchanged after the contracts expired.

75.  The swaps were off-market transactions.

76.  ==Beal could have gotten the same protection on the currency swaps by investing $600,000 if the "sweet spot" were disregarded.==

77.  Early on, the Australian law firm Swaab told BFC that it could not assist in a takeover of Solution 6 and in fact was hired to advise BFC in response to an inquiry received regarding BFC's purchase of Solution 6 stock.  *See* SWAAB DEPOSITION at 17.

78.  Swaab also was asked whether the firm could assist with loan documentation in regard to BFC's funding of Chris Tyler's acquisition of Solution 6 shares.  *See* SWAAB DEPOSITION at 19.

79.  According to Swaab, less than $4,000 was billed for his services.

80.  ==On December 17, 2001, BPB redeemed Montgomery's interest in BM for 215,000 shares of Solution 6 and a cash buyout premium of USD $150,000.==

12

81.     BM then "sold" 75% of the AUD generated from the swaps in BPB in 2001, claiming for tax purposes roughly $153 million in tax losses.  In 2002, BPB sold the balance of its AUD generated from the swaps, claiming a loss for tax purposes of roughly $46 million.

82.     In 2001, after claiming a $153.6 million deduction from the partnership on his personal income tax return, Beal reported income in the amount of $8.6 million, and paid $2.67 million in income taxes.

83.     In 2002, after claiming a $46.5 million deduction from BPB on his personal income tax return, Beal reported income in the amount of $74.6 million, and paid $27.8 million in income taxes.

84.     Bemont reported on its 2001 partnership tax return a Section 988 loss on foreign currency swaps in the amount of $2,505,579 – primarily from the net cost of the digital swaps.

85.     BPB's 2001 tax return Schedule K-1 for Beal reflects a capital contribution of $206,500,000, but Beal did not contribute this in cash; the only assets he purportedly contributed to BPB in 2001 were the Solution 6 shares and $5 million.  The $206,500,000 reported capital contribution on Beal's BPB Schedule K-1 represents the purported cost of the long swaps (at $202.5 million) without taking into account the funds received from Deutsche Bank for the short swaps, the Solution 6 shares, and some Australian currency.

13

86. Although BPB's 2001 partnership tax return reflects Australian currency of $46,990,651 (*see* Statement 4) held by BPB as of December 31, 2001, BPB did not have AUD $46,990,651 in a bank account. Instead, this is the purported basis that BPB inherited in the AUD $46,990,651 of Australian currency when Bemont was liquidated. When Bemont was liquidated, only AUD $4.8 million actual Australian currency went to BPB (via deemed distribution) from the fixed payouts Bemont received from Deutsche Bank under the swaps.

87. The 7.6 million shares of Solution 6 stock also reflected on Statement 4 of BPB's 2001 tax return for $4 million at the end of the year is the same $4 million of Solution 6 stock that BFC's board of directors authorized the purchase of, and which were ultimately distributed to Beal in September 2001 by BFC. The "Accounting" charge listed on Statement 1 of BPB's 2001 tax return is part of the cost of the Coscia Greilich Swaps tax opinion.

88. In 2005, the IRS audited Beal's individual Form 1040 tax return for the 2002 tax year for losses — including those from BPB — flowing through to his personal return. Stephen Pocsik was assigned the examination of Beal's 2002 tax return on April 27, 2005.

89. Pocsik specifically examined whether Beal had sufficient basis to absorb the losses, however, he was not furnished any information concerning the short swaps by Beth

14

Montgomery, Beal's personal accountant.

90. Although the IRS agent made no adjustments to Beal's basis in BPB, Pocsik did not

have all the information concerning the swaps. Information related to the offsetting

swaps was not disclosed. This information was deliberately withheld by Beth

Montgomery.

91. On October 3, 2006, the IRS sent a Notice of Beginning of Administrative

Proceeding to BPB.

92. On October 13, 2006, the IRS issued the FPAA to BM for the tax year ending

December 19, 2001, and to BPB for the tax year 2002.

93. The BM FPAA addressed BM's tax year ending December 19, 2001. In the FPAA,

the IRS disallowed the partnership losses at issue and imposed accuracy-related

penalties at rates of 20% and 40%.

94. The BPB FPAA addressed BPB's tax year ending December 31, 2002. In the FPAA,

the IRS disallowed the partnership losses at issue and imposed accuracy-related

penalties at rates of 20% and 40%. Prior to filing suit, BM and BPB's members

made the jurisdictional deposit of the tax as required by 26 U.S.C. § 6226(e)(1).

95. On January 9, 2007, BM and BPB filed the present partnership proceeding through

their tax matters partner, pursuant to 28 U.S.C. § 1346 and 26 U.S.C. § 6226.

96. At the time the Complaints were filed, BM and BPB met the net-worth requirements

of 26 U.S.C. § 7491 in that their net worth was less than $7 million.

15

97.     Montgomery testified that the tax benefit generated by the swaps was the step up in basis.

98.     Any tax losses were generated by the swaps and not by the decision to not pursue a Solution 6 tender offer.

99.     Montgomery testified that $200 million in basis resulted from the contribution of the long swaps from BPB to Bemont.

100.    Montgomery testified that the tender could never be finalized because he could not get Telstra to commit to selling their shares.

101.    Montgomery testified that any potential tender was called off by December 6, 2001. Montgomery testified that, by the end of October 2001, it looked less likely that any tender would take place.

102.    On September 13, 2001, Montgomery sent the Australian law firm a letter confirming that Beal did not anticipate a tender even though BFC was in the initial stages of exploring the possibilities. The swaps were entered into one day after the letter.

103.    Montgomery also testified that, from August 2001 forward, Telstra had been acquiring more companies for cash and this also soured any potential for a takeover.

The Court specifically cites to and relies upon the Fifth Circuit's holding in *Klamath Strategic Investment Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009) in finding that this transaction lacked economic substance as a matter of law. As noted by the Fifth Circuit, the economic substance doctrine allows courts to enforce the legislative purpose of the

Internal Revenue Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality. A transaction must be honored as legitimate for tax purposes if certain factors are present: (1) it has economic substance compelled by business or regulatory realities; (2) it is imbued with tax-independent considerations; and (3) it is not shaped totally by tax-avoidance features. *Klamath*, 568 F.3d at 543 (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84, 98 S. Ct. 1291, 1303-1304, 55 L. Ed.2d 550 (1978)). Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes.

==In summary, the Court concludes that the proposed tender offer in this case was just a smokescreen for tax avoidance.== The swap transactions provided no economic benefit to the purported tender offer and lacked economic substance for the following reasons:

> a. Before the purchase of the swaps, BPB had made the determination not to actively pursue Solution 6.
>
> b. Any concern with currency risk could have been undertaken in other ways which made more economic sense.
>
> c. The structuring of the various entities was only done to accomplish tax objectives for a sheltered writeoff.
>
> d. After September 13, 2001, the use of the swaps when considered alone had no real economic benefit to the transaction.
>
> e. If BPB had pursued the tender offer, the swaps would have contributed only

marginal benefit.

f.   Although there was an original business plan to pursue Solution 6, this plan
     was abandoned at or near the time BPB entered into the swaps.

g.   The main business purpose in purchasing the swaps was to merely generate
     tax losses, thereby, offsetting other gains reported by Beal.

h.   Although Montgomery testified that BPB was willing to be exposed to as
     much as a 7% currency swing, but sought protection up to 12%, the real
     currency risk when translated into dollars was a small amount of the original
     investment amount BPB had been willing to invest.

i.   In 2001, Australian law did not require a particular form of hedging of
     currency risk or hedging at all with respect to a tender of Solution 6.

j.   Swaab did not recall any discussions with Montgomery regarding the funding
     requirements under Australian law for a potential takeover of Solution 6,
     whether a takeover bid would need to incorporate the specific funding
     arrangements, or whether a takeover bid should be made in Australian or
     American dollars.   Swaab also did not recall any discussions with
     Montgomery regarding whether it would be commercially reasonable to
     hedge the foreign currency risk associated with a takeover bid if American
     dollars were not immediately converted to Australian dollars.  *See* SWAAB
     DEPOSITION at 30.

18

k.      There were no contracts during the time period that the swaps were in existence that required payments in any AUD.

l.      During the relevant period, the partnerships paid no foreign taxes.

m.      No need for foreign currency hedging ever materialized for the partnerships before their termination.

n.      There was no attempt by Montgomery to independently verify the pricing of the swaps or the possible outcomes under the swaps with any person or entity independent of Deutsche.

o.      There was no effort to determine how the yield adjustment fee was calculated, nor was there any attempt to bargain for better rates or more favorable conditions.

p.      Although the parties initially intended to explore the possibilities of a tender offer, the window dressing afforded by the swaps became the primary and motivating factor for entering into the transactions with Deutsche.

q.      By the time the swaps were entered into with Deutsche, BPB had no real intent of pursuing any tender offer.  What was at first a legitimate attempt to secure a possible business was rendered illegitimate by the overriding desire to offset income with extraordinary high and artificial tax losses.

r.      The focus of the parties after mid-August to September 1, 2001 was on the tax treatment of the swaps, while ignoring all other aspects of the foreign

currency investment and demonstrates that the real purpose of the swaps was tax avoidance.

s.      Use of the Black-Scholes pricing model by all experts points to the fact that the options were overpriced and thus did not reflect reasonable market prices or rational economic behavior.

t.      There was no reasonable expectation of profit from the transaction.

Furthermore, adopting the reasoning of the Fifth Circuit in *Kornman & Associates, Inc v. U.S.*, 527 F.3d 443 (5th Cir. 2008), the Court finds that, for Section 762 analysis, the short swaps were partnership liabilities and should have been accounted for by the partnerships in offsetting the basis generated by the long swaps. The obligation by Deutsche to pay BPB was known and fixed by the transaction date. The only "contingency" (and a remote one at that) was what BPB might receive from Deutsche should the currency hit certain levels. The contingency, at best, was marginal and had little impact on the economics of the transaction. Setting aside the unrealistic probability of hitting the "sweet spot," under BPP's reasoning, a return of $10 million on a $2.5 million cash outlay would still have generated losses for BPB in excess of $190 million. Tax losses such as this which do not correspond to actual economic losses are not bona fide deductible losses. Treas. Reg. § 1.165-1(b). Further, the failure of the partnership to treat the short swaps as liabilities "flies in the face of reality." *Kornman*, 527 F.3d at 461.

## TREAS. REG. 1.752-6

Plaintiffs also have sought a declaration from the Court that Treasury Regulation 1.752-6 was retroactively applied and thus unconstitutional. Plaintiffs argue that the statute does not fulfill any statutory exception to the general prohibition against retroactive regulations and because it is not entitled to any deference because it does not carry out Congressional intent in a reasonable manner as required by *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed.2d 694 (1984). The regulation at issue defines liability to include any fixed or contingent obligation. Plaintiffs cry foul and note that this definition applied retroactively flies in the face of the IRS's position over the previous three decades.

The Court need not address whether Treasury Regulation 1.752-6 is unconstitutional in that the Court has found that the transaction lacked real economic substance. The Court notes that there is a divergence of authority in this area but because the transaction is devoid of economic substance, the Court need go no further in its analysis. *See Cemco Investors, LLC v. United States,* 515 F .3d 749, 752 (7th Cir. 2008) (regulation can be applied retroactively); *Murfam Farms, LLC v. United States,* 88 Fed. Cl. 516 (2009) (regulation cannot be applied retroactively); *Maguire Partners-Master Invs., LLC v. United States,* 2009 WL 4907033, 103 A.F.T.R. 2d 763, 776-778 (C.D. Cal. 2009) (regulation can be applied retroactively); *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 667-671 (regulation cannot be applied retroactively) (2008); *Sala v. United States,* 552 F. Supp.2d 1167 (D. Colo. 2008) (regulation unlawful and cannot be applied retroactively); *Klamath Strategic Inv. Fund, LLC v. United States,* 440 F. Supp.2d 608, 625-626 (E.D. Tex. 2006) (retroactivity of

21

regulation is ineffective).

In any event, the linchpin of Plaintiffs' arguments arises from a technical anomaly in the tax code under a line of cases interpreting Section 752, *i.e.*, that a purchased option is an asset, but a sold option is only a contingent liability. Thus, Plaintiffs have taken the position that they can purchase offsetting swaps, hedges, or options and contribute them to a partnership entity and thereby contribute an asset but not a liability. Thereafter, under Plaintiffs' theory, the asset is used to inflate the basis of the partner's interest in the entity.

Irrespective of the technical arguments mustered by Plaintiffs, the Court finds that it would be absurd to consider these offsetting swaps as separate items. If no offset were in place, one party or the other might end up in bankruptcy. No sane or reasonable business person would enter into one transaction without providing some stop gap measure to avoid financial catastrophe. Plaintiffs' Motion for Partial Summary Judgment Regarding the Invalidity of Treas. Reg. § 1.752-6 (Dkt. 138) is therefore DENIED.

### NOTICE 2000-44

The Court must also determine whether the swaps at issue in this case were the type of transactions defined in Notice 2000-44. If not, then the statute of limitations has run as to the 2001 return. The Notice 2000-44 describes two general transactions which are deemed to use tax avoidance measures to artificially inflate the taxpayer's basis.

The first variation described involves a taxpayer borrowing at a premium and the partnership's subsequent assumption of the indebtedness. In the example given, the taxpayer

receives $3,000 from a lender under a loan agreement that provides for an inflated interest rate with a stated principal of $2,000. When the taxpayer sells his interest in the partnership, only the $2000 is considered a liability which reduces the taxpayer's basis in the partnership. In this example, the partnership interest is $1,000 which represents the excess of the amount contributed over the stated principal amount of $2,000. The taxpayer then claims a tax loss with respect to the basis amount even though the taxpayer has incurred no corresponding economic loss.

The second variation discussed involves the purchase of options. In the Notice example, a taxpayer might purchase call options for a cost of $1000x and simultaneously write offsetting call options with a slightly higher strike price but the same expiration date for a premium of slightly less than $1000x. The option positions are then transferred to a partnership. The basis in the interest is then increased by the cost of the purchased call options but not reduced under Section 752. On the disposition of the partnership interest, the taxpayer claims a loss of $1000x even though the taxpayer has incurred no corresponding economic loss.

The question is whether the instant transaction is a similar arrangement designed to produce non-economic tax losses by artificially overstating basis in partnership interests. Plaintiffs' expert testified that the swap transactions were not substantially similar since Beal had actually incurred an economic loss of $2.5 million. He further testified that, based on his understanding of the transaction, the primary objective of Beal's partnerships was to take over Solution 6. Similar option shelters in foreign currency have been held to be substantially similar to the transactions delineated in Notice 2000-44. *See Cemco Investors,* 515 F.3d at 749.

23

The Court finds that the swap transaction was substantially similar to those transactions noted in Notice 2000-44. The notice also covers those transactions lacking in any real economic substance. Here, the tax losses claimed do not correspond to any actual economic losses; nor do they constitute the type of "bona fide" losses that are allowable deductions under the IRS Code and regulations; and, in any event, they are not actual and real.

### PENALTIES

The Court has already ruled that the Government may not assert a substantial valuation penalty (*see* Dkt. 221). The question is whether the Government can assert a penalty for negligence. As to that issue, the Court makes the following findings and conclusions:

104. Montgomery testified that he sought tax advice on the effect of the swaps from Matt Coscia, who had previously worked with Montgomery.

105. Montgomery first sought Coscia's assistance on the tax treatment in late August or early September, about two weeks before the actual purchase of the swaps.

106. Montgomery stated that Beal reviewed Coscia's opinion before the partnerships filed their returns.

107. Montgomery testified that Coscia's opinion was that the swaps were not Notice 2000-44 transactions. Montgomery asked Coscia to revisit his opinion sometime in August 2002.

108. At the time the returns for the partnerships were filed, Montgomery thought it was highly likely that the returns would be audited.

24

109.   The partnerships were aware that Notice 2000-44 might apply to the instant transactions.

110.   The partnerships sought advice not only from Coscia but also from a law firm as to the propriety of the transactions.   The law firm's opinion was not offered into evidence at trial.

111.   No evidence was submitted by Plaintiffs as to any advice received from anyone other than Coscia.

112.   The Court finds that Coscia was not truly an independent advisor to the partnerships, but that his close association with Montgomery weighs against him rendering unbiased advice.  Coscia advised on a number of partnership transactions involving questionable deductions.  He was paid well for his services – $150,000 for this one opinion.

113.   Coscia did little independent research into the question as to whether the investment vehicle would pass the IRS "sniff test."  Much of his "work" was cut and paste from prior opinions used by other tax shelter advocates.

114.   In other words, Coscia gave Montgomery want he wanted – an opinion that passed on the investment strategy.

115.   The Court finds that neither Montgomery nor Coscia were credible in their testimony as to the real purpose behind the foreign currency swaps.

The Government imposed a 20% penalty for negligence or disregard of rules and regulations under Section 6662(b)(1). <mark>Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code,</mark> to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. 26 U.S.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(I). <mark>It also includes the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.</mark> *Heasley v. Commissioner of Internal Revenue,* 902 F.2d 380, 383 (5th Cir. 1990). <mark>Negligence is strongly indicated if a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction or credit which would seem "too good to be true" to a reasonable and prudent person.</mark> Treas. Reg. § 1.6662-3(b)( *l* )(ii).

There can be no finding of negligence if there was a reasonable basis for a return position. Treas. Reg. § 1.6662-3(b)(l). Reasonable basis is a significantly higher standard than not frivolous or not patently improper; it cannot be a merely arguable or colorable claim. Treas. Reg. § 1.6662-3(b)(3). Reasonable basis requires reliance on legal authorities and not on opinions rendered by tax professionals. *Id.*; Treas. Reg. § 1.6662-4(d)(3)(iii). The Court may, however, examine the authorities relied upon in a tax opinion to determine if a reasonable basis exists. Treas. Reg. § 1.6662-4(d)(3)(iii). The "reasonable basis" standard for reliance on opinions is lower than the "substantial authority" standard. Treas. Reg. § 1.6662-4(d) (2).

If a taxpayer acts in good faith and with reasonable cause in the calculation of taxes, penalties may not be applied. "No penalty shall be imposed under Section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that

the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1).

Here, the conduct of Montgomery and Beal forms the basis of the partnership's reasonable cause defense. The TEFRA structure enacted by Congress does not permit a partner to raise an individual defense during a partnership-level proceeding, but when considering the determination of penalties at the partnership level, the Court may consider the defenses of the partnership. *Klamath,* 568 F.3d at 548 (citing *New Millennium Trading, LLC v. Comm'r,* 131 T. C. No. 18, 2008 WL 5330940 at * 7 (2008)). Reasonable cause and good faith may be considered by a district court if asserted on behalf of the partnership. *Id.; see also Stobie Creek Invs., LLC v. United States,* 82 Fed. Cl. 636, 703 (2008). *But see Clearmeadow Invs., LLC v. United States,* 87 Fed. Cl. 509, 521-22 (2009) (finding *Klamath* and *Stobie Creek* "are in error" because the reasonable cause defense in Section 6444(c)(1) is unavailable at the partnership level). The *Clearmeadow* decision cites Treasury Regulation § 301.6221-1(d) and Temporary Treasury Regulation § 301.6221-1T(c)-(d) to contend that these defenses may not be considered at the partnership level. *Clearmeadow Invs.,* 87 Fed. Cl. at 520-21. Taking due notice of the conflicting opinions in the Court of Federal Claims, the Court is bound by the Fifth Circuit's decision in *Klamath,* which explicitly found that a district court has jurisdiction to consider the reasonable cause and good faith defense at the partnership level in a TEFRA proceeding. *Klamath,* 568 F.3d at 547-48.

The plaintiff bears the burden of proof on a reasonable cause defense. *Id.* at 548 (citing *Montgomery v. Comm'r,* 127 T. C. 43, 66, 2006 WL 2472807 (2006)). But, even if the Government bears the burden of proof, as argued by Plaintiffs, the resulting analysis is the same. The most

important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances. TREAS. REG. § 1.6664-4(b). "Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.'" *Klamath,* 568 F.3d at 48 (quoting *Swayze v. United States,* 785 F.2d 715, 719 (9th Cir. 1986)).

The Fifth Circuit in *Klamath* noted the district court's findings that the managing partners sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the resulting tax deductions and hired attorneys to write a detailed tax opinion, providing the attorneys with access to all relevant transactional documents. *Id.* (affirming district court's conclusion that no penalties should apply). The *Klamath* opinion noted that the trial court found that the partnerships proved by a preponderance of the evidence that they relied in good faith on the advice of qualified accountants and tax lawyers. *Id.*

Here, the only professional advice was from Coscia. Although the partnerships sought advice from tax lawyers, no evidence was presented as to the advice. The partnerships raised the defense of privilege and never shared that opinion with the Government. Had the opinion backed the partnerships' position and been introduced at trial, the Court would be inclined to follow the well-reasoned approach followed by the district court in regard to the Southgate matter. Yet, for some reason, Plaintiffs chose to rest their defenses on the shoulders of Coscia. The Court believes that Coscia was no more than a "puppet" for Plaintiffs and rendered no real independent or objective advice. Coscia said what he was paid to say. The Court, therefore, holds that the reasonable cause

28

defense and defense to negligence are not available to Plaintiffs here.

### STATUTE OF LIMITATIONS

Having thus far ruled that the shelters lacked economic substance and no negligence or reasonable cause defenses are available and notwithstanding its finding that this transaction was substantially similar to the Notice 2000-44 letter, the Court still must examine – at least as to the 2001 tax year – whether limitations has run. As set forth below, the Court finds it has.

Prior to October 13, 2005, the IRS promoter team had received information from Deutsche Bank that identified BPB as an entity participating in foreign currency swaps. This information was furnished as part of the Government's investigation of Son of Boss transactions by a subpoena issued on Deutsche.

Plaintiffs have strongly argued and believed that there was an informant who alerted the IRS to the shelters. This argument has only been reinforced by the Government's steady and stubborn refusal to answer discovery on the issue, frequently ignoring this Court's orders to answer the question directly. After much frustration on not only on Plaintiffs' part but also this Court's, the Court is satisfied that there was no whistle blower but that Beal's name came up in the investigation of another unrelated shelter he was involved in prior to BPB. There was no informant here. Nonetheless, the Court is also satisfied that, well within three years after filing the returns, the Government had in its possession information identifying BPB and Bemont furnished by Deutsche.

As a general rule, the amount of any tax imposed must be assessed within three years after the return was filed. 26 U.S.C. § 6501. The Government relies on the exception outlined in 26

29

U.S.C. § 6501(c)(10) which provides a one-year extension from the earlier date of (A) the date on which the Secretary is furnished information with respect to a listed transaction as defined in 26 U.S.C. § 6707(c)(2) or (B) the date a material advisor meets the requirements of Section 6112 with respect to the Secretary's request under that statute relating to the listed transaction with respect to such taxpayer. 26 U.S.C. § 6501(c)(10).

The Court finds that subpart (A) is not applicable. Ms. Montgomery never furnished information as to the short swaps in the audit; thus, the IRS did not have all information available to it.

This leaves the question of whether the requirement of subpart (B) was met. According to the evidence in this case, Deutsche furnished information to the IRS prior to the summer of 2005 which identified BPB and Bemont as engaging in the swap transactions. *See* Plaintiffs' Exhibits 108 & 117a. The actual summons were not admitted. Curiously, one of the IRS agents, Don Berkowitz, who examined these transactions testified that the swap transactions were not substantially similar to Notice 2000-44 transactions. Plaintiffs' Exhibit 104 reveals that the IRS at first chose to ignore swap transactions in its summons requests. What is clear is that, by July 2005, the IRS had information which identified BPB and Bemont, and, as to Bemont or BM Investments, the account number for buy and sell, the foreign exchange amount, the foreign exchange rate, the USD involved, the trade and sell dates, and the percentage sold. The IRS, however, claims that this information did not meet the requirements of information to be provided as a "listed transaction." A threshold question is whether the statute which the IRS cites applies to this case.

On October 22, 2004, Congress enacted the American Jobs Creation Act of 2004 (AJCA), Pub. L. 108-357, sec. 814(a), 118 Stat. 1581, which added Section 6501(c)(10) to the Code. Section 6501(c)(10) provides:

> Listed transactions – If a taxpayer fails to include on any return or statement for any taxable year any information with respect to a listed transaction (as defined in Section 6707A(c)(2)) which is required under Section 6011 to be included with such return or statement, the time for assessment of any tax imposed by this title with respect to such transaction shall not expire before the date which is 1 year after the earlier of:
>
> > A. the date on which the Secretary is furnished the information so required, or
> >
> > B. the date that a material advisor meets the requirements of Section 6112 with respect to a request by the Secretary under Section 6112(b) relating to such transaction with respect to such taxpayer.

26 U.S.C. § 6501(c)(10).

Section 6501(c)(10) incorporates by cross-reference the definition of "listed transaction" set forth in Section 6707A(c)(2), which was added to the Code by AJCA sec. 811, 118 Stat. 1575.

Section 6707A(c) provides the following definitions:

> (1) Reportable transaction. – The term "reportable transaction" means any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under Section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion.
>
> (2) Listed transaction. – The term "listed transaction" means a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of Section 6011.

31

26 U.S.C. § 6707A(c).

The "cardinal principle" of statutory construction requires the courts "to give effect, if possible, to every clause and word of a statute." *United States v. Menasche,* 348 U.S. 528, 538-539, 75 S. Ct. 513, 99 L. Ed. 615 (1955) (internal quotation marks omitted). In applying the traditional rules of statutory construction, the Court assumes that Congress uses language in a consistent manner, unless otherwise indicated. *United States v. Olympic Radio & Television, Inc.,* 349 U.S. 232, 235-236, 75 S. Ct. 733, 99 L. Ed. 1024 (1955). The various sections of the Code should be construed so that one section will explain and support and not defeat or destroy another section. *Crane v. Commissioner,* 331 U.S. 1, 13, 67 S. Ct. 1047, 91 L. Ed. 1301 (1947). Furthermore, "[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." *E.I. du Pont de Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S. Ct. 364, 68 L. Ed. 788 (1924).

AJCA sec. 814(b), 118 Stat. 1581, provides that 26 U.S.C. § 6501(c)(10) is effective for tax years "with respect to which the period for assessing a deficiency did not expire before" October 22, 2004. On October 22, 2004, the period for assessing a deficiency with respect to Bemont's 2001 tax year was open under 26 U.S.C. § 6501(a). Therefore, if the Court regards as determinative the effective date provided in AJCA Sec. 814(b), Section 6501(c)(10) is effective for Bemont's 2001 tax year. Section 6707A, which imposes a penalty for failure to include on a return or statement any required information with respect to reportable transactions and listed transactions, is effective for returns and statements the due date for which is after October 22, 2004, and which were not filed

32

before that date. AJCA sec. 811(c), 118 Stat. 1577.

Does this create a conflict in statutory interpretation? The Court finds that it does not. Section 6707A does not alter the definition of reportable or listed transaction. The regulations under Section 6011 which define listed transaction were published in regulatory form prior to Bemont engaging in the currency swaps. Any interpretation that Sections 6707A and 6510(c)(10) are internally inconsistent would violate the cardinal rule of statutory construction. One statute provides for a penalty for non-compliant returns after an effective date, while the other statute provides for an extension of limitations if the return has not been filed by the Act's effective date.

Not only were Plaintiffs on notice as to the possible application of Notice 2000-44 to the transaction, they were also on notice of the IRS regulations enacted shortly before the returns were filed. On June 14, 2002, the IRS issued temporary and proposed regulations, including Temporary Treasury Regulation § 1.6011-4T that imposed new reporting and registration requirements for certain listed tax shelter transactions. Among other things, the regulations extended certain reporting requirements to partnerships and individuals. The new regulations required that an individual taxpayer who participated, directly or indirectly, in a "reportable transaction" that was a "listed transaction" as defined had to file a disclosure statement with his or her tax return. TEMP. TREAS. REG. § 1.6011-4T(a)(1). A "listed transaction" was any transaction that was the same as or "substantially similar" to a transaction that the IRS had determined to be a tax avoidance transaction, such as that set forth in IRS Notice 2000-44. *Id.* at § 1.6011-4T(b). A transaction would be treated as being the same or "substantially similar" to such a transaction if the transaction was expected to

33

obtain the "same or similar" tax benefits and was either factually similar to such a transaction or based on the same or a similar tax strategy. *Id.* at § 1.6011-4T(b)(1)(I). The term "substantially similar" was to be construed broadly in favor of disclosure. *Id.* The preamble to the revised regulations stated that the IRS planned to issue future regulations extending the disclosure requirement to other transactions, not simply "listed" transactions. Temp. Treas. Reg. § 1.6011-4T. Therefore, the Court finds that 26 U.S.C. § 6510(c)(10) extended the assessment period.

The only remaining question is whether the information furnished by Deutsche satisfies the statute. If so, the IRS was on notice more than one year prior to the FAPA and thus is barred from pursuing Plaintiffs for the 2001 tax year.

The IRS has steadfastly maintained that the disclosure required of Deutsche as a material adviser did not meet the requirements listed in 26 C.F.R. § 301.6112-1(b)(3)(i)-(iii). The parties agree that 26 C.F.R. § 301.6112-1T, the temporary treasury regulation which was current at the time of the swaps, controls the disposition of the limitations issue as related to the requirement to maintain a list. A copy of the temporary regulation submitted by the parties is attached hereto as Exhibit A.

Under the temporary regulation, organizers or sellers of potentially abusive tax sellers must maintain a list identifying certain persons who acquire interests in the tax shelter. *See* 26 C.F.R. § 301.6112-1T at A-1. Are the swaps potentially abusive tax shelters? Under A-4, the answer is "yes" if the transaction's significant purpose is the avoidance or evasion of federal income tax. *Id.* at A-4.

34

Neither party argues that Deutsche is not either a seller or organizer. So, the remaining question is was Deutsche required to maintain a list? The resolution of this question has been an evolving one, and even the parties have demonstrated frequent confusion as to what regulations apply and in what time period. Much of the effort in piecing together this patchwork of laws, notices, and regulations is akin to a dog chasing its tail. However, the regulation at issue defines "an interest" in a tax shelter. *Id.* at A-7. ==The Court believes that Bemont's purchase of digital options is not a right to participate in a tax shelter.== Its "right to participate" is not tied to any partner or corporate interest nor tied to any interest in property. The swaps are not in and of themselves abusive tax shelters. ==The way the swaps were treated for tax purposes is the abuse.==

However, Plaintiffs do not challenge the IRS's position that Deutsche was required to maintain a list. Assuming Deutsche was required to maintain a list, it was required to maintain the list to enable the IRS to determine without undue delay or difficulty the information required by A-17 of the temporary regulation, which lists 11 different components required for any list.

A-17. (a) A list must contain the following information –

(1) The name of the tax shelter and the registration number, if any, obtained under section 6111;

(2) The TIN (as defined in section 7701(a)(41)), if any, of the tax shelter;

(3) The name, address, and TIN (as defined in section 7701(a)(41))) of each person who is required to be included on the list under A-8 or A-10 of this section and , in the case of a tax shelter that is a transaction described in section 6111(d)(1)(A) and § 301.6111-2T(b) whether or not the direct or indicted participant is a corporation, the name, address, and TIN of each investor and any indirect corporate participant in the shelter if known to the organizer or seller;

35

(4) If applicable, the number of units (i.e., percentage of profits, number of shares, etc.) acquired by each person who is required to be included on the list;

(5) The date on which each interest was acquired;

(6) The amount of money invested in the tax shelter by each person required to be included on the list under A-8 or A-10 of this section;

(7) A detailed description of the tax shelter that describes both the structure of the tax shleter and the intended tax benefits for participants in the tax shelter;

(8) A summary or schedule of the tax benefits that each person is intended or expected to derive from participation in the tax shelter, if known by the organizer or seller;

(9) Copies of any additional written materials, including tax analysis or opinions, relating to the tax shelter that have been given to any potential participants in the tax shelter or to any representatives, tax advisors, or agents of such potential participants by the organizer or seller or by any other person who has participated in the offering of the tax shelter (excluding any written materials that the organizer or seller has never possessed);

(10) If the interest was not acquired from the person maintaining the list, the name of the person from whom the interest was acquired; and

(11) The names and address of each agent of the person maintaining the list who is described in paragraph (b) of A-6 of this section.

26 C.F.R. § 301.6112-1T at A-17(a).

As to Requirement (1) requiring the name of the tax shelter and registration number if any, Deutsche furnished the IRS documents entitled Son of Boss Transactions pursuant to a subpoena. No registration number was required for the "shelter." Thus, Requirement (1) is met. Requirement (2) requires the TIN, if any. Again, there was no TIN and none was required. Requirement (3) calls for the name, address, and TIN, if known. Again, there is no showing that the Bemont's TIN was

36

known to Deutsche. However, a name and partial address for the partnerships at issue appear. Requirement (4) is not applicable. Requirement (5) is met in substance by a notation of the date as reflected on the relevant exhibits. The fact that the exhibits reflect a date of 3 months after the transactions were entered into substantially complies. The IRS cannot argue that the date somehow misled it. Requirement (6) is met by the notation of the investment.

As to the remaining Requirements (7) - (11), there is no showing that Deutsche knew anything about how Bemont wanted to structure the transaction. There was no showing that Deutsche had possession of any tax opinions from the multitude of firms providing opinions on the legality of various transactions. Requirements (10) and (11) are simply not applicable. So, as indicated, the Court finds that Deutsche substantially complied with the applicable regulations as set forth in 26 C.F.R. § 301.6112-1T, A-17. The IRS could have used the information available to it to pursue what was given to it as Son of Boss transactions.

In fact, its own corporate representative admitted as much. The deposition of Don Berkowitz indicates that the IRS at first did not seek information regarding swaps. *See* BERKOWITZ DEPOSITION at 18. In fact, as previously noted, he did not believe they were substantially similar. *Id*. Berkowitz testified that the original materials received from Deutsche's counsel were not computerized. Berkowitz testified that the IRS had documents prior to 2007 which referenced BPB but didn't know if those documents would be considered a list. *Id*. at 27.

> Q: "Prior to 2007, did Deutsche Bank produce a list to the Internal Revenue Service naming BPB Investments LC, they type of transaction, a swap, and the ODET numbers to the Internal Revenue Service–Odet reference numbers to the Internal

Revenue Service"?

A: "I know we had information–documents with that kind of information on it, but I don't know if you would consider that a list." *Id*. at 29.

Berkowitz testified that Plaintiffs' Exhibit 108 was received by the IRS in response to part of a 6707 or 6708 examination. *Id*. at 30. He also testified that Plaintiffs' Exhibit 108 was received in July 2005. *Id*.

The IRS has maintained that, until they developed a computer program to search the material furnished, there were just too many documents to search. This did not occur until 2007.[1] No one has ever produced the subpoena issued in 2004, but clearly the letter received from New York counsel states that the documents are responsive to a request for Son of Boss transactions, and there is no dispute that BPB is mentioned. *See generally* Plaintiffs' Exhibit 2100. In any event, the information provided satisfied A-16 of the temporary regulation, *i.e.*, a list from which the IRS could determine without undue delay or difficulty any information it required.

The Court concludes that, assuming Deutsche was required to maintain a list (since both parties appear to agree that it was), the information furnished substantially complied and that limitations has run on the 2001 return. The IRS simply failed to act on and ignored the very information it sought.

The IRS has frequently argued that just because it had a name that does not mean it could locate the entity. Although no party has raised this issue, the audit file on Beal which was completed

---

[1] Yet the IRS had enough information to issue the FAPA well before it had the list it received in 2007.

in the summer of 2005 contains the address for BPB. In fact, Plaintiffs' Exhibit 2109 notes that the audit file on BPB was run on April 28,2005, identifying BPB. It appears that, on April 28, 2005, Pocsik pulled the IDRS on BPB. The file also contains the employer i.d. numbers for the partnerships and the TIN for BPB. For the IRS to claim that they could not use the information provided by Deutsche is patently wrong.

Plaintiffs have also requested that the Court deem certain matters against the IRS. Plaintiffs re-urge their Motion to Deem Facts under Fed. R. Civ. P. 37. What Plaintiffs seek is an order sanctioning the Government for discovery abuse.

On April 14, 2010, the Court found that, pursuant to the IRS summons, information on Bemont and BPB was provided to the IRS prior to October 2005. Both partnerships were identified pursuant to the IRS summons requesting information on Son of Boss transactions. The evidence at trial only substantiates this finding. Of course, the Government takes the position that this finding does not mean that the list requirements were met at that time. Simply stated, if the Bemont transaction was a Son of Boss transaction and the Government received information contemplated by 26 U.S.C. § 6501(c)(10), then limitations as to Bemont has run.

As Plaintiffs point out, there have been eight discovery motions involving the Government as well as three discovery hearings. As noted previously, the Court has been under the distinct impression that the Government was not candid and consistently relied on hyper-technical positions in order to not cooperate in discovery. Although the Government had information relating to documents produced by Deutsche, no documents in the Government's possession were ever

produced to Plaintiffs despite their requests.

This Court's scheduling order specifically contemplated that the IRS would produce documents relevant to the defense of limitations. Two requests for production directed to the IRS on this issue failed to turn up information which Plaintiffs' counsel subsequently received from Deutsche. Two 30(b)(6) witnesses also could not testify as to 2005 materials. Evidently, the relevant documents were obtained by another office within the IRS.

As the Court remembers the testimony presented at trial, Plaintiffs obtained the documents from Deutsche. Despite this, the Government objected to the introduction of documents which it had clearly received but never produced. In at least two hearings, the Government's counsel represented to the Court that the Government had not received information prior to 2007 which identified any of Plaintiffs' participation in swap transactions.

The IRS has rules, but so does the Court. After much discussion during a May 28, 2008 hearing, the Court asked prior Government counsel Jacobus whether the IRS had any lists as to Plaintiffs dealing with currency swaps prior to the lists received from Deutsche and verified under the penalties of perjury by the IRS affiant. Jacobus stated that he was not aware of any. *See* Dkt. 79 at 78-79. Jacobus went on to state that he went to the IRS and told the IRS what to look for. He stated that he made it very clear to the IRS that, if any list identifying one of Plaintiffs' counsel's clients was produced before 2007, he would have to know that information. Jacobus further went on and stated had such information turned up, the Government would have likely conceded the statute of limitations. "We would have just walked away and said looks like the statute ran. Well,

40

no such information turned up." *Id.* at 79.

The Court relied on this representation in ordering Plaintiffs' counsel to go issue a subpoena. In effect, regrettable knowing what the Court has learned from this case, the Court was requiring Plaintiffs' counsel to do what the IRS should have done long ago in the proceedings. The Court was simply misled by the Government's hyper-technical position. This is not to say that Jacobus didn't make a good faith effort, but only to say that the IRS was running the show, not the lawyers.

Exit Jacobus and enter new counsel for the Government, Adams. Again at hearing in September 2009, the Government, through its attorney Adams, represented that the only lists as Plaintiffs were those submitted in 2007 by Deutsche. *See* Dkt. 135 at 21. Two affidavits were filed with the Court confirming this position.

Throughout this process, the IRS has tried to inform the Court as to the rules that should apply from its perspective. Frequently, the Government has asserted claims of privilege as to information related to the taxpayers which do not make sense. The Court notes that for the purposes of Rule 37, an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose. *See* FED. R. CIV. P. 37. The Court finds that, not only has the Government submitted evasive answers to legitimate discovery, it has failed to produce information which was within its control, *i.e.*, the information from Deutsche received in 2005. This caused Plaintiffs to incur additional expense and time to find out what the Government knew about all along. Had the information been timely produced by the Government, maybe, as Mr. Jacobus stated, the limitation issue as to 2001 would have been resolved. At least Plaintiffs would have been able to do some

meaningful discovery from someone at the IRS who had some clue as to what was going on.

After conducting a post-trial hearing on Plaintiffs' Re-Urged Motion to Deem Facts Established Under Federal R. Civ. P. 37 (Dkt. 260), however, the Court believes that its finding that the statute has run renders Plaintiffs' request for sanctions MOOT. This is not to say that the Court condones conduct of Government's counsel and its client in this matter. The Court specifically finds that the Government was not candid with the Court or opposing counsel.

There was a list provided to the IRS in May 2005 which forecloses an assessment for the 2001 tax year. This list sufficiently identified Plaintiffs for purposes of 26 U.S.C. § 6501(c)(10), but the IRS waited almost two years before it requested a another list. This was improper. Further, based on all the evidence in this case, the Court concludes that the IRS had notice of BPB and BM's participation in the digital options early on but decided not to pursue these transactions because there were other shelters which it wanted to pursue first. Relying on what it felt was an interminable extension of the statute, the IRS waited for some period of time before looking at the digital options which had been produced in 2005 pursuant to its authority to require Deutsche to maintain a list regarding potentially abusive tax shelters. It simply did not act, and the game clock ran down.

IT IS THEREFORE ORDERED that the Government have judgment on all issues except as to the 2001 tax year for Bemont which the Court decides in the favor of Plaintiffs for the reasons stated herein.

**SO ORDERED.**

**SIGNED this 2nd day of August, 2010.**

42

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE