**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SAMUEL G. BREITLING AND** | § | |
| **JO ANN BREITLING,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:14-cv-3322-M** |
| | § | |
| **LNV CORPORATION, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

---

**PLAINTIFF'S RESPONSE TO LNV AND MGC'S OBJECTION TO REQUEST FOR INJUCTIVE RELIEF**

**\*\*\*\* URGENT \*\*\*\***

---

Now come Plaintiffs, pro-se, and respond in opposition to LNV Corporation's ("LNV") and MGC Mortgage, Inc.'s ("MGC") (collectively, the "Beal Defendants") Response in Opposition to Request for Injunctive Relief ("Beal Defendants Opposition to Injunctive Relief"), and respectively show the Court as follows:

The Beal Defendants' seek to evict us from our property located as 1704 Cornwall Lane, Sachse, Texas 75048 ("Plaintiffs' Property") based on their blatant and consistent violations of Texas law, including Texas penal code; and based on a court order they obtained through the use of fraud upon the court and the use of forged and falsified deed assignments and other mortgage related documents; as well as the possible bribing of a judge.

The Beal Defendants claim "this Court is precluded from granting the requested injunctive relief pursuant to the Younger abstention doctrine and the Anti-Injunction Act, both of

which prohibit federal courts from enjoining ongoing state court proceedings." However neither

the Younger abstention doctrine nor the Anti-Injunction Act applies to the present case.

### Younger Abstention Doctrine Not Applicable

Younger abstention doctrine applies primarily to criminal cases. The doctrine has been

extended to State civil proceedings in aid of and closely related to state criminal statutes,

(*Huffman v. Pursue, Ltd., 420 U.S. 592, 43 L.Ed.2d 482, 95 S.Ct. 1200 (1975)*); administrative

proceedings initiated by a State agency, (*Ohio Civil Rights Comm'n v. Dayton Christian Sch.,

Inc., 477 U.S. 619, 627 n.2, 91 L. Ed. 2d 512, 106 S. Ct. 2718 (1986)*)); or situations where the

State has jailed a person for contempt of court. (*Judice v. Vail, 430 U.S. 327 (1977)*). The

doctrine applies even where the state does not bring an action until after the person has filed a

lawsuit in federal court, provided that the federal court has not yet undergone proceedings of

substance on the merits of the federal suit. (*Hicks v. Miranda, 422 U.S. 332, 45 L.Ed.2d 223, 95

S.Ct. 2281 (1975)*)

Accordingly the types of cases where the Younger abstention doctrine typically apply are

brought on by a State or a State agency as the plaintiff; or when the State or a State agency is a

party to the case. The State of Texas is not a party to the present case.

From *"Our Federalism" - The Younger Abstention Doctrine*, by Beth Shankle Anderson,

*The Florida Bar Journal, November, 2007 Volume 81, No. 10, page 8*:

> The Younger abstention doctrine has its roots in the concept of "Our Federalism" which
> grew out of the case of *Younger v. Harris, 401 U.S. 37 (1971)*. This doctrine instructs
> federal courts to refrain from hearing constitutional challenges to state action when federal
> action would be regarded as an improper intrusion on the state's authority to enforce its
> laws in its own courts. (*Younger, 401 U.S. at 44*) The abstention doctrine derives from the

longstanding concepts of comity and federalism. The coexistence of state and federal powers embodies a system in which there must be respect by both sovereigns to protect the other's legitimate interests. (*Id. at 44-45*) Justice Black emphasized that while the federal government may be anxious to protect federal rights and interests, it must "always endeavor to do so in ways that will not unduly interfere with the legitimate activities of the [s]tates." (*Id. at 44*) This gave rise to the concept of "Our Federalism" which, the Supreme Court explained, "does not mean blind deference to '[s]tates' [r]ights,' anymore than it means centralization of control over every important issue in our [n]ational [g]overnment and its courts." (*Id. at 39*)

In Younger, Harris, an advocate for communism, was indicted in a California state court and charged with violation of the California Criminal Syndicalism Act. He filed a complaint in the district court seeking an order to enjoin Younger, the district attorney, from prosecuting him any further under the California statute. Harris alleged that the statute violated his right to free speech and press as guaranteed under the First and 14th amendments. (*Id.*) The district court agreed, and held that the California Criminal Syndicalism Act was "void for vagueness and overbredth in violation of the First and [14]th [a]mendments."(*Id. at 40*) The court issued an injunction restraining Younger from further prosecuting Harris under the act. (*Id. at 43*) Younger then appealed the decision to the U.S. Supreme Court.

The U.S. Supreme Court, in an opinion delivered by Justice Black, reversed the decision of the district court and held that the federal relief sought by Harris was barred because of the "**fundamental policy against federal intervention with state criminal proceedings**." The Court noted that Congress, since its early beginnings, had emphasized the importance of deference to state court proceedings, leaving them free from federal court interference, specifically citing the "Anti-Injunction Act." (*Id. at 46*) Justice Black maintained that the primary sources for prohibiting federal intervention in state prosecutions were readily apparent in the "basic doctrine of equity jurisdiction" and comity, both of which comprise the notions found in "Our Federalism."

The Younger abstention doctrine derived from these longstanding concepts of comity and federalism, which are unique to this country. This foundation creates a federal judiciary without blind deference to the states or centralized control over each and every national issue. Younger abstention is distinguished from other abstention doctrines because it is based on considerations of comity and equity jurisprudence. A court sitting in equity should not interfere with the ongoing proceedings of state criminal prosecutions. (*Id. at 55-56*) The Younger court expressly noted that its decision was based on notions of comity and "Our Federalism," not the Anti-Injunction Act. (*Id. at 54 (noting the Court had "no occasion to consider" whether the Anti-Injunction Act applies to the instant case)*)

### Exceptions to the Younger Abstention Doctrine

Younger implied that a federal court may act to enjoin a state court proceeding when certain extraordinary circumstances exist that involve traditional considerations of equity jurisprudence. (*Id. at 53-54.*) Although these exceptions are implicit in Younger, many scholars argue that these exceptions are virtually nonexistent in their application. (William J. Brennan, Jr., _State Constitutions and the Protection of Individual Rights_, *90 **Harv. L. Rev.** 489, 498 (1977)* (concluding that showings of extraordinary circumstances under the

exceptions are "probably impossible to make"); Brian Stagner, *Avoiding Abstention: The Younger Exceptions*, 29 **Tex. Tech. L. Rev**. 137, 141 (1998) (describing the *Younger* exceptions as an "escape hatch that rarely opens")) These three principal exceptions include bad faith and harassment, patently unconstitutional statutes, and the lack of an adequate state forum. (*Younger*, 401 U.S. at 53-54.)

Perhaps the Beal Defendant's and the growing list of attorneys representing them misconstrue the principles inherent in the Younger abstention doctrine to be indicative that it applies to the present case before this court, but they are incorrect in their assessment because in the present case they are attempting to circumvent the jurisdiction of this Court and the State District Court by seeking jurisdiction in a Texas Justice of the Peace Court for an eviction when the present case raises questions pertaining to title and to whether or not the court order granting a summary judgment to LNV in a foreclosure is void thereby making the sale of our property void. Our complaint against the Defendants was originally filed in the Texas District Court where jurisdiction is proper, and then removed to this Honorable Federal District court by the Beal Defendants. Texas law is clear, the justice court lacks jurisdiction in this case.

The jurisdiction of the State district court pre-empts the justice court on issues of possession when questions of title and possession are so integrally linked or intertwined that possession may not be determined without first determining title. In such cases the justice court is deprived of jurisdiction. *Mitchell v. Armstrong Capital Corp., 911 S.W.2d 169, 171 (Tex. App-Houston (1st Dist.) 1995,, writ denied); Merit Management Partners I, L.P. v. Noelke, 266 S.W. 3d 637,650 (Tex. App, Austin, 2008, no pet.)* Texas government code provides that a county court does not have jurisdiction in "a suit for the recovery of land." *Tex. Gov't Code Ann. § 26.043(8) (West 2004);* see also *Doggett v. Nitschke, 498 S.W.2d 339, 339 (Tex. 1973)* ("A county court does not have jurisdiction to try questions of title to land.")

In the present case injunctive relief is not being sought against the State, but against private parties bent on violating State law and on depriving us of our property and our liberty to enjoy our property without due process in violation of our constitutional rights under the Fifth and Fourteenth Amendments. Injunctive relief is being sought to prevent the Beal Defendants from illegally and wrongfully evicting us from our property until the State Court can hear our claims pertaining to title on the merits of the case.

No matter who wins in the JP Court, the case will be appealed. Beal and his Beal Defendants have nearly infinite financial resources, whereas we do not. Beal has now hired four different law firms to act in his behalf against us. Litigating self-represented in yet another court will cause us severe hardship and will result in the epitome of injustice as it would allow the Beal Defendants to use their ill-gotten wealth to further exploit our vulnerability and to confusticate the judicial process.

We paid $22 to request a jury trial.  It will cost us at least $200 to pay for copies to distribute to the court and to the jurors. More importantly, it will take hours of time to prepare for a hearing and a ultimate appeal in the county court; and this preparation will distract us from preparing for the case at hand; and the added stress of this hardship burden will undoubtedly affect our health further jeopardizing our ability to defend ourselves without counsel which is most certainly the intent of the Beal Defendants.

The Younger Court established some exceptions to its broad policy of nonintervention. When state court criminal prosecutions are brought in bad faith or for the purpose of harassment (such as repeated prosecutions without any hope of ultimately securing a conviction), federal equitable principles justify intervention. See id. at 48-49; _Perez v. Ledesma, 401 U.S. 82, 85 (1971)._

The present case does not involve a criminal prosecution, but for the sake of assuming that the Younger doctrine could in some way apply here, the correlation would be that the Beal Defendants have brought in bad faith and for the purpose of harassment this new eviction action in the justice court; when they fully know we have challenged their claim of title in the State district court, which they then removed to this Honorable federal court; and they fully know that our complaint specific to title has not yet been adjudicated. Attorneys for the Beal Defendants know, or should know, that the justice court lacks jurisdiction to evict us; however Beal's money seems to convince many individuals to do things they know they shouldn't do.

We are terrified that we will receive in the justice court a repeat of what happened in Defendant Tillery's court. To quote from an article titled "Ethics issues arise in rulings by justice of the peace" by Lise Olsen published by the Houston Chronicle:

> "Elected Justice of the Peace Hilary Harmon Green repeatedly ordered the eviction of tenants and relatives on behalf of a five-time felon even though she and her husband, City Controller Ron Green, both had financial and personal ties to the home builder... Their contract with Jordon helped the Greens land a $508,000 mortgage, though their house had an assessed value in 2008 of only one third that amount, according to Harris County tax records…. Ethically, Hilary Green should have recused herself on legal cases involving Jordon because of her other associations with him, said Lillian Hardwick, an Austin attorney and expert in judicial conduct who co-authored the authoritative Handbook of Texas Lawyer and Judicial Ethics….Green's most unusual ruling favored Jordon in a family dispute over the ownership of his grandfather's house in 2009….Despite disputes over the ownership of the house and the authenticity of documents, Green ruled for Dwayne Jordon and later denied his uncle permission to re-enter the house to collect his personal property, court records show." (See **Exhibit A** for a copy of the full article.)

A State integrity investigation ranked Texas as at high risk for corruption; it received n overall score of D+. An article published by KERA News titled "Investigation Finds Texas At Risk For Corruption" states:

"Texas ranks in the bottom half of all states for being vulnerable to corruption. That's one of the findings in the extensive State Integrity Investigation which looks at how accountable state governments are to their citizens....Texas also gets low marks for having no limits on how much individuals, lobbyists or political action committees can contribute to campaigns...That's been a source for what you might even call corruption in the state over the years…Texas is by far the largest and wealthiest state that moves hundreds of millions of dollars of political money through the system with no limits. It really skews who is active in Texas politics...." (See **Exhibit B** for the full article.)

A source quoted in another article included in Exhibit B titled "Texas gets near-failing grade for corruption risk" by Emily Wilkins says:

"We were closer to flunking the survey than we might think, noting that the judicial accountability score might have been lower than the C grade Texas received [for judicial accountability] if it was taken into account that Texas judges are allowed to take campaign contributions from lawyers and other special interest groups….We are one of the few states that have no limits on what a lobbyist can give, what a PAC or individual can give – that really pulls down our score and results in Texas being run like it's an oligarchy..."

Individuals with excessive wealth like D. Andrew Beal are used to getting their own way and having the privileges of an oligarch who imposes his will onto others who are more vulnerable that himself; and without regard for the law. We have been outspoken about his Beal Defendants' corrupt business practices since 2008 and he is retaliating against us for this because government authorities and the media are finally investigating. He is driven to take our home from us regardless of whether or not he has a legal right to do so and to cause us as much pain as possible to set an example and make other victims fearful of speaking out about his activities.

Beal and his Beal Defendants removed our case to federal court in hopes of getting a "more favorable" judge (as per Document 52, Exhibit A, starting on page 17, and Exhibit B, starting on page 37) when this didn't not get the results he wanted he has shopped for yet another judge who might be more easily deceived or persuaded (perhaps with a bribe) to give him what

he wants.  This is tyranny; and as the guardian of our great Constitution this court has an obligation to put a stop to it.

One of the exceptions established by the Younger Court to its broad policy of nonintervention is patently unconstitutional statutes, (*Younger*, 401 U.S. at 53-54.) The present case has nothing to do with unconstitutional statutes; however we have been denied our constitutional rights under the Fifth and Fourteenth Amendments to due process and equal protection of the law.  These deprivations have not occurred at the hands of the State but at the hands of the Defendants.

Another exception established by the Younger Court is the lack of an adequate state forum. (*Younger*, 401 U.S. at 53-54.) Although in the present case a lack of an adequate state forum does not exist, there does exist an intentional interference by the Beal Defendants to thwart and convolute that state forum so as to prevent justice and abuse the judicial process.

Younger Court acknowledged that federal equitable principles justify intervention. (See id. at 48-49; *Perez v. Ledesma, 401 U.S. 82, 85 (1971)*). Equitable principles justify intervention in the present case.

As for the Younger Court's exception in the case where actions are brought in bad faith or for the purpose of harassment: Factors for determining whether prosecution was brought in bad faith or to harass include: (1) whether it was frivolous or undertaken with no objective hope of success; (2) whether it was motivated by the defendant's suspect class, or in retaliation for the exercise of constitutional rights; and (3) whether it was conducted in a manner to harass or to constitute an abuse of prosecutorial discretion, typically through unjustified and **oppressive use**

**of multiple prosecutions**). See _Kern v. Clark, 331 F.3d 9, 12-13 (2d Cir. 2003)_ (district court committed error in resolving factual disputes regarding bad faith exception to Younger without conducting an evidentiary hearing). [Note so far we have had no evidentiary hearing in the present case. And although the actions in the present case are not prosecutions, the Beal Defendants are bringing multiple actions in different courts, while the present case specific to whether they have title is still pending.]

The three principal exceptions to the Younger abstention doctrine include bad faith and harassment, patently unconstitutional statutes, and the lack of an adequate state forum. (_Younger_, 401 U.S. at 53-54.)  The first of these exceptions, bad faith and harassment, would most certainly apply to the present case before this court.

The Beal Defendants have consistently acted in bad faith with us, with the State court, with this federal district court and now with the county justice court. They are harassing us with an onslaught of simultaneous legal actions in multiple courts. Additionally the Beal Defendants have demonstrated a similar pattern of abuse of judicial process, bad faith and harassment in numerous other cases against other homeowner victims.

The Beal Defendants and their attorneys and agents willfully violated the automatic stay provided by Texas Rules of Civil Procedure 736.11 by selling our property to Defendant LNV on September 2, 2104. The Beal Defendants were properly informed of the automatic stay effective under Texas Rules of Civil Procedure 736.11 (See **Exhibit C** – Fax of Notice of Automatic Stay of Sale of Property sent to multiple Beal Defendant Employees and agents.) The illegal sale of our property is captured on video.

Additionally the Beal Defendants foreclosed on our property using robosigned, forged and otherwise falsified mortgage and foreclosure related documents; and they have done so, or are attempting to do so, in numerous other cases across the country and in Texas.

As per Texas Attorney General Greg Abbott if affidavits and other documents, such as deeds of trust and appointments of substitute trustees were prepared by employees referred to as "robosigners" who signed thousands of documents a month without reading them; who signed affidavits which falsely claim personal knowledge of facts and which falsely claim the affiant reviewed the attached documents; who notarized documents prior to the signer signing or when the signer was not present before the notary; and who filed affidavits with records attached that do not correctly reflect loan payments, charges and advances; and such documents:

> "were utilized in establishing MGC Mortgage Inc.'s authority to conduct the sale or obtain a court order for a sale, such use would have been in violation of <u>Section 17.46(a)</u> of the <u>Texas Deceptive Trade Practices Act</u>; Section 392.304, Texas Debt Collection Practices Act; <u>Section 37.02, Texas Penal Code</u>; Section 12.001, Texas Property Code; Section 406.009, Texas Government Code; Texas Constitution Article 16, **Section 50; and/or Rule 736(1), Texas Rules of Civil Procedure**, and the document and **therefore the foreclosure sale would have been invalid**." (See **Exhibit D** – Letter from Texas Attorney General Greg Abbott mailed to Beal's MGC.)

The State's interests in upholding its own laws are not thwarted by this Honorable federal court intervening at this point and granting us injunctive relief to prevent irreparable harm until the present case can be heard by the State court on its merits.

## ANTI-INJUNCTION ACT NOT APPLICABLE

The federal Anti-Injunction Act, (28 U.S.C. Sec. 2283) states:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

In the present case we are not asking this court to stay proceedings in a State court, but to restrict the Beal Defendants from seeking jurisdiction for eviction in a county court when Texas statues state that jurisdiction rests with the State district court, and not the county justice court for matters specific to title. The Honorable Magistrate Judge David L. Horan has already recommended that the case be remanded to State court. We are requesting injunctive relief to prevent the Beal Defendants from by-passing the State district court and adjudication on the merits of our case.

Preliminary injunctions decisions are based on a four-factor test: 1) likelihood of success on the merits; 2) potential irreparable harm; and two optional factors 3) balance of the equities and 4) public interest. A preliminary injunction (PI) will only issue when the first two elements are demonstrated by the party requesting PI relief and the combined result of all four elements/factors weighs in favor of a PI.

## LIKELIHOOD OF PREVAILING ON THE MERITS

The Beal Defendants violated Texas Rules of Civil Procedure to obtain a court order to sell our home.

### Violation 1

Rule 736 requires the party seeking to foreclose an equity lien to file a **verified** application in the district court of the county where all or part of the property is located. The rule also includes a list of items which **shall** be included in the application. The lender must serve the application **and** notice on each party who is "obligated to pay the debt" by certified **and** first class mail.

The Beal Defendants did not file the required verified application that included the list of items required in the application in the district court of the county where our property is located as required by Rule 736.

## <u>Violation 2</u>

We never received a valid default notice. The only one sent was in Jan 2013, and Scott Hayes, counsel for MGC in case # DC-1107087 in the 116th Dallas district court told my attorney at the time Patricia McCartney that this was sent in error.

No notice of intent to accelerate was ever sent; and they generated the notice of acceleration the same day they filed their "in Rem" Foreclosure Complaint in the 134th Dallas district court and we didn't receive it until at least a week later.

Before foreclosing a lien against realestate, the debt secured by the real estate must have matured. With consumer loans, this usually occurs through acceleration of the loan after a default in payment. Failing to properly accelerate the debt is probably the most common foreclosure defeat and serve to void a foreclosure sale.

The Texas Supreme Court requires the mortgagee to give clear and unequivocal notice of its intent to accelerate to the extent that the "mortgagee must bring home to the [mortgager] that failure to cure will result in acceleration of the note and foreclosure under the power of the sale." (<u>*Ogden v. Gibraltar Sav. Ass'n.,*</u> *640 S.W.2nd 232, 233 (Tex. 1982)*)

**Violation 3**

In addition to the FNMA requirement that the borrower be provided 30 days right-to-cure a

default, the Fair Debt Collection Practices Act [15 U.S.C.  1692 – 16920] ("FDCPA") required

that a debt collector provide the borrower 30 days in which to request verification of the debt.


We in fact did write to the debt collector, Defendant Codilis & Stawiarski ("C&S") and

requested validation of the debt. No validation of the debt was ever done and Defendant C&S

failed to respond as required by the FDCPA.


**Violation 4**

Texas Rule 736.1 states:

> "(a) Where Filed. An application for an expedited order allowing the foreclosure of a lien
> listed in Rule 735 to proceed must be filed in a county where all or part of the real property
> encumbered by the loan agreement, contract, or lien sought to be foreclosed is located or in
> a probate court with jurisdiction over proceedings involving the property.

> (b) Style. An application must be styled "In re: Order for Foreclosure Concerning [state:
> property's mailing address] under Tex. R. Civ. P. 736.

> (c) When Filed. An application may not be filed until the opportunity to cure has expired
> under applicable law and the loan agreement, contract, or lien sought to be foreclosed.

> (d) Contents. The application must:

> (1) Identify by name and last known address each of the following parties:

> (i) for a home equity loan, reverse mortgage, or home equity line of credit, each
> person obligated to pay the loan agreement, contract, or lien sought to be
> foreclosed and each mortgagor, if any, of the loan agreement, contract, or lien
> sought to be foreclosed;

> (ii) for a tax lien transfer or property tax loan, each person obligated to pay the
> loan agreement, contract, or lien sought to be foreclosed, each mortgagor, if any,
> of the loan agreement, contract, or lien sought to be foreclosed, each owner of the
> property, and the holder of any recorded preexisting first lien secured by the
> property;

> (iii) for a property owners' association assessment, each person obligated to pay the
> loan agreement, contract, or lien sought to be foreclosed who has a current
> ownership interest in the property.

(2) Identify the property encumbered by the loan agreement, contract, or lien sought to be foreclosed by its commonly known street address and legal description.

(3) Describe or state:

(A) the type of lien listed in Rule 735 sought to be foreclosed and its constitutional or statutory reference;

(B) the authority of the party seeking foreclosure, whether as the servicer, beneficiary, lender, investor, property owners' association, or other person with authority to prosecute the foreclosure;

(C) each person obligated to pay the loan agreement, contract, or lien sought to be foreclosed;

(D) each mortgagor, if any, of the loan agreement, contract, or lien sought to be foreclosed who is not a maker or assumer of the underlying debt;

(E) as of a date that is not more than sixty days prior to the date the application is filed:

(i) if the default is monetary, the number of unpaid scheduled payments,

(ii) if the default is monetary, the amount required to cure the default,

(iii) if the default is non–monetary, the facts creating the default, and

(iv) if applicable, the total amount required to pay off the loan agreement, contract, or lien;

(F) that the requisite notice or notices to cure the default has or have been mailed to each person as required under applicable law and the loan agreement, contract, or lien sought to be foreclosed and that the opportunity to cure has expired; and

(G) that before the application was filed, any other action required under applicable law and the loan agreement, contract, or lien sought to be foreclosed was performed.

(4) For a tax lien transfer or property tax loan, state all allegations required to be contained in the application in accordance with section 32.06(c–1)(1) of the Tax Code.

(5) Conspicuously state:

(A) that legal action is not being sought against the occupant of the property unless the occupant is also named as a respondent in the application; and

(B) that if the petitioner obtains a court order, the petitioner will proceed With a foreclosure of the property in accordance with applicable law and the terms of the loan agreement, contract, or lien sought to be foreclosed.

(6) Include an affidavit of material facts in accordance with Rule l66a(f) signed by the petitioner or the servicer describing the basis for foreclosure and, depending on the type of lien sought to be foreclosed, attach a legible copy of:

(A) the note, original recorded lien, or pertinent part of a property owners' association declaration or dedicatory instrument establishing the lien, and current assignment of the lien, if assigned;

(B) each notice required to be mailed to any person under applicable law and the loan agreement, contract, or lien sought to be foreclosed before the application was filed and proof of mailing of each notice; and

(C) for a tax lien transfer or property tax loan:

(i) the property owner's sworn document required under section 32.06(a–1) of the Tax Code; and

(ii) the taxing authority's certified statement attesting to the transfer of the lien, required under section 32.06(b) of the Tax Code."

No such application was ever filed by the Beal Defendants. None of the items that MUST be included in the application under Texas Rule 736 for a non-judicial foreclosure were included in any pleading that might be construed as an application under Texas Rule 736.1.

**Violation 5**

In the Joint Status report filed on October 21, 2014 [Document 32, page 8] counsel for the Beal Defendants state: "On September 2, 2014, the Property was sold to LNV at a **non-judicial** foreclosure sale for $149,400.54."

Further evidence that the Beal Defendants moved forward with a non-judicial foreclosure when they failed to comply with Texas Rule of Civil Procedure 736.1 is that the Beal Defendants filed a notice of substitution of trustee in the county recorder's office, on September 8, 2014 which they attached to their Sworn Complaint for Forcible Detainer filed in the Justice of the Peace Court of Dallas County, Texas and which they also attached to their Response in Opposition to Request for Injunctive Relief [Document 57-2 PageID 950] filed in this court. The substitution of Trustee was from Michael L. Riddle to Shelley Ortolani. (See **Exhibit G**)

A trustee performs the sale only in non-judicial foreclosures. Quoting from "Texas Rule 736

Foreclosure – Judicial?" by Mary Doggett:

> "There is a common misconception in Texas as to what exactly is a foreclosure procedure pursuant to Rule 736 of the Texas Rules of Civil Procedure....In a judicial foreclosure one would file a suit and get a judgment; the court would order the lien foreclosed, issue the order of sale, and have an officer of the court conduct the sale.

> In a 736 foreclosure, on the other hand, the court's actions are more ministerial. Before the court proceeding, the lienholder starts the nonjudicial process by sending default notices and accelerating the debt. Only then does he file an application for an order (as opposed to a suit) in court. Additional parties and claims are not permitted: the only issue for the court to determine is whether the lienholder complied with the conditions precedent to foreclosing the lien. In fact, if the debtor raises any other issues, the court is essentially supposed to dismiss the 736 application. If the court agrees that the lienholder's application is sufficient, the court issues an order that says, "yes, you've done all the steps precedent to a nonjudicial foreclosure; you may now foreclose." It is then the lienholder (through a trustee) who conducts the sale, not an officer of the court. (See **Exhibit E** for the full article.)

When Texas first allowed Texas Home Equity Loans in 1998 it was with the expressed stipulation that the property could only be foreclosed upon through a judicial foreclosure. Every attorney we have every spoken with has told us that a non-judicial foreclosure is not permitted with a Texas Home Equity Loan like we had and that we would always have our day in court.

During the 40 months of prior litigation where we were the plaintiffs and Defendant MGC in the present case was the defendant they could have counter-sued or initiated a foreclosure but they never did; in fact foreclosure was never mentioned because they were never able to produce documents that our attorneys had requested to verify that they were the holder of the note and deed of trust.

## Violation 6

The Beal Defendants were required by 51.002 (b) to disclose the name and address of the

substitute trustee and they did not.

## Violation 7

Texas Rules of Civil Procedure 736.11: Automatic Stay and Dismissal if Independent Suit Filed

states:

(a) A proceeding or order under this rule is automatically stayed if a respondent files a separate, original proceeding in a court of competent jurisdiction that puts in issue any matter related to the origination, servicing, or enforcement of the loan agreement, contract, or lien sought to be foreclosed prior to 5:00 p.m. on the Monday before the scheduled foreclosure sale.

(b) Respondent must give prompt notice of the filing of the suit to petitioner or petitioner's attorney and the foreclosure trustee or substitute trustee by any reasonable means necessary to stop the scheduled foreclosure sale.

(c) Within ten days of filing suit, the respondent must file a motion and proposed order to dismiss or vacate with the clerk of the court in which the application was filed giving notice that respondent has filed an original proceeding contesting the right to foreclose in a court of competent jurisdiction. If no order has been signed, the court must dismiss a pending proceeding. If an order has been signed, the court must vacate the Rule 736 order.

(d) If the automatic stay under this rule is in effect, any foreclosure sale of the property is void. Within 10 business days of notice that the foreclosure sale was void, the trustee or substitute trustee must return to the buyer of the foreclosed property the purchase price paid by the buyer.

(e) The court may enforce the Rule 736 process under chapters 9 and 10 of the Civil Practices and Remedies Code.

The trustee sale was scheduled for Tuesday September 2, 2014. We filed our separate, original

proceeding in the Dallas District court on Friday August 29, 2014. Our complaint is specific to

issues related to the origination, servicing, or enforcement of the loan agreement, contract, or lien

sought to be foreclosed.

The Beal Defendants were notified as per <u>Texas Rules of Civil Procedure 736.11</u> of our separate, original complaint against them and of the automatic stay, but they chose to ignore it proceed with the sale of our property illegally. (See **Exhibit C**).  This fax, as well as emails were sent to the following individuals: David Allison, executive officer with Defendant DMI; William Mynat president of Defendant DMI, Ed Szarkowicz, attorney with Defendant DMI, Scott Rosenblum, director of Defendant DMI; Bret Malloney employed by Defendant MGC and Beal Bank; Grant Hamilton, attorney for Defendant MGC; Mr. Carl Frischling and Mr. Ezra G Levin senior partners at Kramer Levin Naftalis & Frankel LLP where Mr. Rosenblum is employed; Mary M. Speidel, Jeffrey Ben Hardaway, Leo C. Stawiarski Jr., Ernest John 'Ernie' Codilis Jr., all attorneys with Defendant C&S; and several employees of Beal Bank.

I, JoAnn Breitling, personally phoned and spoke with David Allison and Grant Hamiton on the day of the sale to inform them that we had filed an independent lawsuit against the Beal Defendants and that an automatic stay of the sale was in place under <u>Texas Rules of Civil Procedure 736.11.</u>

## Specific issues with Origination that Render the Mortgage Contract Void or Voidable

Our signatures were forged on several documents by the broker during underwriting without our knowledge or permission. (See **Exhibit F** – Forged signatures at origination.) These documents also evidence the fact that we were never given proper legal disclosures under the Truth in Lending Act ("TILA"). This fact was judicially determined by Judge Tanya Parker in the 116th Dallas District court, case # DC-11-07087.

An assignment of deed of trust filed with our county by Defendant MGC shows a "Subsequent Recording" as being "Assigned to Aames Capital Corporation" and "Assigned to Banker Trust of California, N.A. in Trust for the benefit of the holders of Aames Mortgage Trust 2000-2 Mortgage Pass – Through Certificates, Series 2000-2, C/O Countrywide Home Loans SV-79, 1800 Tapo Canyon Road Simi Valley, CA 93065, on September 6, 2001, Instrument No 1520053, here in"

This in indicative of fraud in the factum at origination as the party identified as the "lender" on our origination mortgage documents was not a true lender but a "straw lender" standing in for parties intentionally not disclosed to us, but known to the "straw lender" i.e. parties to the Aames Mortgage Trust 2000-2 Mortgage Pass – Through Certificates, Series 2000-2 Trust. This intentional omission of material fact prevented us from any opportunity to understand the risks and obligations of the mortgage contract. This constitutes fraud in the factum and voids the contract.

**Forged, Robosigned and Falsified Assignments of Deed of Trust**

Even if the mortgage contract were enforceable, which it is not, the Beal Defendants have used forged, robosigned and falsified assignments of deed of trust, allonges and affidavits to convey what claim is beneficial interest in the mortgage (the note and the deed of trust) to Defendant LNV.

In addition to the letter from Texas Attorney General Greg Abbott to Beal Defendant MGC which unequivocally states that court orders and foreclosure sales are invalid if they are obtained through the use of robosigned and falsified assignments of deed of trust, allonges and affidavits;

and that this also violates a host of Texas laws, including penal code. (This letter proves that the Beal Defendants were warned and intentionally chose to violate the laws of Texas, and similar laws in other States, to continue to perfect foreclosures with such illegal methods.) This evidence makes intent to defraud by the Beal Defendants conclusive.

Fraud on the court occurs when the judicial machinery itself has been tainted, such as when an attorney, who is an officer of the court, is involved in the perpetration of a fraud or makes material misrepresentations to the court. Fraud upon the court makes void the orders and judgments of that court.

In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

What has been presented herein and in our other pleadings are only a fraction of the evidence we have to show that Defendant LNV is not the holder of the mortgage.

A recent Texas Supreme Court decision in Fourteenth Court of Appeals, case No: 14-13-00932-CV; Yarbourgh v. Household Finance Corporation III on appeal from the County Court at Law No. 2 Galveston County Texas states:

"In an issue of first impression, we must decide whether an affirmative defense of forgery, supported by an affidavit alleging that the defendants' signatures on a deed of trust were forged, raises a genuine issue of title intertwined with the issue of possession sufficient to deprive a justice court of jurisdiction in a forcible detainer action. We hold that it does. The courts below

lacked jurisdiction in this forcible detainer action because determining the right to possession necessarily required the resolution of a title dispute." (See **Exhibit I** for the full opinion)


### Specific issues with Mortgage Servicing that render the Mortgage Unenforceable


In the Joint Status report filed on October 21, 2014 [Document 32, page 8] counsel for the Beal

Defendants also state:

> "MGC is the master servicer of the Loan on behalf of LNV, and DMI has been the authorized sub-servicer of the Loan since April 2010."

The Texas Department of Savings and Mortgage Lending say that Defendant MGC is not

licensed as a mortgage servicer in Texas; they operate under Beal Bank's license. Defendant

DMI is licensed as a mortgage servicer in Texas; however mortgage sub-servicing is not a valid

mortgage servicing activity.


In our prior 40 months of litigation with Beal Defendant MGC they were unable to produce a

payoff balance or a payment history.


In June 2008 we were approved for a refinance at a much better interest rate, but Beal Defendant

MGC failed to provide a payoff balance; eventually the offer expired and we've been stuck with

MGC's shenanigans ever since. (See **Exhibit I** – Borrower Release documents, other documents

specific to our attempt to refinance in 2008 and various communications with MGC during this

time.)


Page one of Exhibit H is an expedited request for our pay off balance dated June 16, 2008.

Notice someone named L. Campbell wrote next to the Received stamp: "Not in system."

Page two of **Exhibit I** is another request for pay off sent to MGC by Beneficial the lender who we had the refinance offer with dated July 3, 2008. Again an MGC employee wrote that our loan was not in their system.

Pages three and four of **Exhibit I** is a communication from MGC to Beneficial stated we had an incomplete authorization form.

Pages 5 through 7 of **Exhibit I** are another request, using MGC's forms for the pay-off dated July 14, 2008. We never got the pay off balance.

Also attached as **Exhibit J** are communications with attorneys representing MGC in our prior litigation. Page 1 in a letter from attorney Scott Hayes to my attorney at the time, Patricia McCarthy, evidencing the fact that he abated the case for sixty days; this was a delay tactic.

Page 2 of **Exhibit J** is a copy of a letter from Glenn Joyner a reverse mortgage consultant – we were again trying to refinance to get away from MGC and their horrific bad faith and servicing practices – to MGC attempting get a pay off (this attempt was also unsuccessful) however the letter states that Beal Defendant MGC told Mr. Joyner that Beal Defendant DMI was the new servicer for the loan but that DMI told him that "MGC did in fact still own the loan."

Pages 3 through 6 of **Exhibit J** are my first complaint letter to Attorney General Greg Abbott about Beal Defendant MGC dated in May 2009. I made two additional complaints in 2011 and 2013, but nothing to my knowledge was ever done to investigate. I have copies of numerous letters sent to Attorney General Greg Abbott about Beal Defendant MGC obtained through the Freedom of Information Act; they all say the same thing: MGC put them into a default by not

providing a place to make payments; and then prevented them from curing the default through several tactics including tacking on exorbitant fees, and then using that default to initiate foreclosure.

We have considerable additional evidence of foul play in the servicing of our loan by Beal Defendant MGC. They were given ample opportunity to cure the many instances of violation to Texas Constitution Article XVI, Section 50 and Texas Rules of Civil Proceedure 736(1) but consistently fail to do so and continue down a path of what can only be concluded are intentional violations.

Texas Constitution Article XVI, Section 50(i) states:

> "This subsection shall not affect or impair any right of the borrower to recover damages from the lender or assignee under applicable law for wrongful foreclosure."

## IRREPARABLE HARM IF INJUNCTIVE RELIEF NOT GRANTED

A wrongful eviction and the added stress of fighting yet another court battle in another court with the Beal Defendants will cause our family irreparable harm; it may cause the death of my husband. (See **Exhibit K** – Letter from Samuel Breitling's doctor and **Exhibit L** – Medical records for JoAnn and Matthew Breitling.)

## BALANCE OF THE EQUITIES

D. Andrew Beal is reported to purchase "distressed debt" for $0.04 on the dollar. He purchases pools of loans and then looks for the "kernels" whether or not they are valid debts or defaulted debts. Beal's MGC will cause a default if the homeowner is not in a default.

We have on the other hand invested heavily in our home over a thirty three year period of time.

## PUBLIC INTEREST

Public interest is best served when individuals like D. Andrew Beal and his Beal Defendants are held accountable for violating the law. Americans can have no confidence in our judiciary when wealthy billionaires get away with blatant violations of law to steal homes from seniors and hard working American through those violations.

## FEDERAL RULE 11

Federal rule 11 provides for sanctions on attorneys who violate professional code of conduct and abuse the judicial process.

_____          _____
JoAnn S Breitling                                          Samuel G. Breitling

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was

served upon all counsel of record and pro-se parties via the Court's CM/ECF system, regular

mail, and/or certified mail, return receipt requested n this 16th day of October 2014.


_____          _____

JoAnn S Breitling                                    Samuel G. Breitling